**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**(NORTHERN DIVISION)**

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

SEP 0 9 2021

TAMMY H. DOWNS, CLERK

By:_____
DEP CLERK

REBECCA ABBOTT, MEAGAN ALBERT, SOPHIA
ALFARO, KRYSTAL LEIGH ANDERSON,
MEGAN ASHLEY, KIMBERLY AZENETH AVILA,
ALYSSA MEGAN BARB, MIRIAH BARBERO,
LINDSAY BARR, GRISEL BARRETO, ASHLEY
BAXTER, JULIE BLAKELEY, KELSEY
BLANKENSHIP, MELISSA BLOOMQUIST-
SMITH, CRISTEN BOLES, OLIVIA BOYER,
CRYSTAL BRINIG, NICOLE BRISKY,
CHEYENNE BROWNING, CELIA BRUNO, ANA
BUTKUS, MARIA CALDERON, JORDAN
CANTAFIO, SERENITEY CARLIN, SAMANTHA
CLARK, VICTORIA COKER, JEN COMEAU,
KIMBERLY CONWAY, ADRIANNE COOPER,
ANGELA COX, BRANDY DAVIS, KALEY
DEFORD, CHELZY DESVIGNE, BRITTANY
DISTASO, JESSICA DURRETT, NATALYA
DZYUBA, THERESA MARIE FINTONIS, AYAME
TATIANA GALASSINI, MARCELA GARCÍA,
SHELBY GERACI, CHRISTINA GORDON,
GABRIELLE HARRISON, DEBBIE HAWKINS,
SHANNON HERRINGTON, AMANDA HILL,
LILLIAN HINKLE, NICOLE HOLLING, AMANDA
HOBBS-ROGERS, SAMMI HOBDY, SHAYLAN
ISAACS, OLIVIA JOHNSON, REBECCA KEETON,
RACHEL KNUDSON, RACHAEL KRUUP, DEANA
LINEGAR, APRIL LOCKHART, TRACI MARIE
LUSSIER, BRITTANY MARTIN, KALI
MCGLINCH, LORI-ANN MCKENZIE-HENRY,
JANICE TAINA MERCADO GUADALUPE,
RENEE MILLINE, LOUKEVIA MOORE, ANDREA
MOZO, TABITHA MULLINAX, SANTEQUIA
NGWU, STEPHANIE NORGAARD, LEAH
OSTAPCHENKO, ROBERT PARTELLO,
MELINDA PASS, KRISHNA PATEL, JO-ELLEN
PATERNO, SHEETAL PATTNI, MIA  PELLETIER,
TINA MARIE PEREZ, ALI PLILER, SARAH
JANINNE PRICE, SARAH RIDINGS, KASSANDRA
ROMERO, CHRISTINA SALYERS, LEA SANTOS,

Case No. 3:21-cv-188-BSM

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

This case assigned to District Judge Miller
and to Magistrate Judge Harris

KIRTHI SASIKUMAR, JULIE SECRIST, CHERYL
ELAINE SMITH, KINDER SMITH, EMILY
SODERBLOOM-CATHEY, KIRSTEN SOUTH,
LAKRISHA SPIKES, CHRISTINE STEELE,
ASHLEY SWENNINGSON, KYLA TALLEY,
MARGO TEZENO, KATRINA THOMAS,
RHIANNA THORNTON, EMMA TROLINDER,
MEGAN TROYER, SONJA RENÉE TWIGGS,
BRITTANY (DUTTON) WALLACE, BEVERLY
WATKINS, JENNIFER KAY WATTS, ACACIA
WILSON, AMBER WRIGHT, AND RETRENA
YOUNGE, individually and on behalf of all others
similarly situated,

*Plaintiffs*,

v.

WALMART INC.

*Defendant.*

---

## COMPLAINT

---

COME NOW Plaintiffs, individually and on behalf of all other similarly situated persons, by and through its undersigned attorneys, and for its Complaint against Walmart Inc., state as follows:

### NATURE OF CASE

1.      Toxic heavy metals such as arsenic, lead, cadmium, and mercury have no health benefit.   These toxic heavy metals are unfit for consumption. Both the Food and Drug Administration and the World Health Organization have declared these toxic heavy metals dangerous to human health, particularly to babies and children, who are most vulnerable to its neurotoxic effects.

2.      Babies' developing brains are exceptionally sensitive to injury caused by these toxic heavy metals, and several developmental processes have been shown to be highly vulnerable to chemical toxicity.

3.      Even low levels of exposure to toxic heavy metals can cause serious and often irreversible damage to brain development leading to permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior. As a result, there is no established safe level of toxic heavy metals for babies.  Any amount is too much.

4.      On February 4, 2021, the Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform of the U.S. House of Representatives released a staff report which detailed an investigation that revealed that Defendant's baby foods were contaminated with significant levels of toxic heavy metals, including arsenic, lead, cadmium, and mercury.

5.      The presence of toxic heavy metals in food, especially in baby food, is material to consumers. No consumer would knowingly purchase baby foods for its child from a manufacturer that allowed its baby foods to contain measurable amounts of arsenic, lead, cadmium, or mercury. Yet, Defendant, knowingly sold baby foods containing high levels of arsenic and lead and despite having actual knowledge of this fact, did not disclose the presence of toxic heavy metals in its baby foods to consumers.

## PARTIES

6.      Defendant Walmart Inc. ("Walmart") is a Delaware corporation with its principal place of business in Bentonville, Arkansas that manufactures, markets, and sells baby food.

7.      When reference in this Complaint is made to any act or omission of a defendant, it should be read to mean that the officers, directors, agents, employees, or representatives of the Defendant committed or authorized such act or omission or failed to adequately supervise or

properly control or direct its employees while engaged in the management, direction, operation, or control of the affairs of the defendant, and did so while acting within the scope of its employment or agency.

8.    The Plaintiffs in this action consist of consumers who purchased Defendant's baby food in each of the U.S. States and the District of Columbia without knowledge that Defendant was knowingly manufacturing and selling baby foods with ingredients that contained high levels of toxic heavy metals.

9.    Walmart sells its infant, baby, and toddler foods under the brand name Parent's Choice, which "is Walmart's exclusive, private brand that today extends beyond infant formula [to] Baby and Toddler Foods including Yogurt Bites, Cereals, Cereal Bars, Little Puffs, Little Munchers, [ ] Little Wheeles . . . [and] Toddler Formula," among other products.

10.    Although Walmart has recently claimed that it is only a retailer of baby foods and not a manufacturer, on its website it markets itself as a trustworthy manufacturer:

> Parent's Choice Infant Formulas are produced in factories located in Ohio and Vermont, U.S.A. Our dairy ingredients are sourced from leading dairy markets, including the United States, Canada, and New Zealand. The FDA-inspected, ISO 9001:2015-certified facility has been producing infant formulas for more than 30 years in strict compliance with good manufacturing practices (GMP).
>
> Our main focus is on quality and compliance; our manufacturing operations and facilities adhere to the Infant Formula Act and meet supplemental certification requirements. For example, we are compliant with the Safe Quality Food (SQF) Program, which certifies our food safety and quality management system adheres to international and domestic food safety regulations.

11.     In marketing its baby foods, Walmart often emphasizes that it meets FDA standards. For example, the "About Parent's Choice" page of its website includes a section under the heading "Our Infant Formula Meets FDA Nutritional and Quality Standards." In this section, Walmart declares:

> More moms and dads realize that all manufacturers of infant formula must begin with safe food ingredients that are approved for use in infant formula. This means our formulas meet the nutritional requirements of the Federal Food, Drug, and Cosmetic Act for infant formula under the regulation of the FDA. Infant Formula is often relied on as a sole source of nutrition, which is why formula quality and safety requirements are governed by federal law.

> Manufacturers are also required to provide FDA assurance of the nutritional quality of each infant formula before it can be marketed to moms, dads, and other caregivers. In addition, requirements for specific labeling, nutrient content, and quality control measures must be met and documentation including records and reports must be submitted to FDA for verification.

12.     According to Walmart, "[t]hanks to the Infant Formula Act and FDA regulations, it doesn't matter what brand of formula you pick as long as you discuss feeding options with your pediatrician. Chances are he or she will agree that brand names don't matter when choosing formula." Thus, Walmart offers Parent's Choice products as the best choice for parents because Parent's Choice products are generally cheaper than other brands' products. That is, Walmart promises parents all the same safety and quality, plus a lower price.

13.     In addition to making general representations about how doctors and pharmacists prefer store brands, Walmart holds itself out as an expert. On the Parent's Choice website, Walmart

prominently highlights 15 of its experts, including doctors, nutritionists, and quasi-celebrity parenting experts. In other places, Walmart poses the frequently asked question, "Who can I talk to about the nutritional value of Parent's Choice baby formulas?" and answers the question: "Our infant formula experts are ready to answer questions about the ingredients or nutritional value of Parent's Choice baby formulas."

14.     Walmart tells parents that Walmart believes "transparency is critical." In one example, Walmart explicitly explains to parents that its non-GMO products might contain trace amounts of GMO materials: "Even though we take measures to eliminate genetically engineered material in our ingredients, trace amounts of genetically engineered materials might be present in our products. We disclose that trace levels may be present in finished product from process sources and manufacturing environments."

15.     Plaintiff Rebecca Abbott is a natural person and a citizen and resident of Mena, Arkansas. In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits and vegetables, in the state of Arkansas, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

16.     Plaintiff Meagan Albert is a natural person and is a citizen and resident of New Hartford, Connecticut. In 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to fruits and vegetables, in the state of Connecticut, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

17.    Plaintiff Sophia Alfaro is a natural person and is a citizen and resident of Pahoa, Hawaii. Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, and other foods, in the state of Hawaii, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

18.    Plaintiff Krystal Leigh Anderson is a natural person and is a citizen and resident of Sanford, North Carolina. In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to oatmeal, fruits, and vegetables, in the state of North Carolina, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

19.    Plaintiff Megan Ashley is a natural person and is a citizen and resident of New Castle, Indiana. Plaintiff purchased Walmart baby foods, including but not limited to fruits, vegetables, Hawaiian delight, and meat, in the states of Indiana and Tennessee, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

20.    Plaintiff Kimberly Azeneth Avila is a natural person and is a citizen and resident of Kona, Hawaii. In 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to fruits and vegetables, in the state of Hawaii, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had

Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

21.      Plaintiff Alyssa Megan Barb is a natural person and is a citizen and resident of Augusta, West Virginia.   In 2003-2004, 2013-2014, 2018-2019, and 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to puffs, lil' crunchies, and yogurt melts, in the states of West Virginia, Virginia, Maryland, and Pennsylvania, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

22.      Plaintiff Miriah Barbero is a natural person and is a citizen and resident of Roseburg, Oregon.  In 2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, and meats, in the state of Oregon, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

23.      Plaintiff Lindsay Barr is a natural person and is a citizen and resident of Broken Arrow, Oklahoma.   In 2015-2016 and 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, yogurt melts, and good start soothe, in the state of Oklahoma, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

24.     Plaintiff Grisel Barreto is a natural person and is a citizen and resident of Henderson, Nevada.  In 2015-2018, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, vegetables, and meats, in the states of Massachusetts and Nevada, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

25.     Plaintiff Ashley Baxter is a natural person and is a citizen and resident of Camden, North Carolina.  In 2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, in the state of Virginia, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

26.     Plaintiff Julie Blakeley is a natural person and is a citizen and resident of Rising Sun, Maryland.  In 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, barley cereal, oatmeal, fruits, vegetables, yogurt, and teething cookies, in the states of Maryland, West Virginia, and Pennsylvania, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

27.     Plaintiff Kelsey Blankenship is a natural person and is a citizen and resident of Union City, Tennessee.  In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to oatmeal, fruits, and vegetables, in the states of Tennessee and Nevada, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in

Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

28.     Plaintiff Melissa Bloomquist-Smith is a natural person and is a citizen and resident of Camillus, New York. In 2016-2020, Plaintiff purchased Walmart baby foods, including but not limited to fruits and vegetables, in the state of New York, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

29.     Plaintiff Cristen Boles is a natural person and is a citizen and resident of Birmingham, Alabama. In 2013-2018, Plaintiff purchased Walmart baby foods, including but not limited to fruits and vegetables, in the state of Alabama, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

30.     Plaintiff Olivia Boyer is a natural person and is a citizen and resident of Odenville, Alabama. In 2017, 2018, 2020 and 2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits and vegetables, in the states of Alabama and Florida, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

31.     Plaintiff Crystal Brinig is a natural person and is a citizen and resident of Greenfield, Minnesota. In 2015-2018, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, fruits, and vegetables, in the state of Minnesota, to feed her child(ren).

Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

32.    Plaintiff Nicole Brisky is a natural person and is a citizen and resident of Fremont, Wisconsin. In 2020-2021, Plaintiff purchased Walmart baby foods, in the state of Wisconsin, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

33.    Plaintiff Cheyenne Browning is a natural person and is a citizen and resident of Smiths Station, Alabama. In 2019 and 2020, Plaintiff purchased Walmart baby foods, including, but not limited to rice cereal and oatmeal, in the state of Alabama, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

34.    Plaintiff Celia Bruno is a natural person and is a citizen and resident of Portage, Indiana. In 2007-2009 and 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, fruits, vegetables, Hawaiian delight, yogurt melts, graduates, and cookies, in the states of Indiana and Illinois, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

35.    Plaintiff Ana Butkus is a natural person and is a citizen and resident of Louisville, Kentucky. In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to

rice cereal, oatmeal, puffs, fruits, and vegetables, in the state of Kentucky, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

36.     Plaintiff Maria Calderon is a natural person and is a citizen and resident of Dallas, Texas. In 2008, 2010, 2012, 2014, 2016, and 2018-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, puffs, fruits, teethers, and biscuits, in the state of Texas, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

37.     Plaintiff Jordan Cantafio is a natural person and is a citizen and resident of Sault Sainte Marie, Michigan. In 2019-2021, Plaintiff purchased Walmart baby foods in the state of Michigan, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

38.     Plaintiff Serenitey Carlin is a natural person and is a citizen and resident of Collinsville, Oklahoma. In 2016 and 2019-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, and vegetables, in the state of Oklahoma, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

39.     Plaintiff Samantha Clark is a natural person and is a citizen and resident of New Castle, Delaware. In 2017-2018 and 2020-2021, Plaintiff purchased Walmart baby foods, in the

state Delaware, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

40.    Plaintiff Victoria Coker is a natural person and is a citizen and resident of Camden, Arkansas. In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, and vegetables, in the state of Arkansas, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

41.    Plaintiff Jen Comeau is a natural person and is a citizen and resident of Lagrange, Maine. In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, chicken, lil' mixtures, Hawaiian delight, and custard, in the state of Maine, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

42.    Plaintiff Kimberly Conway is a natural person and is a citizen and resident of Standish, Maine. In 2016-2020, Plaintiff purchased Walmart baby foods, including but not limited to fruits, vegetables, mac and cheese, turkey, and chicken, in the states of Maine, Maryland, and New Jersey, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

43.    Plaintiff Adrianne Cooper is a natural person and is a citizen and resident of Tulsa, Oklahoma. In 2015, 2017, and 2019, Plaintiff purchased Walmart baby foods, including but not

limited to rice cereal, oatmeal, fruits, and vegetables, in the states of Oklahoma and Texas, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

44.     Plaintiff Angela Cox is a natural person and is a citizen and resident of Pueblo, Colorado.  In 2015-2017 and 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, fruits and vegetables, in the states of Colorado and Oregon, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

45.     Plaintiff Brandy Davis is a natural person and is a citizen and resident of Thompsonville, Illinois.  In 2015-2016, Plaintiff purchased Walmart baby foods, including but not limited to fruits, vegetables, puffs, yogurt melts, teethers, and lil' crunchies, in the state of Illinois, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

46.     Plaintiff Kaley Deford is a natural person and is a citizen and resident of Logansport, Indiana.  In 2016-2018 and 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, and vegetables, in the state of Indiana, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

47.     Plaintiff Chelzy Desvigne is a natural person and is a citizen and resident of Biloxi, Mississippi. In 2017-2021, Plaintiff purchased Hain baby foods, including but not limited to rice cereal, oatmeal, fruits, and vegetables in the states of Mississippi, California, Georgia, and Washington to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

48.     Plaintiff Brittany Distaso is a natural person and is a citizen and resident of Macomb, Michigan. In 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to oatmeal, puffs, fruits, and vegetables, in the states of New Jersey and Maryland, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

49.     Plaintiff Jessica Durrett is a natural person and is a citizen and resident of Texarkana, Texas. In 2010, and 2014-2015, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, chicken, beef, and turkey, in the states of Arkansas and Texas, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

50.     Plaintiff Natalya Dzyuba is a natural person and is a citizen and resident of Blaine, Minnesota. In 2005-2008, 2012-2013, 2017, and 2019-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, whole grain cereal, fruits, vegetables, snacks and yogurt, in the states of Minnesota, Florida, and Nebraska, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's

baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

51.     Plaintiff Ayame Tatiana Galassini is a natural person and is a citizen and resident of Roswell, New Mexico. In 2018-2021, Plaintiff purchased Walmart baby foods, including but not limited to fruits, vegetables, and teethers, in the state of New Mexico, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

52.     Plaintiff Marcela García is a natural person and is a citizen and resident of Henderson, Colorado. In 2019-2021, Plaintiff purchased Walmart baby foods, including but not limited to oatmeal, fruits, vegetables, snack puffs, pasta pick-ups, lil' entrees, arrowroot cookies, and turkey sausage, in the state of Colorado, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

53.     Plaintiff Shelby Geraci is a natural person and is a citizen and resident of Mechanicville, New York. In 2018-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal and 2nd stage foods, in the state of New York, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

54.     Plaintiff Christina Gordon is a natural person and is a citizen and resident of Bedford, Wyoming. In 2018-2020, Plaintiff purchased Walmart baby foods, in the states of

Wyoming, Georgia and Alabama, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

55.     Plaintiff Gabrielle Harrison is a natural person and is a citizen and resident of Sumter, South Carolina. In 2014-2017, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, graduates, and meats, in the state of South Carolina, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

56.     Plaintiff Debbie Hawkins is a natural person and is a citizen and resident of West Jefferson, North Carolina. Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, and vegetables, in the state of North Carolina, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

57.     Plaintiff Shannon Herrington is a natural person and is a citizen and resident of Fort Scott, Kansas. In 2011-2012, 2015, and 2018, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, fruits, and vegetables, in the states of California and Kansas, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

58.     Plaintiff Amanda Hill is a natural person and is a citizen and resident of Meigs, Georgia.  In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to fruits, chicken and turkey, in the state of Georgia, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

59.     Plaintiff Lillian Hinkle is a natural person and is a citizen and resident of Newark, Ohio.  In 2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, in the state of Ohio, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

60.     Plaintiff Nichole Holling is a natural person and is a citizen and resident of Pinetop-Lakeside, Arizona.  In 2018-2019, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, chicken and turkey, in the state of Arizona, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

61.     Plaintiff Amanda Hobbs-Rogers is a natural person and is a citizen and resident of Stanwood, Washington.  In 2015-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, fruits, and vegetables, in the states of Oklahoma, Texas, Washington, and Wisconsin, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

62.     Plaintiff Sammi Hobdy is a natural person and is a citizen and resident of Florala, Alabama.  In 2007-2008 and 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, fruits, and vegetables, in the states of Alabama, Florida, and Georgia to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

63.     Plaintiff Shaylan Isaacs is a natural person and is a citizen and resident of Springville, Utah.  In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, puffs, fruits, pudding, mac and cheese, and yogurt, in the states of Ohio and Utah, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

64.     Plaintiff Olivia Johnson is a natural person and is a citizen and resident of Marietta, Ohio.  In 2010, 2012-2013, and 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, barley cereal, puffs, teething biscuits, yogurt melts, and stage 1-3 foods, in the states of Ohio, West Virginia, and Florida, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

65.     Plaintiff Rebecca Keeton is a natural person and is a citizen and resident of Newark, Ohio.  In 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, fruits, and vegetables, in the states of Ohio and Illinois, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby

foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

66.     Plaintiff Rachel Knudson is a natural person and is a citizen and resident of College Station, Texas. In 2014-2017, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, whole wheat cereal, oatmeal, fruits, vegetables, lil' crunchies, yogurts, arrowroot cookies, lil' meals, and meats, in the states of Texas and Pennsylvania, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

67.     Plaintiff Rachael Kruup is a natural person and is a citizen and resident of Bryant, South Dakota. In 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, meats, rice snacks, and yogurt, in the states of North Dakota, Pennsylvania, and South Dakota, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

68.     Plaintiff Deana Linegar is a natural person and is a citizen and resident of Dearborn, Michigan. In 2013-2015 and 2018-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, and vegetables, in the state of Michigan, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

69.     Plaintiff April Lockhart is a natural person and is a citizen and resident of Albuquerque, New Mexico. In 2012-2018, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, in the state of California, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

70.     Plaintiff Traci Marie Lussier is a natural person and is a citizen and resident of Middlebury, Vermont. In 2002-2003, 2008-2009, and 2017-2018, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, and vegetables, in the state of Vermont, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

71.     Plaintiff Brittany Martin is a natural person and is a citizen and resident of Saraland, Alabama. In 2020 and 2021, Plaintiff purchased Walmart baby foods, including but not limited to fruits and vegetables, in the state of Alabama, to feed her child(ren).     Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

72.     Plaintiff Kali McGlinch is a natural person and is a citizen and resident of Fillmore, Utah. In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, puffs, fruits, vegetables, meats, mac and cheese, teething snacks, and cookies, in the states of Ohio and Utah, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that

the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

73.    Plaintiff Lori-Ann Mckenzie-Henry is a natural person and is a citizen and resident of Upper Marlboro, Maryland. In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, fruits, vegetables, and yogurt, in the district of Washington, D.C., to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

74.    Plaintiff Janice Taina Mercado Guadalupe is a natural person and is a citizen and resident of Smyrna, Georgia. In 2005 and 2009-2018, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, fruits, and meats, in the state of Georgia, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

75.    Plaintiff Renee Milline is a natural person and is a citizen and resident of Houston, Alaska. In 2014-2015 and 2015-2018, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, puffs, fruits, vegetables, step meals and snacks, in the state of Alaska, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

76.    Plaintiff Loukevia Moore is a natural person and is a citizen and resident of Westwego, Louisiana. In 1999-2021, Plaintiff purchased Walmart baby foods, including but not limited to fruits, in the states of Alabama and Florida, to feed her child(ren). Plaintiff made those

purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

77.     Plaintiff Andrea Mozo is a natural person and is a citizen and resident of Spanish Fork, Utah.  In 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, multi-grain cereal, fruits, and meats, in the state of Utah, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

78.     Plaintiff Tabitha Mullinax is a natural person and is a citizen and resident of Gaffney, South Carolina.  In 2018-2019, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, fruits, vegetables, and meats, in the state of South Carolina, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

79.     Plaintiff Santequia Ngwu is a natural person and is a citizen and resident of Hattiesburg, Mississippi.  In 2002, 2004, 2015-2016, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, in the state of Georgia, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

80.     Plaintiff Stephanie Norgaard is a natural person and is a citizen and resident of Portland, Oregon.  In 2018 and 2020-2021, Plaintiff purchased Walmart baby foods, including but

not limited to rice cereal, puffs, fruits, vegetables, yogurt melts, and snacks, in the state of Oregon, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

81.     Plaintiff Leah Ostapchenko is a natural person and is a citizen and resident of Leesburg, Georgia. In 2019-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, meats, and lil' meals, in the state of Georgia, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

82.     Plaintiff Robert Partello is a natural person and is a citizen and resident of Gasport, New York. In 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, whole-grain cereal, fruits, vegetables, meats, yogurt, snacks and finger foods, in the state of New York, to feed his child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods he purchased contained heavy metals, he would not have purchased them.

83.     Plaintiff Melinda Pass is a natural person and is a citizen and resident of Estill Springs, Tennessee. In 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal and oatmeal, in the states of Tennessee and Kentucky, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

84.     Plaintiff Krishna Patel is a natural person and is a citizen and resident of Carmel, Indiana.  In 2016-2018, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal and fruits, in the states of Indiana and California, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

85.     Plaintiff Jo-Ellen Paterno is a natural person and is a citizen and resident of Warwick, Rhode Island.  In 2012-2021, Plaintiff purchased Walmart baby foods, including but not limited to fruits and vegetables, in the states of Rhode Island, New Hampshire, and Massachusetts, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

86.     Plaintiff Sheetal Pattni is a natural person and is a citizen and resident of Caper, Wyoming.  In 2014-2021, Plaintiff purchased Plum baby foods, including but not limited to fruits and vegetables, in the states of Wyoming, Colorado, Utah, and Washington, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

87.     Plaintiff Mia Pelletier is a natural person and is a citizen and resident of Limestone, Maine.  In 2016-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, fruits, and vegetables, in the state of Maine, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had

Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

88.     Plaintiff Tina Marie Perez is a natural person and is a citizen and resident of Horseheads, New York. In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, and pasta primavera, in the states of New York and Pennsylvania, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

89.     Plaintiff Ali Pliler-Lopez is a natural person and is a citizen and resident of North Little Rock, Arkansas. In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal and multigrain cereal, in the state of Arkansas, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

90.     Plaintiff Janinne Price is a natural person and is a citizen and resident of Ninilchik, Alaska. In 2009-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, puffs, cereal bars, all varieties of pouch and jarred foods, and rice teethers, in the state of Alaska, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

91.     Plaintiff Sarah Ridings is a natural person and is a citizen and resident of Villa Ridge, Missouri. In 2003, 2005-2008, 2016, and 2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, and vegetables, in the state of Missouri, to

feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

92.     Plaintiff Kassandra Romero is a natural person and is a citizen and resident of Rock Springs, Wyoming. In 2020 and 2021 Plaintiff purchased Hain baby foods, including but not limited to cereal, oatmeal, fruits, and vegetables, in the state of Wyoming to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

93.     Plaintiff Christina Salyers is a natural person and is a citizen and resident of Lexington, Tennessee. In 2018-2021, Plaintiff purchased Parent's Choice baby foods, including but not limited to rice, oatmeal and yogurt bites in the state of Tennessee, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

94.     Plaintiff Lea Santos is a natural person and is a citizen and resident of Stroudsburg, Pennsylvania. In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to fruits, vegetables, teethers, and meats, in the state of Pennsylvania, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

95.     Plaintiff Kirthi Sasikumar is a natural person and is a citizen and resident of Rochester Hills, Michigan. In 2018-2020, Plaintiff purchased Walmart baby foods, including but

not limited to cereal, fruits, and vegetables, in the state of Michigan, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

96.     Plaintiff Julie Secrist is a natural person and is a citizen and resident of Lakewood, Colorado.  In 2005-2007 and 2018-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, snack puffs, Hawaiian delight, and turkey, in the state of Colorado, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

97.     Plaintiff Cheryl Elaine Smith is a natural person and is a citizen and resident of Lawrenceburg, Kentucky.  In 1999-2001, 2005-2006, and 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to oatmeal, fruits, vegetables, and meat in the states of Kentucky, Florida and North Carolina, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

98.     Plaintiff Kinder Smith is a natural person and is a citizen and resident of Gallatin, Tennessee.  In 2008-2011 and 2014-2017, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, meats, and juices in the state of Tennessee, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

99.     Plaintiff Emily Soderbloom-Cathey is a natural person and is a citizen and resident of Fulton, Missouri.  In 2010, 2012 and 2016, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal and oatmeal, in the states of Missouri, Michigan and Illinois, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

100.    Plaintiff Kirsten South is a natural person and is a citizen and resident of Carthage, Mississippi.  In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, in the state of Mississippi, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

101.    Plaintiff Lakrisha Spikes is a natural person and is a citizen and resident of Colfax, Louisiana.  In 2010-2019, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal and oatmeal, in the states of Louisiana and Texas, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

102.    Plaintiff Christine Steele is a natural person and is a citizen and resident of Sioux Falls, South Dakota.  In 2000-2006 and 2018-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, puffs, fruits, vegetables, meats, yogurts, juices, and lil' crunchies, in the state of South Dakota, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had

Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

103.    Plaintiff Ashley Swenningson is a natural person and is a citizen and resident of Hazen, North Dakota. In 2009-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, meats, rice snacks, and yogurt, in the state of North Dakota, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

104.    Plaintiff Kyla Talley is a natural person and is a citizen and resident of Torrington, Wyoming. In 2018-2021, Plaintiff purchased Walmart baby foods, including but not limited to fruits and vegetables, in the states of Nebraska and Wyoming, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

105.    Plaintiff Margo Tezeno is a natural person and is a citizen and resident of Opelousas, Louisiana. In 2010-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, barley cereal, fruits, vegetables, Hawaiian delight, chicken, turkey, and entrees, in the states of Louisiana and Florida, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

106.    Plaintiff Katrina Thomas is a natural person and is a citizen and resident of Dover, Delaware. In 2013-2018, Plaintiff purchased Walmart baby foods, including but not limited to

fruits and vegetables, in the states of Delaware, Maryland and Virginia, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

107. Plaintiff Rhianna Thornton is a natural person and is a citizen and resident of Waycross, Georgia. In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to fruits rice puffs, fruits, and vegetables, in the states of Georgia and Florida, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

108. Plaintiff Emma Trolinder is a natural person and is a citizen and resident of St. Paul, Indiana. In 2019-2020, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, chicken, turkey, ham, and beef, in the state of Indiana, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

109. Plaintiff Megan Troyer is a natural person and is a citizen and resident of Oscoda, Michigan. In 2014-2016 and 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, and meats, in the states of Michigan and Texas, to feed her child(ren). Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods. Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

110.     Plaintiff Sonja Renée Twiggs is a natural person and is a citizen and resident of Sandpoint, Idaho.  In 2008-2021, Plaintiff purchased Walmart baby foods, in the states of Idaho, Montana, and Washington, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

111.     Plaintiff Brittany (Dutton) Wallace is a natural person and is a citizen and resident of Golconda, Illinois.  In 2016-2021, Plaintiff purchased Walmart baby foods, including but not limited to grain bars, yogurt blends, puffs, biscuits, lil' crunchies, and lil' meals, in the states of Illinois and Kentucky, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

112.     Plaintiff Beverly Watkins is a natural person and is a citizen and resident of Burlington, North Carolina.  In 2011, 2013, and 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, meats, Hawaiian delight, mac n cheese, barley bowls, lil' crunchies, grain bars, teether wheels, toddler snacks, lil' biscuits, yogurt melts, and arrowroot cookies, in the state of North Carolina, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

113.     Plaintiff Jennifer Kay Watts is a natural person and is a citizen and resident of Mattoon, Illinois.  In 2002-2003 and 2013-2015, Plaintiff purchased Walmart baby foods,

including but not limited to rice cereal, fruits, and vegetables, in the states of Washington and Illinois, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

114.    Plaintiff Acacia Wilson is a natural person and is a citizen and resident of Atlantic, Iowa.  In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, puffs, fruits, lil' crunchies, and harvest bowl, in the states of Iowa and Nebraska, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

115.    Plaintiff Amber Wright is a natural person and is a citizen and resident of Louisville, Kentucky.  In 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, oatmeal, fruits, vegetables, and chicken, in the state of Kentucky, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

116.    Plaintiff Retrena Younge is a natural person and is a citizen and resident of Little Rock, Arkansas.  In 1998, 2014-2016, 2018, and 2020-2021, Plaintiff purchased Walmart baby foods, including but not limited to rice cereal, ham, beef and chicken, in the state of Arkansas, to feed her child(ren).  Plaintiff made those purchases without knowledge of the presence of heavy metals in Defendant's baby foods.  Had Plaintiff known that the Defendant's baby foods she purchased contained heavy metals, she would not have purchased them.

## JURISDICTION AND VENUE

117.    This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d).  Plaintiffs bring this civil action seeking to represent a class of more than 100 plaintiffs ("Class", "Classes", or "Subclass"), pursuant to Fed. R. Civ. P. 23.  The amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs.  At all times relevant herein, at least one member of the proposed Class of plaintiffs is a citizen of a state different from the defendant.

118.    As its principal place of business, Walmart is at home in the State of Arkansas giving the Court general personal jurisdiction over it.

119.    Moreover, Walmart has intentionally availed itself of the Arkansas market, by regularly marketing and advertising its products there and purposefully selling to distributors with the intent those products be sold in Arkansas giving sufficient connection between Walmart's contacts with the state and this litigation to provide the Court specific personal jurisdiction over Walmart.

120.    Venue is proper in this district under 28 U.S.C. § 1391(b). A substantial part of the events giving rise to plaintiffs' claims, namely the sale and purchase of baby food contaminated with toxic heavy metals, occurred in this District.

## FACTS RELEVANT TO ALL COUNTS

121.    Toxic heavy metals generally refer to naturally occurring metals and semi-metallic compounds and elements that negatively affect human health. Toxic heavy metals include arsenic, beryllium, cadmium, lead, and mercury.

122.    There is no established health benefit for the consumption of mercury, cadmium, lead or arsenic and foods containing them are unfit for consumption. The poisonous effects of toxic heavy metals have been known for thousands of years.

123.    Some of the well-known effects of exposure to arsenic, beryllium, cadmium, lead, and mercury include: cancer, encephalopathy (brain disfunction), osteomalacia (softening of bones), pulmonary fibrosis, diabetes, autism, and attention deficit/hyperactivity disorder.

124.    Babies' developing brains are exceptionally sensitive to injury caused by these toxic heavy metals, and several developmental processes have been shown to be highly vulnerable to chemical toxicity.

125.    Even low levels of exposure to toxic heavy metals can cause serious and often irreversible damage to brain development leading to permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior. As a result, there is no established safe level of toxic heavy metals for babies.  Any amount is too much.

126.    Although not generally known by the general public, toxic heavy metals can contaminate foods in the growing process when the food is grown in contaminated soil or watered with contaminated water.

127.    Therefore, it is important that food ingredients are grown in soil and watered with water that are free of these contaminants.

128.    However, even when a grower fails to take the necessary steps to prevent contamination of food ingredients with heavy metals through soil or water exposures, various techniques can be used to remediate the contamination. For example, studies have shown that simply washing rice before it is cooked can reduce the arsenic concentration by 57%. Boiling vegetables in distilled water can reduce the arsenic concentration by 60%. Peeling beets, carrots,

and potatoes also reduces arsenic levels. Chelating agents can also be used for the removal of heavy metals from foods.

129.    On February 4, 2021, the Subcommittee on Economic and Consumer Policy Committee on Oversight and Reform of the U.S. House of Representatives released a staff report ("House Staff Report") which detailed an investigation that revealed that Defendant's baby foods were contaminated with significant levels of toxic heavy metals, including arsenic, lead, cadmium, and mercury. The House Staff Report is attached as Exhibit 1 and incorporated herein.

130.    Walmart refused to cooperate with the Subcommittee's investigation. Still, independent testing of Walmart products confirmed that its baby foods contain concerning levels of toxic heavy metals.

131.    In 2019, Healthy Babies Bright Futures released testing results that showed Walmart's baby foods contained arsenic at levels as high as 108 ppb, lead as levels as high as 26.9 ppb, cadmium at levels as high as 26.1 ppb, and mercury at levels as high as 2.05 ppb.

132.    Despite knowingly manufacturing and selling baby foods that contain toxic heavy metals, Defendant did not disclose these facts to consumers through any of its branding, advertising, or labeling.

133.    Defendant did not disclose the presence of toxic heavy metals in its baby foods with the intent that Plaintiffs and Class members would purchase its baby foods as they knew the presence of toxic heavy metals was material to purchasers of baby foods, including Plaintiffs and Class members, and that Plaintiffs and Class members would not purchase its baby foods if they knew that Defendant knowingly sold baby foods containing toxic heavy metals.

134.    Plaintiffs and Class members purchased the baby foods at issue herein for its use or that of members of its households.

135.    At all times material hereto, Defendant was a merchant of baby food and engaged in the advertising, offering for sale, sale, and/or distribution of goods, namely baby food.

136.    Defendant's acts or practices were likely to cause, and did cause, substantial injury to consumers.

137.    Defendant's acts or practices were likely to mislead a reasonable consumer, and did mislead Plaintiffs and Class members.

138.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's baby foods or would have paid less for those products.

139.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

140.    The injuries caused by Defendant's acts or practices, namely consumers' monetary losses, are not outweighed by any countervailing benefit to consumers or competition. Defendant's unfair acts served no purpose other than to increase its own profits.

141.    Plaintiff and Class members' injuries were not reasonably avoidable. Because Defendant was the sole source of material information and did not disclose such information to its customers, consumers could not have had reason to anticipate the impending harm and thus avoided their injuries.

## CLASS ACTION ALLEGATIONS

142.    Plaintiffs bring this action individually and on behalf of the following Class pursuant to Fed. R. Civ. P. 23(b)(3): All retail purchasers of Defendant's Baby Food sold in the United States from within the applicable statute of limitations until February 4, 2021.

143.    Plaintiffs also bring this action on behalf of state Subclasses consisting of all retail purchasers of Defendant's Baby Food sold in that state from within the applicable statute of limitations until February 4, 2021.

144.    Specifically excluded from each Class are: Defendant's employees and agents; any Judge conducting proceedings in this action and its parents, spouses and children as well as any other member of its family residing in the judge's household; counsel of record in this action and its parents, spouses and children as well as any other member of its family residing in Counsel's household; and the legal representatives, heirs, successors and assigns of any excluded person.

145.    The exact number of the members of the Class (or Subclasses) is not presently known, but is so numerous that joinder of individual members is this action is impracticable. Based on the nature of the activities alleged, Plaintiffs believe that the members of the Class number in the millions and are geographically dispersed throughout the United States.

146.    Plaintiffs are members of the Class, and Plaintiffs' claims are typical of the claims of the other Class members. Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs understand and appreciate its duties to the Class and Subclass and are committed to vigorously protecting the rights of absent members of the Class and Subclass.

147.    Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the Class. The claims of all members of the Class, including Plaintiffs, depend upon a showing that Defendant sold baby food contaminated with toxic heavy metals.

148.    Plaintiffs are represented by counsel who are competent and experienced in the prosecution of class action litigation.

149.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

150.    The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

151.    Common issues of law and fact include, but are not limited to, the following:

    a.    Did Defendant sell baby food contaminated with toxic heavy metals?

    b.    Did Defendant's testing reveal the presence of toxic heavy metals in its baby food ingredients?

    c.    Does the presence of toxic heavy metals make baby food unfit for consumption?

    d.    Is the presence of toxic heavy metals material to reasonable consumers of baby foods?

    e.    Did Defendant disclose the presence of toxic heavy metals in its baby foods?

152.    A class action is superior to the other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Defendant and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. Absent a class action, it would not be feasible

for the vast majority of the members of the Class to seek redress for the violations of law alleged herein.

153.     This class action presents no difficulties in management that would preclude its maintenance as a class action.

## COUNT 1
### Breach of Implied Warranty of Merchantability
### on Behalf of Plaintiffs and the Nationwide Class

154.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

155.     Plaintiffs bring this Count individually and on behalf of the members of the Nationwide Class against Defendant.

156.     The Magnuson-Moss Warranty Act creates a private right of action for any consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under the Act or under a written warranty, implied warranty, or service contract. 15 U.S.C. § 2310(d)(1).

157.     At all times relevant hereto, Defendant was engaged in the sale of toxic baby food, as described herein, throughout the United States, including Virginia, for use by members of the general public, including Plaintiffs and the members of the Class with the intent that it be used as food for babies.

158.     At all times relevant hereto, Defendant manufactured its toxic baby food and placed it in sealed packaging to be opened by the ultimate consumer and fed to human babies.

159.     In so doing, Defendant impliedly warranted that the toxic baby food sold to Plaintiffs and the Class was wholesome, uncontaminated and fit for the ordinary purpose for which such goods are used, i.e., feeding babies.

160.    When sold by Defendant, the package was expected to reach the ultimate consumer without substantial change in the condition in which it was sold, and it did, in fact, reach its ultimate consumer without substantial change.

161.    Plaintiffs used Defendant's toxic baby foods to feed their children as intended by Defendant.

162.    The toxic baby food sold by Defendant was not wholesome, uncontaminated or fit for human consumption at the time of sale due to the presence of toxic heavy metals.

163.    Defendant had actual knowledge of its breaches of warranty set forth above as they routinely measure the amount of heavy metals in the ingredients of its toxic baby foods.

164.    Plaintiffs provided Defendant with pre-suit notice of its breaches of warranty by sending a certified letter to Defendant containing the basis of Plaintiffs' claims.   Notice was received by Defendant on or about March 24, 2021.

165.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Plaintiffs and the other members of the Class have suffered damages in the amount of the sales price of the toxic baby food.

166.    As a result of Defendant's breach of warranty, Plaintiffs and Class members suffered actual damages in that (1) the actual value of the merchandise they received was less than the value of the merchandise they bargained for denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.  Awarding Plaintiffs and Class members damages; and

e.  Granting such further relief as the Court deems just.

## COUNT 2
### Magnuson-Moss Warranty Act (25 U.S.C. §§ 2301, *et seq.*), on Behalf of Plaintiffs and the Nationwide Class

167.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

168.    Plaintiffs bring this Count individually and on behalf of the members of the nationwide Class against Defendant.

169.    At all times relevant hereto, Defendant was engaged in the sale of toxic baby food, as described herein, throughout the United States, including Virginia, for use by members of the general public, including Plaintiffs and the members of the Class with the intent that it be used as food for babies.

170.    At all times relevant hereto, Defendant manufactured its toxic baby food and placed it in sealed packaging to be opened by the ultimate consumer and fed to human babies.

171.    Defendant's toxic baby foods are goods that are normally purchased for personal, family or household purposes.

172.    Plaintiffs and Class members purchased Defendant's toxic baby food for consumption by babies in its care. Plaintiffs have each purchased more than $5 of Defendant's toxic baby food and their individual claims exceed $25.

173.    In connection with the sale of its toxic baby foods, Defendant made written affirmations of fact directed to Plaintiffs and Class members relating to the nature of the material and affirming that such material is defect free or will meet a specified level of performance over a specified period of time.

174.    Defendant represented through its marketing and labeling that its toxic baby foods were fit for consumption.

175.    However, due to the presence of toxic heavy metals, Defendant's toxic baby foods were not fit for consumption.

176.    Plaintiffs relied on Defendant's representations that its toxic baby foods were fit for consumption and these representations were part of the basis of the bargain.

177.    Plaintiffs and Class members were injured as a direct and proximate cause of Defendant's breach of warranty. Plaintiffs and members of the Class have been harmed because they would not have purchased the toxic baby food had they known it was unfit for consumption.

178.    Defendant had actual knowledge of its breaches of warranty set forth above as they routinely measure the amount of heavy metals in the ingredients of its toxic baby foods.

179.    Plaintiffs provided Defendant with pre-suit notice of its breaches of warranty by sending a certified letter to Defendant containing the basis of Plaintiffs' claims. Notice was received by Defendant on or about March 24, 2021.

180.    As a direct and proximate result of Defendant's breach of warranty, Plaintiffs and the other members of the Class have suffered damages in the amount of the sales price of the toxic baby food.

181.    As a result of Defendant's breach of warranty, Plaintiffs and Class members suffered actual damages in that (1) the actual value of the merchandise they received was less than the value of the merchandise they bargained for denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

   a.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

   b.   Designating Plaintiffs as Class representative and counsel as Class counsel;

   c.   Entering judgment in favor of Plaintiffs and the Class and against Defendant;

   d.   Awarding Plaintiffs and Class members damages; and

   e.   Granting such further relief as the Court deems just.

### COUNT 3
### Breach of Express Warranty
### on Behalf of Plaintiffs and the Nationwide Class

182.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

183.    Plaintiffs bring this Count individually and on behalf of the members of the nationwide Class against Defendant.

184.    At all times relevant hereto, Defendant was engaged in the sale of toxic baby food, as described herein, throughout the United States, including Illinois, for use by members of the general public, including Plaintiffs and the members of the Class with the intent that it be used as food for babies.

185.    At all times relevant hereto, Defendant manufactured its toxic baby food and placed it in sealed packaging to be opened by the ultimate consumer and fed to human babies.

186.    When sold by Defendant, the package was expected to reach the ultimate consumer without substantial change in the condition in which it was sold, and it did, in fact, reach its ultimate consumer without substantial change.

187.    The toxic baby food sold by Defendant did not conform to Defendant's representations and warranties in that it was not wholesome, uncontaminated or fit for human consumption due to the presence of toxic heavy metals.

188.    Defendant had actual knowledge of its breaches of warranty set forth above as they routinely measure the amount of heavy metals in the ingredients of its toxic baby foods.

189.    Plaintiffs provided Defendant with pre-suit notice of its breaches of warranty by sending a certified letter to Defendant containing the basis of Plaintiffs' claims.  Notice was received by Defendant on or about March 24, 2021.

190.    As a direct and proximate result of Defendant's breach of warranty, Plaintiffs and the other members of the Class have suffered damages in the amount of the sales price of the toxic baby food.

191.    As a result of Defendant's breach of warranty, Plaintiffs and Class members suffered actual damages in that (1) the actual value of the merchandise they received was less than the value of the merchandise they bargained for denying them of the benefit of their bargain; and

(2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

       a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

       b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

       c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

       d.  Awarding Plaintiffs and Class members damages; and

       e.  Granting such further relief as the Court deems just.

### COUNT 4
**Violation of the Alabama Deceptive Trade Practices Act—Deception (Ala. Code §§ 8-19-1 *et seq.*), on Behalf of Plaintiffs Cristen Boles, Olivia Boyer, Cheyenne Browning, Sammi Hobdy, Brittany Martin, Loukevia Moore, and the Alabama Subclass**

192.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

212.    Plaintiffs Cristen Boles, Olivia Boyer, Cheyenne Browning, Sammi Hobdy, Brittany Martin, and Loukevia Moore bring this Count individually and on behalf of the members of the Alabama Subclass.

213.    This claim is brought in the alternative to any common law claim for fraud, misrepresentation, deceit, suppression of material facts or fraudulent concealment arising out of any act, occurrence or transaction actionable under the Alabama Deceptive Trade Practices Act.

214.    At all relevant times, members of the Alabama Subclass were natural people who purchased Defendant's toxic baby food products detailed above for personal, family or household use.

215.    At all relevant times, Defendant was either natural persons or corporations, trusts, partnerships, incorporated or unincorporated associations or some other legal entity.

216.    The Alabama Deceptive Trade Practices Act declares that (1) passing off goods or services as those of another; (2) causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (3) causing confusion or misunderstanding as to the affiliation, connection, or association with, or certification by another, provided that this section shall not prohibit the private labeling of goods or services; (4) using deceptive representations or designations of geographic origin in connection with goods or services; (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have; (6) representing that goods are original or new if they are deteriorated, reconditioned, reclaimed, used, secondhand, or altered to the point of decreasing their value or rendering the goods unfit for the ordinary purpose for which they were purchased; (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (8) disparaging the goods, services, or business of another by false or misleading representation of fact; (9) advertising goods or services with intent not to sell them as advertised; (10) advertising goods or services with intent not to supply reasonably expectable public demand unless the advertisement discloses a limitation of quantity; (11) making a false or misleading statement of fact concerning the reasons for, existence of, or amounts of, price reductions; and (12) engaging

in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce; is unlawful. *See* Ala. Code § 8-19-5.

217.   The Alabama Deceptive Trade Practices Act further states that any person who commits one or more of the acts or practices declared unlawful under this chapter and thereby causes monetary damage to a consumer, shall be liable to each consumer for (1) any actual damages sustained by such consumer or person, or the sum of $100, whichever is greater; or (2) up to three times any actual damages. *See* Ala. Code § 8-19-10.

218.   Defendant, by and through its employees, agents, and/or servants, and in connection with its advertising and sale of its toxic baby food products detailed above, knowingly engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above.

219.   Defendant knew that its statements were false or that its conduct was deceptive because, on information and belief, it routinely tested the raw ingredients used in its toxic baby foods as well as its finished toxic baby foods for the presence of toxic heavy metals.

220.   The facts that Defendant misrepresented, concealed, suppressed or omitted as alleged above were material, in that such facts are the type of information upon which a reasonable consumer is expected to rely in making a decision of whether to purchase Defendant's products.

221.   Defendant's misrepresentation, concealment, suppression and omission of material facts as alleged above creates a likelihood of deception and has the capacity to deceive a reasonable consumer.

222.   Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations

above with the intent that Plaintiffs and Class members would rely on those deceptive and unfair acts and practices and induce Plaintiffs and Class members to purchase Defendant's products.

223.    Because the characteristics of Defendant's merchandise were not as represented, and those characteristics are material to a reasonable consumer of the type of merchandise, the value of that merchandise was less than the value of the merchandise would have had the merchandise actually possessed the characteristics that were represented.

224.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

225.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

226.    Plaintiffs and Class members could not have avoided these injuries. Because Defendant were the sole source of material information that Defendant failed to disclose, Plaintiffs and Class members could not have had reason to anticipate the impending harm and thus avoided their injuries.

227.    Plaintiffs provided Defendant pre-suit notice pursuant to Ala. Code § 8-19-10(e) by sending a certified letter containing the basis of Plaintiffs' claims on April 13, 2021.  Notice was received by Defendant on or about April 19, 2021.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.  Entering injunctive relief against Defendant requiring that it cease its deceptive and unfair acts and practices and make corrective disclosures;

e.  Awarding Plaintiffs and Class their actual damages, or the sum of $100, whichever is greater; or up to three times their actual damages; and

f.  Granting such further relief as the Court deems proper.

## COUNT 5
### Violation of the Alabama Deceptive Trade Practices Act—Unconscionability (Ala. Code §§ 8-19-1 *et seq.*), on Behalf of Plaintiffs Cristen Boles, Olivia Boyer, Cheyenne Browning, Sammi Hobdy, Brittany Martin, Loukevia Moore, and the Alabama Subclass

228.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

229.   Plaintiffs Cristen Boles, Olivia Boyer, Cheyenne Browning, Sammi Hobdy, Brittany Martin, and Loukevia Moore bring this Count individually and on behalf of the members of the Alabama Subclass.

230.   This claim is brought in the alternative to any common law claim for fraud, misrepresentation, deceit, suppression of material facts or fraudulent concealment arising out of any act, occurrence or transaction actionable under the Alabama Deceptive Trade Practices Act.

231.   At all relevant times, members of the Alabama Subclass were natural people who purchased Defendant's toxic baby food products detailed above for personal, family or household use.

232.     At all relevant times, Defendant was either a natural person or corporation, trust, partnership, incorporated or unincorporated association or some other legal entity.

233.     The Alabama Deceptive Trade Practices Act declares that engaging in unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce is unlawful. *See* Ala. Code § 8-19-5.

234.     The Alabama Deceptive Trade Practices Act further that any person who commits an unlawful practice under this chapter and thereby causes monetary damage to a consumer, shall be liable to each consumer for (1) Any actual damages sustained by such consumer or person, or the sum of $100, whichever is greater; or (2) Up to three times any actual damages. *See* Ala. Code § 8-19-10.

235.     Defendant, by and through its employees, agents, and/or servants, and in connection with its advertising and sale of toxic baby food products detailed above, knowingly engaged in deceptive and unconscionable acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above.

236.     Defendant knew that its statements were false or that its conduct was unconscionable because there was an absence of meaningful choice on plaintiff's part.

237.     Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above with the intent that Plaintiffs and Class members would rely on those deceptive and unfair acts and practices and induce Plaintiffs and Class members to purchase Defendant's products.

238.     Because the characteristics of Defendant's merchandise were not as represented, and those characteristics are material to a reasonable consumer of the type of merchandise, the

value of that merchandise was less than the value of the merchandise would have had the merchandise actually possessed the characteristics that were represented.

239.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

240.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

241.    Plaintiffs and Class members could not have avoided these injuries. Because Defendant were the sole source of material information that Defendant failed to disclose, Plaintiffs and Class members could not have had reason to anticipate the impending harm and thus avoided their injuries.

242.    Plaintiffs provided Defendant pre-suit notice pursuant to Ala. Code § 8-19-10(e) by sending a certified letter containing the basis of Plaintiffs' claims on April 13, 2021.  Notice was received by Defendant on or about April 19, 2021.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

   a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

   b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d. Entering injunctive relief against Defendant requiring that it cease its deceptive and unfair acts and practices and make corrective disclosures;

e. Awarding Plaintiffs and Class their actual damages, or the sum of $100, whichever is greater; or up to three times their actual damages; and

f. Granting such further relief as the Court deems proper.

## COUNT 6
### Violation of the Alaska Unfair Trade Practices and Consumer Protection Act
### (Alaska Stat. §§ 45.50.471, *et seq.*), on Behalf of Plaintiffs Renee Milline, Janinne Price, and the Alaska Subclass

244.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

245.    Plaintiffs Renee Milline and Janinne Price bring this Count individually and on behalf of the members of the Alaska Subclass against all Defendant.

246.    The Alaska Unfair Trade Practices and Consumer Protection Act ("Alaska UTPCPA") provides that "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce are declared to be unlawful."

247.    The Alaska UTPCPA further provides that (1) fraudulently conveying or transferring goods or services by representing them to be those of another; (2) falsely representing or designating the geographic origin of goods or services; (3) causing a likelihood of confusion or misunderstanding as to the source, sponsorship, or approval, or another person's affiliation, connection, or association with or certification of goods or services; (4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; (5) representing that goods are original or new if they are deteriorated,

altered, reconditioned, reclaimed, used, secondhand, or seconds; (6) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (7) disparaging the goods, services, or business of another by false or misleading representation of fact; (8) advertising goods or services with intent not to sell them as advertised; (9) advertising goods or services with intent not to supply reasonable expectable public demand, unless the advertisement prominently discloses a limitation of quantity; (10) making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; (11) engaging in any other conduct creating a likelihood of confusion or of misunderstanding and that misleads, deceives, or damages a buyer or a competitor in connection with the sale or advertisement of goods or services; and (12) using or employing deception, fraud, false pretense, false promise, misrepresentation, or knowingly concealing, suppressing, or omitting a material fact with intent that others rely upon the concealment, suppression, or omission in connection with the sale or advertisement of goods or services whether or not a person has in fact been misled, deceived, or damaged; are unfair or deceptive acts or practices. *See* Alaska Stat. Ann. § 45.50.471.

248.    The Alaska UTPCPA further provides that a person who suffers an ascertainable loss of money or property as a result of another person's act or practice may bring a civil action to recover for each unlawful act or practice three times the actual damages or $500, whichever is greater. *See* Alaska Stat. Ann. § 45.50.531.  Any person who was the victim of the unlawful act, whether or not the person suffered actual damages, may bring an action to obtain an injunction prohibiting a seller or lessor from continuing to engage in an act or practice.

249.    Defendant, by and through its employees, agents, and/or servants, and in connection with its advertising, offering for sale, sale, and/or distribution of services in Alaska, engaged in

deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above.

250.   The facts that Defendant misrepresented, concealed, suppressed or omitted as alleged above were material, in that such facts are the type of information upon which a reasonable consumer is expected to rely in making a decision of whether to purchase Defendant's products.

251.   Defendant's misrepresentation, concealment, suppression and omission of material facts as alleged above creates a likelihood of deception and has the capacity to deceive a reasonable consumer.

252.   Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above with the intent that Plaintiffs and Class members would rely on those deceptive and unfair acts and practices and induce Plaintiffs and Class members to purchase Defendant's products.

253.   Because the characteristics of Defendant's merchandise were not as represented, and those characteristics are material to a reasonable consumer of the type of merchandise, the value of that merchandise was less than the value of the merchandise would have had the merchandise actually possessed the characteristics that were represented.

254.   Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

255.   Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise they bargained for denying them of the benefit of their bargain; and

(2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

256.    Plaintiffs and Class members could not have avoided these injuries. Because Defendant was the sole source of material information that Defendant failed to disclose, Plaintiffs and Class members could not have had reason to anticipate the impending harm and thus avoided their injuries.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

    a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

    b. Designating Plaintiffs as Class representative and counsel as Class counsel;

    c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

    d. Entering injunctive relief against Defendant requiring that it cease its deceptive and unfair acts and practices and make corrective disclosures;

    e. Awarding Plaintiffs and Class three times their actual damages, or the sum of $500, whichever is greater; reasonable attorneys' fees and costs; and

    f. Granting such further relief as the Court deems proper.

### COUNT 7
**Violation of the Arizona Consumer Fraud Act (Ariz. Rev. Stat. Ann. § 44-1521), on Behalf of Plaintiff Nichole Holling and the Arizona Subclass**

257.    Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

258.    Plaintiff Nichole Holling brings this Count individually and on behalf of the Arizona Subclass.

259.    Arizona's Consumer Fraud Act prohibits the "act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."

260.    At all relevant times, members of the Arizona Subclass and Defendant were either natural people or the person's legal representative, a partnership or domestic or foreign corporation, a company, trust, business entity or association or an agent, employee, salesman, partner, officer, director, member, stockholder, associate or trustee.

261.    Defendant willfully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection with the sale and advertisement of "merchandise" in violation of Ariz. Rev. Stat. Ann. §44-1522(A) as described in the allegations above.

262.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Arizona Subclass.

263.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Arizona Subclass has little alternative but to submit and causes consumers substantial injury.

264.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children

from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

265.    The Arizona Subclass has suffered economic injury as a direct and proximate result of the Arizona Defendant's conduct.

266.    Plaintiff and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

267.    Instead, as a result of Defendant's misrepresentation, Plaintiff and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

268.    As a direct and proximate result of the foregoing acts and practices, the Arizona Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiff, individually and on behalf of the Class and/or Classes of persons described herein, prays for an Order as follows:

   a.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

   b.   Designating Plaintiff as Class representative and counsel as Class counsel;

   c.   Entering judgment in favor of Plaintiff and the Class and against Defendant;

   d.   Awarding Plaintiff and Class members damages; and

e.   Granting such further relief as the Court deems just.

## COUNT 8
### Violation of the Arkansas Deceptive Trade Practices Act (Ark. Code Ann. §§ 4-88-101, *et seq.*), on Behalf of Plaintiffs Rebecca Abbott, Victoria Coker, Jessica Durrett, Ali Plier-Lopez, Retrena Younge, and the Arkansas Subclass

269.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

270.   Plaintiffs Rebecca Abbott, Victoria Coker, Jessica Durrett, Ali Plier-Lopez, and Retrena Younge bring this Court individually and on behalf of the Arkansas Subclass.

271.   The Arkansas Deceptive Trade Practices Act prohibits, among other things: (a) deceptive and unconscionable trade practices including, but not limited to, (1) knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model; (2) advertising the goods or services with the intent not to sell them as advertised; (3) engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade; and (b) in connection with the sale or advertisement of any goods or services, (1) the act, use, or employment by a person of any deception, fraud, or false pretense; or (2) the concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission. *See* Ark. Code Ann. §§ 4-88-101(1-3).

272.   Under the Arkansas Deceptive Trade Practices Act, a person who suffers an actual financial loss as a result of his or her reliance on the use of an unlawful practice may bring an action to recover his or her actual financial loss proximately caused by the offense or violation and reasonable attorney's fees.

273.   At all relevant times, members of the Arkansas Subclass and Defendant were individuals, organizations, groups, associations, partnerships, or corporations.

274.   Defendant willfully engaged in deceptive and unconscionable acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts it intended others to rely upon in connection with the sale and advertisement of its toxic baby foods.

275.   Because the characteristics of Defendant's toxic baby foods were not as represented, and those characteristics are material to a reasonable consumer of the type of merchandise, the value of that merchandise was less than the value of the merchandise would have had the merchandise actually possessed the characteristics that were represented. Because the product defect has actually manifested, Plaintiffs have suffered actual damages as a result of Defendant's conduct.

276.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unconscionable because it offends public policy, and is so oppressive that the Arkansas Subclass has little alternative but to submit and causes consumers substantial injury.

277.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unconscionable in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

278.   Plaintiffs relied on Defendant's representations when purchasing Defendant's toxic baby foods.

279.   Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products.

280.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered actual damages in that (1) the actual value of the merchandise they received was less than the value of the merchandise they bargained for denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.    Designating Plaintiffs as Class representative and counsel as Class counsel;

c.    Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.    Awarding Plaintiffs and Class members damages; and reasonable attorney's fees; and

e.    Granting such further relief as the Court deems just.

**COUNT 9**
**Violation of the California Consumers Legal Remedies Act (Cal. Civ. Code §§ 1750, _et seq._), on Behalf of Plaintiffs Chelzy Desvigne, Shannon Herrington, April Lockhart, Krishna Patel, and the California Subclass**

281.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

282.    Plaintiffs Chelzy Desvigne, Shannon Herrington, April Lockhart and Krishna Patel bring this Count individually and on behalf of the California Subclass.

283.     The California Consumers Legal Remedies Act ("California CLRA") prohibits any unfair, deceptive, and/or unlawful practices, as well as unconscionable commercial practices in connection with the sale of any goods or services to consumers. *See* Cal. Civ. Code § 1770.

284.     The California CLRA specifically prohibits, among other things: (1) passing off goods or services as those of another; (2) misrepresenting the source, sponsorship, approval, or certification of goods or services; (3) misrepresenting the affiliation, connection, or association with, or certification by, another; (4) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; (5) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and (6) advertising goods or services with intent not to sell them as advertised.

285.     The CLRA allows any consumer who suffers any damage as a result of the use or employment by any person of a prohibited practice to bring a private action against that person to recover actual damages, an order enjoining the methods, acts, or practices; restitution of property; punitive damages; and any other relief that the court deems proper.

286.     Defendant is either an individual, partnership, corporation, limited liability company, association, or other group, however organized.

287.     Defendant's products are tangible chattels bought or leased for use primarily for personal, family, or household purposes.

288.     Members of the California Subclass are individuals who acquired, by purchase or lease, Defendant's goods or services for personal, family, or household purposes.

289.    Defendant willfully engaged in unfair, deceptive, and/or unlawful practices, as well as unconscionable commercial practices as described in the allegations above.

290.    As a result, Defendant's conduct violates several provisions of the California CLRA, including but not limited to:

a.  Section 1770(a)(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; and

b.  Section 1770(a)(7): Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins.

291.    In addition, under California law, a duty to disclose arises in any of the following four circumstances: (1) when the defendant is in a fiduciary relationship with the plaintiff; (2) when the defendant has exclusive knowledge of material facts not known to the plaintiff; (3) when the defendant actively conceals a material fact from the plaintiff; and (4) when the defendant makes partial representations but also suppresses some material facts.

292.    Defendant had a duty to disclose to Plaintiffs and the California Subclass that the toxic baby food was of substandard quality and contained excessive levels of toxins for the following two independent reasons: (1) Defendant had exclusive knowledge of the information at

the time of sale; and (2) Defendant actively concealed from Plaintiffs and the California Subclass the excessive amount of toxins contained in the toxic baby food.

293.    Defendant's omissions in violation of the California CLRA were likely to mislead an ordinary consumer. Plaintiffs and the California Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the California Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality. If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the California Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the California Subclass would not have purchased Defendant's toxic baby food.

294.    Defendant's omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

295.    Plaintiffs and the California Subclass relied to their detriment on Defendant's omissions in purchasing toxic baby food.

296.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

297.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2)

Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

298.    Plaintiffs provided Defendant pre-suit notice pursuant to Cal. Civ. Code § 1782(a) by sending a certified letter containing the basis of Plaintiffs' claims on March 12, 2021.  Notice was received by Defendant on or about March 23, 2021.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.  Awarding Plaintiffs and Class members damages; and reasonable attorney's fees; and

e.  Granting such further relief as the Court deems just.

**COUNT 10**
**Violation of the California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200, *et seq*.), on Behalf of Plaintiffs Chelzy Desvigne, Shannon Herrington, April Lockhart, Krishna Patel, and the California Subclass**

299.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

300.    Plaintiffs Chelzy Desvigne, Shannon Herrington, April Lockhart, and Krishna Patel bring this Count individually and on behalf of the California Subclass.

301.    The California Unfair Competition Law ("California UCL") prohibits any "unconscionable, false, or deceptive act or practice in business, commerce, or trade unlawful, unfair or fraudulent business act or practice[.]"

302.    The California UCL further provides that any person who has engaged in unfair competition may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.

303.    The California UCL allows for an action for relief to be brought by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition.

304.    At all relevant times, members of the California Subclass and Defendant were either natural persons, corporations, firms, partnerships, joint stock companies, associations or other organizations of persons.

305.    Defendant willfully engaged in unlawful, fraudulent and unfair acts and practices in violation of Cal. Bus. & Prof. Code § 17200 as described in the allegations above.

306.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

307.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

308.    Defendant's conduct was illegal in that it violated Proposition 65, Cal. Health & Safety Code § 25249.5, *et seq.* by failing to warn that Defendant's toxic baby food contained potential carcinogens.

309.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is fraudulent in that concealing and failing to disclose the presence of toxic heavy metals in its baby food was likely to deceive consumers.

310.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the California Subclass.

311.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the California Subclass has little alternative but to submit and causes consumers substantial injury.

312.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

313.    The California Subclass has suffered economic injury as a direct and proximate result of the Defendant's conduct.

314.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

315.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

316.    As a direct and proximate result of the foregoing acts and practices, the California

Defendant has received, or will receive, income, profits, and other benefits which they would not

have received if they had not engaged in the violations described in this Complaint.

317.    WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes

of persons described herein, pray for an Order as follows:

  a.  Finding that this action satisfies the prerequisites for maintenance as a class action
      set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or
      Classes defined herein;

  b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

  c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

  d.  Awarding Plaintiffs and Class members restitution of Defendant's wrongfully
      obtained revenue; and

  e.  Granting such further relief as the Court deems just.

**COUNT 11**
**Violation of the California False Advertising Law (Cal. Bus. & Prof. Code §§ 17500, *et
seq*.), on Behalf of Plaintiffs Chelzy Desvigne, Shannon Herrington, April Lockhart, and
Krishna Patel, and the California Subclass**

318.    Plaintiffs incorporate by reference and reallege each and every allegation contained

above, as though fully set forth herein.

319.    Plaintiffs Chelzy Desvigne, Shannon Herrington, April Lockhart, and Krishna

bring this Count individually and on behalf of the California Subclass.

320.    Defendant engaged in advertising and marketing to the public and offered for sale

toxic baby food that contained toxins in amounts that are unsafe for babies.

321.    The California False Advertising Law ("California FAL") states:

> It is unlawful for any person, firm, corporation or association, or any employee
> thereof with intent directly or indirectly to dispose of real or personal property

or to perform services, professional or otherwise, or anything of any nature whatsoever or to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated before the public in this state, or to make or disseminate or cause to be made or disseminated from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement, concerning that real or personal property or those services, professional or otherwise, or concerning any circumstance or matter of fact connected with the proposed performance or disposition thereof, which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading, or for any person, firm, or corporation to so make or disseminate or cause to be so made or disseminated any such statement as part of a plan or scheme with the intent not to sell that personal property or those services, professional or otherwise, so advertised at the price stated therein, or as so advertised. *See* Cal. Bus. & Prof. Code §§ 17500, *et seq*.

322.    Defendant's business practices as alleged herein constitute unfair, deceptive, untrue and misleading advertising pursuant to California's FAL because Defendant advertised toxic baby food in a manner that is untrue and misleading, and that is known or reasonably should have been known to Defendant to be untrue or misleading, as Defendant created the impression that the product was safe for babies to consume when, in fact, it was not. Defendant concealed the material information from consumers that toxic baby food contained excessive amounts of toxins and was of substandard quality.

323.    Defendant's omissions alleged herein deceived or had the tendency to deceive the general public regarding the quality and composition of toxic baby food.

324.    Defendant's omissions alleged herein were the type of omissions that are material, i.e., a reasonable person would attach importance to them and would be induced to act on the information in making purchase decisions.

325.    Defendant's omissions alleged herein are objectively material to a reasonable consumer, and therefore reliance upon such omissions may be presumed as a matter of law.

326.    At the time Defendant made the omissions alleged herein, Defendant knew or should have known that they were untrue or misleading, and Defendant acted in violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.*

327.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

328.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

329.    As a result, Plaintiffs and each member of the California Subclass have been injured, lost money or property, and are entitled to relief.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.    Designating Plaintiffs as Class representative and counsel as Class counsel;

c.    Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.    Awarding Plaintiffs and Class members restitution of Defendant's wrongfully obtained revenue; and

e.    Granting such further relief as the Court deems just.

## COUNT 12
### Violation of the Colorado Consumer Protection Act (Colo. Rev. Stat. §§ 6-1-105(1), *et seq.*), on Behalf of Plaintiffs Angela Cox, Marcela García, Sheetal Pattni, Julie Secrist, and the Colorado Subclass

330.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

331.    Plaintiffs Angela Cox, Marcela García, Sheetal Pattni, and Julie Secrist bring this Count individually and on behalf of the Colorado Subclass.

332.    The Colorado Consumer Protection Act defines deceptive trade practices to include, among other things, when, in the course of the person's business, vocation, or occupation, the person: (a) either knowingly or recklessly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith; (b) represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another; (c) advertises goods, services, or property with intent not to sell them as advertised; (d) fails to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction; and (e) either knowingly or recklessly engages in any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice. *See* Colo. Rev. Stat. §§ 6-1-105(1), *et seq.*

333.    The Colorado Consumer Protection Act further provides for a civil action against any person who has engaged in or caused another to engage in any deceptive trade practice listed in this article by any person who is an actual or potential consumer of the defendant's goods, services, or property and is injured as a result of such deceptive trade practice.

334.    At all relevant times, members of the Colorado Subclass and Defendant were either individuals, corporations, business trusts, estates, trusts, partnerships, unincorporated associations, or any other legal or commercial entity.

335.    In marketing and selling its toxic baby food, Defendant either knowingly or recklessly made a false representation as to the characteristics of its toxic baby foods.

336.    In marketing and selling its toxic baby food, Defendant either knowingly or recklessly represented that its toxic baby food was of a particular standard, quality, or grade, when it knew or should know that they are of another.

337.    In marketing and selling its toxic baby food, Defendant either knowingly or recklessly failed to disclose material information concerning goods, services, or property which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction.

338.    In marketing and selling its toxic baby food, Defendant either knowingly or recklessly engaged in an unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice.

339.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of Defendant's business.

340.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above significantly impact the public as they are actual or potential consumers of Defendant's goods.

341.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Colorado Subclass.

342.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

343.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Colorado Subclass has little alternative but to submit and causes consumers substantial injury.

344.    Defendant's knowing misrepresentations and omissions in the sale of its toxic baby food detailed above had the capacity to mislead consumers.

345.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

346.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

347.    The Colorado Subclass has suffered economic injury as a direct and proximate result of the Defendant's conduct.

348.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.  Awarding Plaintiffs and Class members damages; and

e.  Granting such further relief as the Court deems just.

## COUNT 13
**Violation of the Connecticut Unfair Trade Practices Act (Conn. Gen. Stat. §§ 42-110A, *et seq.*), on Behalf of Plaintiff Meagan Albert and the Connecticut Subclass**

349.    Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

350.    Plaintiff Meagan Albert brings this Count individually and on behalf of the Connecticut Subclass.

351.    Connecticut's Unfair Trade Practices Act ("Connecticut UTPA") prohibits any "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

352.    The Connecticut UTPA further provides that any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by Conn. Gen. Stat. § 42-110(b), may bring an action to recover actual damages.

353.     At all relevant times, members of the Connecticut Subclass and Defendant were either a natural person, corporation, limited liability company, trust, partnership, incorporated or unincorporated association.

354.     Defendant willfully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with its advertising and sale of its toxic baby food in violation of Conn. Gen. Stat. § 42-110b(a), as described in the allegations above.

355.     Defendant's misrepresentations and omissions as alleged above occurred in connection with its advertising, sale, offering for sale or the distribution of property in Connecticut.

356.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

357.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Connecticut Subclass.

358.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Connecticut Subclass has little alternative but to submit and causes consumers substantial injury.

359.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

360.    Plaintiff and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

361.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered ascertainable losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

362.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiff, individually and on behalf of the Class and/or Classes of persons described herein, prays for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiff as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiff and the Class and against Defendant;

d.  Awarding Plaintiff and Class members damages; costs of suit and reasonable attorneys' fees, and

e.  Granting such further relief as the Court deems just.

## COUNT 14
### Violation of the Delaware Consumer Fraud Act (Del. Code Ann. tit. 6, §§ 2511, *et seq.*), on Behalf of Plaintiffs Samantha Clark, Katrina Thomas, and the Delaware Subclass

363.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

364.    Plaintiffs Samantha Clark and Katrina Thomas bring this Count individually and on behalf of the Delaware Subclass.

365.    Delaware's Consumer Fraud Act prohibits any "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice."

366.    At all relevant times, members of the Delaware Subclass and Defendant were either an individual, corporation, government, or governmental subdivision or agency, statutory trust, business trust, estate, trust, partnership, unincorporated association or other legal or commercial entity.

367.    Defendant willfully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the Delaware Consumer Fraud Act, Del. Code Ann. tit. 6, § 2511(6)) in violation of Del. Code Ann. tit. 6, § 2513(a), as described in the allegations above.

368.    The Delaware Subclass relied on Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above.

369. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

370. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

371. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Delaware Subclass.

372. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Delaware Subclass has little alternative but to submit and causes consumers substantial injury.

373. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

374. The Delaware Subclass has suffered economic injury as a direct and proximate result of the Defendant's conduct.

375. Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

376. Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2)

Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

377.   As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.   Designating Plaintiffs as Class representative and counsel as Class counsel;

c.   Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.   Awarding Plaintiffs and Class members damages; and

e.   Granting such further relief as the Court deems just.

### COUNT 15
**Violation of the District of Columbia Consumer Protection Procedures Act (D.C. Code §§ 28-3904, *et seq.*), on Behalf of Plaintiff Lori-Ann McKenzie-Henry and the District of Columbia Subclass**

378.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

379.   Plaintiff Lori-Ann McKenzie-Henry brings this Count individually and on behalf of the District of Columbia Subclass.

380.   The District of Columbia's Consumer Protection Procedures Act ("District of Columbia CPPA") prohibits any person from engaging "in an unfair or deceptive trade practice, whether or not any consumer is in fact misled, deceived, or damaged thereby."

381.    The District of Columbia CPPA specifically forbids, among other things, (1) representing that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have; (2) representing that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another; (3) misrepresenting a material fact which has a tendency to mislead; (4) failing to state a material fact if such failure tends to mislead; (5) Using innuendo or ambiguity as to a material fact, which has a tendency to mislead; and (6) advertising or offering goods or services without the intent to sell them or without the intent to sell them as advertised or offered.

382.    The District of Columbia CPPA provides that a consumer may bring an action seeking relief from the use of an unfair or deceptive act and may, on behalf of that individual, or on behalf of both the individual and the general public, bring an action seeking relief from the use of unfair or deceptive act when it involves consumer goods or services that the individual purchased for personal, household, or family purposes.

383.    At all relevant times, members of the District of Columbia Subclass and Defendant were individuals, firms, corporations, partnerships, cooperatives, associations, or another organization, legal entity, or group of individuals.

384.    At all relevant times, members of the District of Columbia Subclass were persons who purchased Defendant's products for personal, household or family purposes and not for resale.

385.    At all relevant times, Defendant in the ordinary course of business sells, directly or indirectly, consumer goods or services.

386.    Defendant willfully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection

with the sale and advertisement of its baby foods in violation of D.C. Code § 28-3904 as described in the allegations above.

387.   Specifically, Defendant's acts described above violate the prohibition of (1) representing that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or quantities that they do not have in that Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; (2) representing that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another in that Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins; (3) misrepresenting a material fact which has a tendency to mislead in that Defendant's marketing of its baby food represented that its safety and quality; and (4) failing to state a material fact if such failure tends to mislead in that Defendant failed to disclose the material fact that it knowingly sold baby food containing toxic heavy metals.

388.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

389.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

390.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

391.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriches Defendant at the expense of the District of Columbia Subclass.

392.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the District of Columbia Subclass has little alternative but to submit and causes consumers substantial injury.

393.    The District of Columbia Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

394.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

395.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

396.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiff, individually and on behalf of the Class and/or Classes of persons described herein, prays for an Order as follows:

a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b. Designating Plaintiff as Class representative and counsel as Class counsel;

c. Entering judgment in favor of Plaintiff and the Class and against Defendant;

d. Awarding Plaintiff and Class members treble damages or $1,500 per violation, whichever is greater; reasonable attorneys' fees; punitive damages; and costs;

e. Entering an injunction against the use of the unlawful trade practice; and entering any order as may be necessary to restore to the consumer money which may have been acquired by means of the unlawful trade practice; and

f. Granting such further relief as the Court deems just.

**COUNT 16**
**Violation of the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. §§ 501.201, *et seq.*), on Behalf of Plaintiffs Olivia Boyer, Sammi Hobdy, Olivia Johnson, Loukevia Moore, Cheryl Smith, Margo Tezeno, Rhianna Thorton, and the Florida Subclass**

397. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

398. Plaintiffs Olivia Boyer, Sammi Hobdy, Olivia Johnson, Loukevia Moore, Cheryl Smith, Margo Tezeno, and Rhianna Thorton bring this Count individually and on behalf of the Florida Subclass.

399. Florida's Deceptive and Unfair Trade Practices Act prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

400. Florida's Deceptive and Unfair Trade Practices Act further provides anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an

act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part and in any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs.

401.    Plaintiffs and Class members purchased the product or services at issue in this matter for their own use or for that of members of their households.

402.    At all times material hereto, Defendants engaged in the advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of goods or services, or any property, whether tangible or intangible, or any other article, commodity, or thing of value, in or from Florida.

403.    The facts that Defendant misrepresented, concealed, suppressed or omitted as alleged above were material, in that such facts are the type of information upon which a reasonable consumer is expected to rely in making a decision of whether to purchase Defendant's products.

404.    Defendant's misrepresentation, concealment, suppression and omission of material facts as alleged above creates a likelihood of deception and was likely to deceive a consumer acting reasonably in the same circumstances.

405.    Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above with the intent that Plaintiffs and Class members would rely on those deceptive and unfair acts and practices and induce Plaintiffs and Class members to purchase Defendant's products.

406.    Because the characteristics of Defendant's merchandise were not as represented, and those characteristics are material to a reasonable consumer of the type of merchandise, the

value of that merchandise was less than the value of the merchandise would have had the merchandise actually possessed the characteristics that were represented.

407.    Plaintiffs and Class members purchased Defendant's products or services at issue in this action in Florida without knowledge of the material facts that were concealed, suppressed or omitted and without knowledge that Defendants affirmative representations were false.

408.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

409.    Instead, as a result of Defendant's misrepresentations, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

410.    Plaintiffs and Class members could not have avoided these injuries. Because Defendant was the sole source of material information that Defendant failed to disclose, Plaintiffs and Class members could not have had reason to anticipate the impending harm and thus avoided their injuries.

411.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Florida Subclass has little alternative but to submit and causes consumers substantial injury.

412.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children

from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

413.    The Florida Subclass has suffered economic injury as a direct and proximate result of the Defendant's conduct.

414.    As a direct and proximate result of the foregoing acts and practices, the Florida Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.   Designating Plaintiffs as Class representative and counsel as Class counsel;

c.   Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.   Awarding Plaintiffs and Class members actual damages; attorney's fees and court costs; and

e.   Granting such further relief as the Court deems just.

**COUNT 17**
**Violation of the Georgia Fair Business Practices Act (Ga. Code Ann. §§ 10-1-390, *et seq.*), on Behalf of Plaintiffs Chelzy Desvigne, Amanda Hill, Sammi Hobdy, Janice Taina Mercado Guadalupe, Santequia Ngwu, Leah Ostapchenko, Rhianna Thornton, and the Georgia Subclass**

415.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

416.    Plaintiffs Chelzy Desvigne, Amanda Hill, Sammi Hobdy, Janice Taina Mercado Guadalupe, Santequia Ngwu, Leah Ostapchenko, and Rhianna Thornton bring this Count individually and on behalf of the Georgia Subclass.

417.    Georgia's Fair Business Practices Act prohibits the "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce."

418.    Georgia's Fair Business Practices Act specifically declares unlawful, among other things: (1) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have; (2) representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another; and (3) advertising goods or services with intent not to sell them as advertised.

419.    Georgia's Fair Business Practice Act further provides that any person who suffers injury or damages as a result of a violation of the Act, as a result of consumer acts or practices in violation of this part may bring an action against the person or persons engaged in such violations to seek equitable injunctive relief and to recover his or her general and exemplary damages sustained as a consequence thereof.

420.    At all relevant times, members of the Georgia Subclass and Defendant were either a natural person, corporation, trust, partnership, incorporated or unincorporated association, or other legal entity.

421.    Defendant willfully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended

others to rely upon in connection with trade or commerce in violation of Ga. Code Ann. § 10-1-393(a) as described in the allegations above.

422.    Specifically, Defendant's acts and practices described above violated the Georgia Fair Business Practice Act's prohibitions on (1) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have in that Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; (2) representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another in that Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins; and (3) advertising goods or services with intent not to sell them as advertised in that Defendant advertised its toxic baby food as a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins when Defendant knew it was not.

423.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

424.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

425.    Defendant's misrepresentations and omissions discussed above had the capacity to deceive and did deceive Plaintiffs and Class members.

426.   Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

427.   Instead, as a result of Defendant's misrepresentations, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

428.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Georgia Subclass.

429.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Georgia Subclass has little alternative but to submit and causes consumers substantial injury.

430.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

431.   The Georgia Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

432.   As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

433.     Plaintiffs provided Defendant pre-suit notice pursuant to Ga. Code Ann. § 10-1-399(b) by sending a certified letter containing the basis of Plaintiffs' claims on April 12, 2021. Said notice was received by Defendant on or about April 16, 2021.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.   Designating Plaintiffs as Class representative and counsel as Class counsel;

c.   Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.   Awarding Plaintiffs and Class members damages and reasonable attorneys' fees and expenses of litigation incurred with the action; and

e.   Granting such further relief as the Court deems just.

**COUNT 18**
**Violation of the Hawaii Uniform Deceptive Trade Practices Act (Haw. Rev. Stat. §§ 480-1, *et seq.*), on Behalf of Plaintiffs Sophia Alfaro, Kimberly Azeneth Avila, and the Hawaii Subclass**

434.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

435.     Plaintiffs Sophia Alfaro and Kimberly Azeneth Avila bring this Count individually and on behalf of the Hawaii Subclass.

436.     Hawaii's Uniform Deceptive Trade Practices Act ("Hawaii UDTPA") prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

437.    Hawaii's UDTPA further provides that any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter may sue for damages sustained by the person.

438.    At all relevant times, members of the Hawaii Subclass were natural persons who, primarily for personal, family, or household purposes, purchased Defendant's goods or services.

439.    At all relevant times, Defendant and the members of the Hawaii Subclass were either individuals, corporations, firms, trusts, partnerships, limited partnerships, limited liability partnerships, limited liability limited partnerships, limited liability companies, and incorporated or unincorporated associations.

440.    Defendant willfully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with trade or commerce in violation of Haw. Rev. Stat. § 480-2 as described in the allegations above.

441.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

442.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

443.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

444.    Instead, as a result of Defendant's misrepresentations, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2)

Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

445.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Hawaii Subclass.

446.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Hawaii Subclass has little alternative but to submit and causes consumers substantial injury.

447.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

448.    The Hawaii Subclass has suffered economic injury as a direct and proximate result of the Defendant's conduct.

449.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b. Designating Plaintiffs as Class representative and counsel as Class counsel;

c.   Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.   Awarding Plaintiffs and Class members treble damages, reasonable attorneys' fees and costs; and

e.   Granting such further relief as the Court deems just.

**COUNT 19**
**Violation of the Idaho Consumer Protection Act (Idaho Code Ann. §§ 48-601, *et seq*.), on Behalf of Plaintiff Sonja Renee Twiggs and the Idaho Subclass**

450.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

451.   Plaintiff Sonja Renee Twiggs brings this Count individually and on behalf of the Idaho Subclass.

452.   Idaho's Consumer Protection Act ("Idaho CPA") prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade of commerce," as well as "any unconscionable method, act or practice in the conduct of trade or commerce." *See* Idaho Code Ann. § 48-603.

453.   Specifically, the Idaho's CPA forbids: (1) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have; (2) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (3) advertising goods or services with intent not to sell them as advertised; (4) engaging in any act or practice that is otherwise misleading, false, or deceptive to the consumer; and (5) engaging in any unconscionable method, act or practice in the conduct of trade or commerce.

454.    The CPA provides that any person who purchases or leases goods or services and suffers any ascertainable loss of money or property as a result of the use by another person of an unfair or deceptive practice bay bring an action to recover actual damages.

455.    At all relevant times, members of the Idaho Subclass and Defendant were either natural people, corporations, trusts, partnerships, incorporated or unincorporated associations, companies, trusts, business entities or any other legal entity.

456.    Defendant willfully engaged in unfair, deceptive, and unconscionable practices in the conduct of trade or commerce as described in the allegations above.

457.    As a result, Defendant's conduct violates several provisions of the Idaho CPA, including but not limited to:

a.   Section 48-603(5): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have— here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; and

b.   Section 48-603(7): Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins.

c.   Section 48-603(17): Engaging in any act or practice which is otherwise misleading, false, or deceptive to the consumer—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers

could use without unduly exposing their babies to health risks from exposure to toxins.

d. Section 48-603(18): Engaging in any unconscionable method, act or practice in the conduct of trade or commerce. Here, Defendant knew that its toxic baby food contained amounts of toxins that are unsafe for babies, knew or reasonably should have known that consumers would want to buy baby food that is free of toxins that are harmful to babies, and knew or reasonable should have known that consumers would not buy baby food that contains such toxins. Nevertheless, Defendant continually marketed its toxic baby food as safe for babies to consume and unconscionably withheld information from the public about the amounts of toxins in the toxic baby food. These actions violate the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

458. Defendant's omissions in violation of the Idaho CPA were likely to mislead an ordinary consumer. Plaintiffs and the Idaho Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiffs and the Idaho Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality. If Defendant had disclosed that its baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Idaho Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Idaho Subclass would not have purchased Defendant's toxic baby food.

459.    Defendant's omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

460.    Plaintiffs and the Idaho Subclass relied to their detriment on Defendant's omissions in purchasing toxic baby food.

461.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

462.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

463.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

    d.   Awarding Plaintiffs and Class members damages, reasonable attorneys' fees and costs; and

    e.   Granting such further relief as the Court deems just.

**COUNT 20**

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 Ill. Comp. Stat. Ann. 505/1, *et seq.*), on Behalf of Plaintiffs Celia Bruno, Brandy Davis, Rebecca Keeton, Emily Soderbloom-Cathey, Brittany Wallace, Jennifer Watts, and the Illinois Subclass**

464.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

465.    Plaintiffs Celia Bruno, Brandy Davis, Rebecca Keeton, Emily Soderbloom-Cathey, Brittany Wallace, and Jennifer Watts bring this Count individually and on behalf of the Illinois Subclass.

466.    Illinois's Consumer Fraud and Deceptive Business Practices Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice… in the conduct of any trade or commerce … whether any person has in fact been misled, deceived or damaged thereby"

467.    At all times material hereto, Defendants engaged in the advertising, offering for sale, sale, and/or distribution of services in Illinois.

468.    Defendants, by and through their employees, agents, and/or servants, and in connection with their advertising, offering for sale, sale, and/or distribution of services, engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above.

469.    The facts that Defendants misrepresented, concealed, suppressed or omitted as alleged above were material, in that such facts are the type of information upon which a reasonable consumer is expected to rely in making a decision of whether to purchase Defendants' products.

470.    At all relevant times, members of the Illinois Subclass and Defendants were either natural persons or their legal representatives, partnerships, corporations, companies, trusts, business entities, or associations.

471.    Plaintiffs and Class members purchased the product or services at issue in this matter for their own use or for that of members of their households.

472.    Defendants' misrepresentation, concealment, suppression and omission of material facts as alleged above creates a likelihood of deception and has the capacity to deceive a reasonable consumer.

473.    Defendants engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as described in the allegations above with the intent that Plaintiffs and Class members would rely on those deceptive and unfair acts and practices and induce Plaintiffs and Class members to purchase Defendants' products.

474.    Because the characteristics of Defendants' merchandise were not as represented, and those characteristics are material to a reasonable consumer of the type of merchandise, the value of that merchandise was less than the value of the merchandise would have had the merchandise actually possessed the characteristics that were represented.

475.    Plaintiffs and Class members purchased Defendants' products or services at issue in this action in Illinois without knowledge of the material facts that were concealed, suppressed or omitted and without knowledge that Defendants affirmative representations were false.

476. Plaintiffs and Class members were deceived by Defendants' deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendants' products or would have paid less for those products.

477. Instead, as a result of Defendants' misrepresentations, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

478. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Illinois Subclass has little alternative but to submit and causes consumers substantial injury.

479. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

480. Plaintiffs and Class members could not have avoided these injuries. Because Defendants were the sole source of material information that Defendants failed to disclose, Plaintiffs and Class members could not have had reason to anticipate the impending harm and thus avoided their injuries.

481. As a direct and proximate result of the foregoing acts and practices, the Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b. Designating Plaintiffs as Class representative and counsel as Class counsel;

c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d. Awarding Plaintiffs and Class members damages, attorneys' fees and costs of suit; and

e. Granting such further relief as the Court deems just.

**COUNT 21**
**Violation of the Indiana Deceptive Consumer Sales Act (Ind. Code §§ 24-5-0.5, *et seq.*), on Behalf of Plaintiffs Megan Ashley, Celia Bruno, Kaley Deford, Krishna Patel, Emma Trolinder, and the Indiana Subclass**

482. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

483. Plaintiffs Megan Ashley, Celia Bruno, Kaley Deford, Krishna Patel, and Emma Trolinder bring this Count individually and on behalf of the Idaho Subclass.

484. The Indiana Deceptive Consumer Sales Act ("Indiana DCSA") prohibits suppliers from committing acts or omissions that are unfair, abusive, or deceptive in connection with a consumer transaction; further, acts and omissions prohibited by the Indiana DCSA include both implicit and explicit misrepresentations. *See* Ind. Code § 24-5-0.5-3(a).

485. Among other things, the Indiana DCSA specifically defines the following acts and representations about the subject matter of the consumer transaction as deceptive acts: (1) that such subject of a consumer transaction has sponsorship, approval, performance, characteristics,

accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; and (2) that such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

486.    At all relevant times, Plaintiffs, members of the Indiana Subclass, and Defendant were either individuals, corporations, business trusts, estates, trusts, partnerships, associations, nonprofit corporations or organizations, or cooperatives or some other legal entity.

487.    Defendant willfully engaged in unfair, deceptive, and/or unlawful practices, as well as unconscionable commercial practices as described in the allegations above.

488.    As a result, Defendant's conduct violates several provisions of the Indiana DCSA, including but not limited to:

    a.    Section 24-5-0.5-3(b)(1): Representing that the subject of a consumer transaction has sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that it does not have—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; and

    b.    Section 24-5-0.5-3(b)(2): Representing that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins.

489.    Defendant's omissions in violation of the Indiana DCSA were likely to mislead an ordinary consumer. Plaintiffs and the Indiana Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxic heavy metals. Plaintiff and the Indiana Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality. If Defendant had disclosed that its toxic baby food contained toxic heavy metals and was of substandard quality, Plaintiffs and the Indiana Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Indiana Subclass would not have purchased Defendant's toxic baby food.

490.    Defendant's omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

491.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

492.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

493.    Plaintiffs provided Defendant pre-suit notice pursuant to Ind. Code § 24-5-0.5-5(a) by sending a certified letter containing the basis of Plaintiffs' claims on April 13, 2021. Said notice was received by Defendant on or about April 19, 2021.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.   Designating Plaintiffs as Class representative and counsel as Class counsel;

c.   Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.   Awarding Plaintiffs and Class members their damages or $500, whichever is greater, reasonable attorneys' fees and costs; and

e.   Granting such further relief as the Court deems just.

### COUNT 22
**Violation of the Iowa Private Right of Action for Consumer Frauds Act (Iowa Code Ann. §§ 714H.1, *et seq.*), on Behalf of Plaintiff Acacia Wilson and the Iowa Subclass**

494.   Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

495.   Plaintiff Acacia Wilson brings this Count individually and on behalf of the Iowa Subclass.

496.   Iowa's Private Right of Action for Consumer Frauds Act ("Iowa PRACFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise, or the solicitation of contributions for charitable purposes."

497.     The Iowa PRACFA further provides that a consumer who suffers an ascertainable loss of money or property as the result of an unfair or deceptive practice may bring an action to recover actual damages.

498.     At all relevant times, members of the Iowa Subclass were natural persons.

499.     Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection with trade or commerce in violation of Iowa Code Ann. § 714A.3(1) as described in the allegations above.

500.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

501.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

502.     Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

503.     Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

504.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Iowa Subclass.

505.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Iowa Subclass has little alternative but to submit and causes consumers substantial injury.

506.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

507.    The Iowa Subclass has suffered economic injury as a direct and proximate result of the Defendant's conduct.

508.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiff, individually and on behalf of the Class and/or Classes of persons described herein, prays for an Order as follows:

a.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.    Designating Plaintiff as Class representative and counsel as Class counsel;

c.    Entering judgment in favor of Plaintiff and the Class and against Defendant;

d.    Awarding Plaintiff and Class members damages, reasonable attorneys' fees and costs; and

e.    Granting such further relief as the Court deems just.

## COUNT 23
### Violation of the Kansas Consumer Protection Act (Kan. Stat. Ann. §§ 50-623, *et seq.*), on Behalf of Plaintiff Shannon Herrington and the Kansas Subclass

509.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

510.    Plaintiff Shannon Herrington brings this Count individually and on behalf of the Kansas Subclass.

511.    The Kansas Consumer Protection Act ("Kansas CPA") prohibits suppliers from engaging in any deceptive act or practice in connection with a consumer transaction. *See* Kan. Stat. Ann. § 50-626.

512.    Specifically, the Kansas CPA prohibits (1) representations made knowingly or with reason to know that: (a) property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have; (b) property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation; (c) property or services has uses, benefits or characteristics unless the supplier relied upon and possesses a reasonable basis for making such representation; or (d) use, benefit or characteristic of property or services has been proven or otherwise substantiated unless the supplier relied upon and possesses the type and amount of proof or substantiation represented to exist; (2) the willful use, in any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a material fact; and (3) the willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact.

513.    The Kansas CPA also provides that no supplier shall engage in any unconscionable act or practice in connection with a consumer transaction.

514.    The Kansas CPA allows a consumer who is aggrieved by a violation of the act to bring a private action for actual damages or a civil penalty not to exceed $10,000 per violation.

515.   At all relevant times, Plaintiffs and the Kansas Subclass were individuals who purchased Defendant's baby foods for personal, family or household purposes.

516.   At all relevant times, Defendant was a manufacturer, distributor, dealer, seller, lessor, assignor, or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer.

517.   Defendant willfully engaged in deceptive acts and practices in connection with consumer transactions as described in the allegations above.

518.   As a result, Defendant's conduct violates several provisions of the Kansas CPA, including but not limited to:

    a.   Section 50-626(b)(1)(A): Representing, knowingly or with a reason to know, that property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins;

    b.   Section 50-626(b)(1)(D): Representing, knowingly or with a reason to know, that property or services of are a particular standard, quality, grade, style, or model, if they are of another which differs materially from the representation—as above, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; and

    c.   Section 50-626(b)(3): The willful failure to state a material fact, or the willful concealment, suppression or omission of a material fact—here, Defendant willfully

failed to state and concealed its knowledge about the levels of toxins in its toxic baby food, a material fact concerning the ingredients and health effects of its toxic baby food.

519.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

520.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

521.    Defendant's conduct as alleged above was unfair, including but not limited to:

    a.   Section 50-627(b)(1): The supplier took advantage of the inability of the consumer to reasonably protect the consumer's interests because of the consumer's ignorance or similar factor—here, the Defendant had knowledge about the amounts of toxins in its toxic baby food, which information:

        i.   Defendant measures and analyzes in the regular operation of its business;

        ii.   Is directly related to consumers' interest; and

        iii.   Is not within the ability of the consumer to reasonably measure and analyze.

    b.   Section 50-627(b)(6): The supplier made a misleading statement of opinion on which the consumer was likely to the consumer's detriment—Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a

safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins.

522.     Defendant's omissions in violation of the Kansas CPA were likely to mislead an ordinary consumer. Plaintiff and the Kansas Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Kansas Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality. If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiff and the Kansas Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiff and the Kansas Subclass would not have purchased Defendant's toxic baby food.

523.     Defendant's omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

524.     Plaintiffs and the Kansas Subclass relied to their detriment on Defendant's omissions in purchasing toxic baby food.

525.     As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiff, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b. Designating Plaintiffs as Class representative and counsel as Class counsel;

c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d. Awarding Plaintiffs and Class members damages or a civil penalty not to exceed $10,000 for each violation, whichever is greater, and

e. Granting such further relief as the Court deems just.

## COUNT 24
### Violation of the Kentucky Consumer Protection Act (Ky. Rev. Stat. Ann. §§ 367.110, *et seq.*), on Behalf of Plaintiffs Ana Butkus, Melinda Pass, Cheryl Smith, Brittany Wallace, Amber Wright, and the Kentucky Subclass

526. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

527. Plaintiffs Ana Butkus, Melinda Pass, Cheryl Smith, Brittany Wallace, and Amber Wright bring this Count individually and on behalf of the Kentucky Subclass.

528. Kentucky's Consumer Protection Act ("Kentucky CPA") prohibits any "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce."

529. The Kentucky CPA further provides that any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair, false, misleading or deceptive act or practice may bring an action to recover actual damages.

530.    At all relevant times, members of the Kentucky Subclass and Defendant were either natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, or another legal entity.

531.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with trade or commerce in violation of Ky. Rev. Stat. Ann. § 367.170(1) as described in the allegations above.

532.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

533.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

534.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

535.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

536.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Kentucky Subclass.

537.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Kentucky Subclass has little alternative but to submit and causes consumers substantial injury.

538.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

539.    The Kentucky Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

540.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.  Awarding Plaintiffs and Class members damages, reasonable attorneys' fees and costs; and

e.  Granting such further relief as the Court deems just.

**COUNT 25**
**Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law (La.**
**Rev. Stat. Ann. §§ 51:1401, *et seq.*), on Behalf of Plaintiffs Loukevia Moore, Lakrisha**
**Spikes, Margo Tezeno, and the Louisiana Subclass**

541.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

542.    Plaintiffs Loukevia Moore, Lakrisha Spikes, and Margo Tezeno bring this Count individually and on behalf of the Louisiana Subclass.

543.    Louisiana's Unfair Trade Practices and Consumer Protection Law prohibits any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

544.    Louisiana's Unfair Trade Practices and Consumer Protection Law further provides that any person who suffers any ascertainable loss of money as a result of the use or employment by another person of an unfair or deceptive method, act, or practice may bring an action to recover actual damages.

545.    At all relevant times, members of the Louisiana Subclass and Defendant were either natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, or another legal entity.

546.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection its advertising, offering for sale, sale, or distribution of property, in violation of La. Rev. Stat. Ann. § 51:1405(A) as described in the allegations above.

547.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

548.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

549.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

550.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

551.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Louisiana Subclass.

552.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Louisiana Subclass has little alternative but to submit and causes consumers substantial injury.

553.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

554.    The Louisiana Subclass has suffered economic injury as a direct and proximate result of the Louisiana Defendant's conduct.

555.    As a direct and proximate result of the foregoing acts and practices, the Louisiana

Defendant has received, or will receive, income, profits, and other benefits which they would not

have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons

described herein, pray for an Order as follows:

a.    Finding that this action satisfies the prerequisites for maintenance as a class action

set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or

Classes defined herein;

b.    Designating Plaintiffs as Class representative and counsel as Class counsel;

c.    Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.    Awarding Plaintiffs and Class members actual damages, reasonable attorneys' fees

and costs of suit; and

e.    Granting such further relief as the Court deems just.

### COUNT 26
**Violation of the Maine Unfair Trade Practices Act (Me. Rev. Stat. Ann. tit. 5, §§ 205-A, *et seq.*), on Behalf of Plaintiffs Jen Comeau, Kimberly Conway, Mia Pelletier, and the Maine Subclass**

556.    Plaintiffs incorporate by reference and reallege each and every allegation contained

above, as though fully set forth herein.

557.    Plaintiffs Jen Comeau, Kimberly Conway, and Mia Pelletier bring this Count

individually and on behalf of the Maine Subclass.

558.    Maine's Unfair Trade Practices Act prohibits any "[u]nfair methods of competition

and unfair or deceptive acts or practices in the conduct of any trade or commerce."

559.    Maine's Unfair Trade Practices Act further provides that any person who purchases

or leases goods, services or property, real or personal, primarily for personal, family or household

purposes and thereby suffers any loss of money or property, real or personal, as a result of the use or employment by another person of a unfair or deceptive acts or practices may bring an action for actual damages, restitution and for such other equitable relief, including an injunction, as the court determines to be necessary and proper.

560.    At all relevant times, members of the Maine Subclass and Defendant were either natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations or another legal entity.

561.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with trade or commerce in violation of Me. Rev. Stat. Ann. tit. 5, § 207 as described in the allegations above.

562.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above occurred in connection with its advertising, offering for sale, sale or distribution of services or property.

563.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

564.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

565.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

566.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Maine Subclass.

567.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Maine Subclass has little alternative but to submit and causes consumers substantial injury.

568.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

569.    The Maine Subclass has suffered economic injury as a direct and proximate result of the Maine Defendant's conduct.

570.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

571.    Plaintiffs provided Defendant pre-suit settlement offer pursuant to Me. Rev. Stat. Ann. tit. 5, § 213(1-A), by sending a certified letter containing the basis of Plaintiffs' claims on April 13, 2021.  Said notice was received by Defendant on or about April 19, 2021.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.  Awarding Plaintiffs and Class members damages, reasonable attorneys' fees and costs; and

e.  Granting such further relief as the Court deems just.

**COUNT 27**
**Violation of the Maryland Consumer Protection Act (Md. Code Ann., Com. Law §§ 13-101, *et seq.*), on Behalf of Plaintiffs Alyssa Barb, Julie Blakeley, Kimberly Conway, Lori-Ann McKenzie-Henry, Katrina Thomas, and the Maryland Subclass**

572.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

573.    Plaintiffs Alyssa Barb, Julie Blakeley, Kimberly Conway, Lori-Ann McKenzie-Henry, and Katrina Thomas brings this Count individually and on behalf of the Maryland Subclass.

574.    The Maryland Consumer Protection Act ("Maryland CPA") provides a person may not engage in any unfair, abusive or deceptive trade practice in the sale or lease or consumer goods or services.

575.    The Maryland CPA also provides that unfair, abusive, or deceptive trade practices include, among other things, any: (1) false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers; (2) representation that: (i) consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have; or (ii) consumer goods, consumer

realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not; (3) failure to state a material fact if the failure deceives or tends to deceive; and (4) deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with (i) the promotion or sale of any consumer goods, consumer realty, or consumer service.

576.    The Maryland CPA further provides that any person may bring an action to recover for injury or loss sustained by him as the result of an unfair, abusive or deceptive practice.

577.    At all relevant times, Plaintiffs, members of the Maryland Subclass, and Defendant were either individuals, corporations, business trusts, statutory trusts, estates, trusts, partnerships, associations, two or more persons having a joint or common interest, or another legal or commercial entity.

578.    Defendant willfully engaged in unfair, abusive, and deceptive trade practices as described in the allegations above.

579.    As a result, Defendant's conduct violates several provisions of the Maryland CPA, including but not limited to:

     a.    Section 13-301(1): Making false or misleading oral or written statements, visual descriptions, or other representations of any kind which have the capacity, tendency, or effect of deceiving or misleading consumers—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins;

b. Section 13-301(2)(b)(i): Representing that consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not—Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins;

c. Section 13-301(2)(b)(ii): Representing that consumer good, consumer realty, or consumer services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another—Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins;

d. Section 13-301(3): Failing to state a material fact if the failure deceives or tends to deceive—Defendants failed to state the material fact that toxic baby food contains excessive levels of toxins, which both tends to deceive and did deceive Plaintiffs and the Maryland Subclass; and

e. Section 13-301(9)(I): Committing deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that the consumer rely on the same in connection with the promotion or sale of any consumer goods—Defendant deceived Plaintiffs and the Maryland Subclass by misrepresenting toxic baby food as a safe baby food by knowingly concealing, suppressing, and omitting from all marketing the material fact that toxic baby food contains harmful amounts of toxins.

580.    Defendant's omissions in violation of the Maryland CPA were likely to mislead an ordinary consumer. Plaintiffs and the Maryland Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Maryland Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

581.    If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Maryland Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Maryland Subclass would not have purchased Defendant's toxic baby food.

582.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

583.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

584.    Plaintiffs and the Maryland Subclass relied to their detriment on Defendant's omissions in purchasing toxic baby food.

585.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

    a.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

    b.   Designating Plaintiffs as Class representative and counsel as Class counsel;

    c.   Entering judgment in favor of Plaintiffs and the Class and against Defendant;

    d.   Awarding Plaintiffs and Class members damages, reasonable attorneys' fees and costs; and

    e.   Granting such further relief as the Court deems just.

### COUNT 28
**Violation of the Massachusetts Regulation of Business Practice and Consumer Protection Act (Mass. Gen. Laws Ann. ch. 93A, §§ 1, *et seq.*), on Behalf of Plaintiffs Grisel Barreto, Brittany Distaso, Jo-Ellen Paterno, and the Massachusetts Subclass**

586.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

587.    Plaintiffs Grisel Barreto, Brittany Distaso, and Jo-Ellen Paterno bring this Count individually and on behalf of the Massachusetts Subclass.

588.    Massachusetts's Regulation of Business Practice and Consumer Protection Act prohibits any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

589.    At all relevant times, members of the Massachusetts Subclass and Defendant were either natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and another legal entity.

590.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with trade or commerce in violation of Mass. Gen. Laws Ann. ch. 93A, § 2(a) as described in the allegations above.

591.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

592.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

593.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

594.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

595.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Massachusetts Subclass.

596.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Massachusetts Subclass has little alternative but to submit and causes consumers substantial injury.

597.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

598.    The Massachusetts Subclass has suffered economic injury as a direct and proximate result of the Massachusetts Defendant's conduct.

599.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

600.    Plaintiffs provided Defendant pre-suit notice pursuant to Mass. Gen. Laws Ann. ch. 93A, § 9(3) by sending a certified letter containing the basis of Plaintiffs' claims on April 12, 2021. Said notice was received by Defendant on or about April 19, 2021.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b. Designating Plaintiffs as Class representative and counsel as Class counsel;

c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d. Awarding Plaintiffs and Class members treble damages, attorneys' fees, costs; and

e. Granting such further relief as the Court deems just.

## COUNT 29
### Violation of the Michigan Consumer Protection Act (Mich. Comp. Laws §§ 445.901, *et seq.*), on Behalf of Plaintiffs Jordan Cantafio, Deana Linegar, Kirthi Sasikumar, Emily Soderbloom-Cathey, Megan Troyer, and the Michigan Subclass

601.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

602.    Plaintiffs Jordan Cantafio, Deana Linegar, Kirthi Sasikumar, Emily Soderbloom-Cathey, and Megan Troyer bring this Count individually and on behalf of the Michigan Subclass.

603.    Michigan's Consumer Protection Act makes unlawful "[f]ailing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer."

604.    At all relevant times, members of the Michigan Subclass and Defendant were "persons" within the meaning of the Consumer Protection Act. *See* Mich. Comp. Laws § 445.902(d).

605.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection with trade or commerce in violation of Mich. Comp. Laws § 445.903(1)(s) as described in the allegations above.

606.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

607.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

608.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

609.    Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

610.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching the Defendant at the expense of the Michigan Subclass.

611.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Michigan Subclass has little alternative but to submit and causes consumers substantial injury.

612.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

613.    The Michigan Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

614.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.  Awarding Plaintiffs and Class members damages their damages or $250, whichever is greater, together with reasonable attorneys' fees and costs; and

e.  Granting such further relief as the Court deems just.

## COUNT 30
**Violation of the Minnesota Prevention of Consumer Fraud Act (Minn. Stat. Ann. §§ 325F.68, *et seq.*), on Behalf of Plaintiffs Crystal Brinig and the Minnesota Subclass**

615.  Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

616.  Plaintiff Crystal Brinig brings this Count individually and on behalf of the Minnesota Subclass.

617.  Minnesota's Prevention of Consumer Fraud Act ("Minnesota PCFA") prohibits any "act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."

618.  At all relevant times, members of the Minnesota Subclass and Defendant were "persons" within the meaning of the Minnesota PCFA. *See* Minn. Stat. Ann. § 325F.68(3).

619.  Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection with the sale of merchandise (as defined by Minn. Stat.

Ann. § 325F.68(2)) in violation of Minn. Stat. Ann. § 325F.69 as described in the allegations above.

620.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

621.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

622.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Minnesota Subclass.

623.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Minnesota Subclass has little alternative but to submit and causes consumers substantial injury.

624.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

625.    At all relevant times, special circumstances have existed and required Defendant to disclose rather than omit information about the levels of toxins in its toxic baby food. These special circumstances include but are not limited to the following:

    a.    Defendant had a fiduciary relationship with Plaintiffs and members of the Minnesota Subclass in that (1) the Defendant knew or had reason to know that Plaintiffs and the Minnesota Subclass were placing trust and confidence in it and relying on it to counsel and inform them about the safety and nutrition of baby food;

(2) Plaintiffs and the Minnesota Subclass placed their confidence in Defendant, resulting in superiority and influence over Plaintiffs and the Minnesota Subclass; (3) there was an asymmetry of information between the parties in favor of the Defendant, in combination with the status of the relationship; and (4) the parties had disparate levels of business experience, and Defendant invited Plaintiffs and the Minnesota Subclass to place their confidence in Defendant.

b. Defendant had special knowledge of material facts to which Plaintiffs and the Minnesota Subclass did not have access.

c. Defendant speaks widely and loudly through its branding about the safety and nutrition of its toxic baby food, e.g., misleading statements about complying with government safety standards when Defendant knows such standards do not directly regulate the amounts of toxins in its toxic baby food, and therefore Defendant must be required at the same time to say enough about the amounts of toxins in its toxic baby food to prevent its words from misleading consumers.

626.     The Minnesota Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

627.     As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiff, individually and on behalf of the Class and/or Classes of persons described herein, prays for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiff as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiff and the Class and against Defendant;

d.  Awarding Plaintiff and Class members damages, reasonable attorneys' fees, and costs; and

e.  Granting such further relief as the Court deems just.

### COUNT 31
**Violation of the Minnesota Unlawful Trade Practices Act (Minn. Stat. Ann. §§ 325D.09, *et seq.*), on Behalf of Plaintiff Crystal Brinig and the Minnesota Subclass**

628.  Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

629.  Plaintiffs Crystal Brinig brings this Count individually and on behalf of the Minnesota Subclass.

630.  At all relevant times, members of the Minnesota Subclass and Defendant were "persons" within the meaning of the Minnesota Unlawful Trade Practices Act ("Minnesota UTPA"). *See* Minn. Stat. Ann. § 325D.10.

631.  Minnesota's UTPA prohibits misrepresentations about the quality of goods: "No personal shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise." *See* Minn. Stat. Ann. § 325D.13.

632.  Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they

intended others to rely upon in connection with the sale of merchandise as described in the allegations above.

633.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act in connection with the sale of merchandise.

634.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest and is the type of harm that Minn. Stat. Ann. § 325D.09 expresses must be suppressed.

635.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Minnesota Subclass.

636.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Minnesota Subclass has little alternative but to submit and causes consumers substantial injury.

637.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

638.    At all relevant times, special circumstances have existed and required Defendant to disclose rather than omit information about the levels of toxins in its toxic baby food. These special circumstances include but are not limited to the following:

> a. Defendant had a fiduciary relationship with Plaintiffs and members of the Minnesota Subclass in that (1) the Defendant knew or had reason to know that Plaintiffs and the Minnesota Subclass were placing trust and confidence in it and

relying on it to counsel and inform them about the safety and nutrition of baby food; (2) Plaintiffs and the Minnesota Subclass placed their confidence in Defendant, resulting in superiority and influence over Plaintiffs and the Minnesota Subclass; (3) there was an asymmetry of information between the parties in favor of the Defendant, in combination with the status of the relationship; and (4) the parties had disparate levels of business experience, and Defendant invited Plaintiffs and the Minnesota Subclass to place their confidence in Defendant.

b.  Defendant had special knowledge of material facts to which Plaintiffs and the Minnesota Subclass did not have access.

c.  Defendant speaks widely and loudly through its branding about the safety and nutrition of its toxic baby food, e.g., misleading statements about complying with government safety standards when Defendant knows such standards do not directly regulate the amounts of toxins in its toxic baby food, and therefore Defendant must be required at the same time to say enough about the amounts of toxins in its toxic baby food to prevent its words from misleading consumers.

639.  The Minnesota Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

640.  As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiff, individually and on behalf of the Class and/or Classes of persons described herein, prays for an Order as follows:

a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b. Designating Plaintiff as Class representative and counsel as Class counsel;

c. Entering judgment in favor of Plaintiff and the Class and against Defendant;

d. Awarding Plaintiff and Class members their damages; and

e. Granting such further relief as the Court deems just.

**COUNT 32**
**Violation of the Minnesota Uniform Deceptive Trade Practices Act (Minn. Stat. Ann. §§ 325D.43, *et seq.*), on Behalf of Plaintiff Crystal Brinig and the Minnesota Subclass**

641.    Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

642.    Plaintiff Crystal Brinig brings this Count individually and on behalf of the Minnesota Subclass.

643.    The Minnesota Uniform Deceptive Trade Practices Act ("Minnesota UDTPA") prohibits persons from committing deceptive acts in the course of business. *See* Minn. Stat. Ann. § 325D.44.

644.    Among other things, the Minnesota UDTPA specifically defines the following acts and representations about the subject matter of the consumer transaction as deceptive acts: (1) causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods; (2) that such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; and (3) that such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

645. At all relevant times, Plaintiffs, members of the Minnesota Subclass, and Defendant were either individuals, corporations, business trusts, estates, trusts, partnerships, associations, nonprofit corporations or organizations, or cooperatives or some other legal entity.

646. Defendant willfully engaged in unfair, deceptive, and/or unlawful practices, as well as unconscionable commercial practices as described in the allegations above.

647. As a result, Defendant's conduct violates several provisions of the Minnesota UDTPA, including but not limited to:

    a. Section 325D.44(2): Causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods—here, Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food while at the same time asserting that the toxic baby food irrelevant safety standards causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that consumers will believe the toxic baby food does not contain excessive amounts of toxins and is regarded as safe for babies to eat. This provision does not require proof of actual confusion or misunderstanding.

    b. Section 325D.44(5): Representing that the subject of a consumer transaction has sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that it do not have—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; and

c.  Section 325D.44(7): Representing that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins.

648.  At all relevant times, special circumstances have existed and required Defendant to disclose rather than omit information about the levels of toxins in its toxic baby food. These special circumstances include but are not limited to the following:

a.  Defendant had a fiduciary relationship with Plaintiffs and members of the Minnesota Subclass in that (1) the Defendant knew or had reason to know that Plaintiffs and the Minnesota Subclass were placing trust and confidence in it and relying on it to counsel and inform them about the safety and nutrition of baby food; (2) Plaintiffs and the Minnesota Subclass placed their confidence in Defendant, resulting in superiority and influence over Plaintiffs and the Minnesota Subclass; (3) there was an asymmetry of information between the parties in favor of the Defendant, in combination with the status of the relationship; and (4) the parties had disparate levels of business experience, and Defendant invited Plaintiffs and the Minnesota Subclass to place their confidence in Defendant.

b.  Defendant had special knowledge of material facts to which Plaintiffs and the Minnesota Subclass did not have access.

c.  Defendant speaks widely and loudly through its branding about the safety and nutrition of its toxic baby food, e.g., misleading statements about complying with

government safety standards when Defendant knows such standards do not directly regulate the amounts of toxins in its toxic baby food, and therefore Defendant must be required at the same time to say enough about the amounts of toxins in its toxic baby food to prevent its words from misleading consumers.

649.   Defendant's omissions in violation of the Minnesota UDTPA were likely to mislead an ordinary consumer. Plaintiffs and the Minnesota Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxic heavy metals. Plaintiff and the Minnesota Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality. If Defendant had disclosed that its toxic baby food contained toxic heavy metals and was of substandard quality, Plaintiffs and the Minnesota Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Minnesota Subclass would not have purchased Defendant's toxic baby food.

650.   Defendant's omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

651.   Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

652.   Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2)

Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

WHEREFORE, Plaintiff, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

  a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

  b.  Designating Plaintiff as Class representative and counsel as Class counsel;

  c.  Entering judgment in favor of Plaintiff and the Class and against Defendant;

  d.  Awarding Plaintiff and Class members damages, reasonable attorneys' fees, and costs; and

  e.  Granting such further relief as the Court deems just.

**COUNT 33**
**Violation of the Mississippi Consumer Protection Act (Miss. Code Ann. §§ 75-24-1, *et seq.*), on Behalf of Plaintiffs Chelzy Desvigne and Kirsten South and the Mississippi Subclass**

653.    Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

654.    Plaintiffs Chelzy Desvigne and Kirsten South brings this Count individually and on behalf of the Mississippi Subclass.

655.    At all relevant times, Plaintiffs, members of the Mississippi Subclass, and Defendant were "persons" within the meaning of Miss. Code Ann. § 75-24-3(a).

656.    The Mississippi Consumer Protection Act ("Mississippi CPA") prohibits unfair or deceptive trade practices in or affecting commerce. *See* Miss. Code Ann. § 75-24-5.

657.    Defendant willfully engaged in unfair or deceptive trade practices in or affecting commerce as described in the allegations above.

658.   As a result, Defendant's conduct violates several provisions of the Mississippi CPA, including but not limited to:

  a.   Section 75-24-5(2)(e): Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; and

  b.   Section 75-24-5(2)(g): Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins.

659.   Defendant's omissions in violation of the Mississippi CPA were likely to mislead an ordinary consumer. Plaintiffs and the Mississippi Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Mississippi Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality. If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Mississippi Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Mississippi Subclass would not have purchased Defendant's toxic baby food.

660.    Plaintiffs and the Mississippi Subclass relied to their detriment on Defendant's omissions in purchasing toxic baby food.

661.    Pursuant to Miss. Code Ann. § 75-24-15(2), Plaintiffs made a reasonable attempt to resolve their claims through an informal dispute settlement program approved by the Attorney General by delivering a letter by to consumer@ago.ms.gov on July 16, 2021, in addition to sending written notice by mail to Defendant on April 12, 2021, which Defendant received on or about April 16, 2021.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.    Designating Plaintiffs as Class representative and counsel as Class counsel;

c.    Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.    Awarding Plaintiffs and Class members their damages; and

e.    Granting such further relief as the Court deems just.

### COUNT 34
**Violation of the Missouri Merchandising Practices Act (Mo. Rev. Stat. Ann. §§ 407.010, *et seq.*), on Behalf of Plaintiffs Sarah Ridings, Emily Soderbloom-Cathey, and the Missouri Subclass**

662.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

663.    Plaintiffs Sarah Ridings and Emily Soderbloom-Cathey bring this Count individually and on behalf of the Missouri Subclass.

664.    Missouri's Merchandising Practices Act ("Missouri MPA") prohibits any "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce or the solicitation of any funds for any charitable purpose."

665.    At all relevant times, members of the Missouri Subclass and Missouri Defendant were "persons" within the meaning of the Missouri MPA. *See* Mo. Rev. Stat. Ann. § 407.010(5).

666.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with trade or commerce in violation of Mo. Rev. Stat. Ann. § 407.020 as described in the allegations above.

667.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

668.    At all relevant times, Plaintiffs and members of the Missouri Subclass acted as a reasonable consumer would in light of all circumstances.

669.    Defendant's unlawful method, acts, and practices as alleged would cause a reasonable person to enter into the transactions that resulted in damages.

670.    At trial, Plaintiffs will present, both individually and on behalf of the Missouri Subclass, evidence that is sufficiently definitive and objective to allow the loss of individual damages to be calculated with a reasonable degree of certainty.

671.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

672.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it inequitably enriches Defendant at the expense of the Missouri Subclass.

673.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Missouri Subclass has little alternative but to submit and causes consumers substantial injury.

674.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

675.     The Missouri Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

676.     As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.   Designating Plaintiffs as Class representative and counsel as Class counsel;

c.   Entering judgment in favor of Plaintiffs and the Class and against Defendant;

    d.   Awarding Plaintiffs and Class members their individual damages, punitive damages, attorneys' fees based on the amount of time reasonably expended, and costs; and

    e.   Granting such further relief as the Court deems just.

**COUNT 35**
**Violation of the Montana Unfair Trade Practices and Consumer Protection Act (Mont. Code Ann. §§ 30-14-101, *et seq.*), on Behalf of Plaintiffs Lea Santos, Sonja Renee Twiggs, and the Montana Subclass**

677.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

678.    Plaintiff Plaintiffs Lea Santos and Sonja Renee Twiggs brings this Count individually and on behalf of the Montana Subclass.

679.    At all relevant times, Plaintiffs, the Montana Subclass, and Defendant were "persons" within the meaning of Mont. Code Ann. § 30-14-102(6).

680.    The Montana Unfair Trade Practices and Consumer Protection Act prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. *See* Mont. Code Ann. § 30-14-103.

681.    Defendant willfully engaged in unfair, deceptive, and/or unlawful practices as described in the allegations above.

682.    Defendant's misrepresentations, omissions, and suppression of material information in the sale of its toxic baby food are acts or practices in the conduct or trade or commerce.

683.    Plaintiffs and the Montana Subclass suffered loss of money as a direct and proximate result of Defendant's unfair, deceptive practices.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

    a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

    b. Designating Plaintiffs as Class representative and counsel as Class counsel;

    c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

    d. Awarding Plaintiffs and Class members the greater of their actual damages or $500, treble damages, attorneys' fees, and costs; and

    e. Granting such further relief as the Court deems just.

## COUNT 36
**Violation of the Nebraska Consumer Protection Act (Neb. Rev. Stat. §§ 59-1601, *et seq.*), on Behalf of Plaintiffs Kyla Talley, Acacia Wilson, and the Nebraska Subclass**

684. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

685. Plaintiffs Kyla Talley and Acacia Wilson bring this Count individually and on behalf of the Nebraska Subclass.

686. Nebraska's Consumer Protection Act prohibits any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

687. At all relevant times, members of the Nebraska Subclass and Defendant were "persons" within the meaning of the Consumer Protection Act. *See* Neb. Rev. Stat. § 59-1601(1).

688. Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with trade or commerce in violation of Neb. Rev. Stat. § 59-1602 as described in the allegations above.

689.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

690.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

691.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Nebraska Subclass.

692.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Nebraska Subclass has little alternative but to submit and causes consumers substantial injury.

693.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

694.     The Nebraska Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

695.     As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b. Designating Plaintiffs as Class representative and counsel as Class counsel;

c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d. Awarding Plaintiffs and Class members their damages or $1,000, whichever is greater; reasonable attorneys' fees; costs; and

e. Granting such further relief as the Court deems just.

**COUNT 37**
**Violation of the Nebraska Uniform Deceptive Trade Practices Act (Neb. Rev. Stat. §§ 87-301, *et seq.*), on Behalf of Plaintiffs Kyla Talley, Acacia Wilson, and the Nebraska Subclass**

696.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

697.    Plaintiffs Kyla Talley and Acacia Wilson bring this Count individually and on behalf of the Nebraska Subclass.

698.    The Nebraska Uniform Deceptive Trade Practices Act ("Nebraska UDTPA") prohibits persons from committing deceptive acts in the course of business. *See* Neb. Rev. Stat. § 87-301.

699.    Among other things, the Nebraska UDTPA specifically defines the following acts and representations about the subject matter of the consumer transaction as deceptive acts: (1) causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods; (2) causing likelihood of confusion or misunderstanding as to affiliation, connection, or associations with, or certification by, another; (3) that such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; and (4) that

such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

700.    At all relevant times, Plaintiffs, members of the Nebraska Subclass, and Defendant were either individuals, corporations, business trusts, estates, trusts, partnerships, associations, nonprofit corporations or organizations, or cooperatives or some other legal entity.

701.    Defendant willfully engaged in unfair, deceptive, and/or unlawful practices, as well as unconscionable commercial practices as described in the allegations above.

702.    As a result, Defendant's conduct violates several provisions of the Nebraska UDTPA, including but not limited to:

  a. Section 87-302(a)(2): Causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods—here, Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food while at the same time asserting that the toxic baby food irrelevant safety standards causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that consumers will believe the toxic baby food does not contain excessive amounts of toxins as approved by the authorities who issue certain safety regulations. This provision does not require proof of actual confusion or misunderstanding.

  b. Section 87-302(a)(3): Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another—here, Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food while at the same time asserting that the toxic baby food irrelevant safety standards causes the likelihood of confusion or misunderstanding

about the sources and certifications of its ingredients in that it causes a likelihood that consumers will believe the toxic baby food does not contain excessive amounts of toxins as approved by the authorities who issue certain safety regulations. This provision does not require proof of actual confusion or misunderstanding.

c. Section 87-302(a)(4): Representing that the subject of a consumer transaction has sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that it do not have—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; and

d. Section 87-302(a)(6): Representing that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins.

703.    Defendant's omissions in violation of the Nebraska UDTPA were likely to mislead an ordinary consumer. Plaintiffs and the Nebraska Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxic heavy metals. Plaintiff and the Nebraska Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality. If Defendant had disclosed that its toxic baby food contained toxic heavy metals and was of substandard quality, Plaintiffs and the Nebraska Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of

substandard quality, and Plaintiffs and the Nebraska Subclass would not have purchased Defendant's toxic baby food.

704.   Defendant's omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

705.   Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

706.   Instead, as a result of Defendant's misrepresentation, Plaintiffs and Class members suffered monetary losses in that (1) the actual value of the merchandise they received was less than the value of the merchandise as represented denying them of the benefit of their bargain; and (2) Plaintiffs and Class members paid more than the fair market value of the merchandise they received causing them out-of-pocket damages.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.   Designating Plaintiffs as Class representative and counsel as Class counsel;

c.   Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.   Awarding Plaintiffs and Class members damages, attorneys' fees, and costs; and

e.   Granting such further relief as the Court deems just.

**COUNT 38**
**Violation of the Nevada Deceptive Trade Practices Act (Nev. Rev. Stat. §§ 598.0903, *et seq.*), on Behalf of Plaintiffs Grisel Barreto, Kelsey Blankenship, and the Nevada Subclass**

707.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

708.    Plaintiffs Grisel Barreto and Kelsey Blankenship bring this Count individually and on behalf of the Nevada Subclass.

709.    Nevada's Private Right of Action for Consumer Frauds Act prohibits any "false representation in a transaction" in the course of a business or operation.

710.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in the course of the Defendant's business in violation of Nev. Rev. Stat. § 598.0915 as described in the allegations above.

711.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

712.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

713.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Nevada Subclass.

714.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Nevada Subclass has little alternative but to submit and causes consumers substantial injury.

715.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children

from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

716.    The Nevada Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

717.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.    Designating Plaintiffs as Class representative and counsel as Class counsel;

c.    Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.    Awarding Plaintiffs and Class members damages; and

e.    Granting such further relief as the Court deems just.

**COUNT 39**
**Violation of the New Hampshire Regulation of Business Practices for Consumer Protection Act (N.H. Rev. Stat. Ann. §§ 358-A, *et seq.*), on Behalf of Plaintiffs Jo-Ellen Paterno, and the New Hampshire Subclass**

718.    Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

719.    Plaintiff Jo-Ellen Paterno bring this Count individually and on behalf of the New Hampshire Subclass.

720.     New Hampshire's Regulation of Business Practices for Consumer Protection Act ("New Hampshire CPA") prohibits any "unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." *See* N.H. Rev. Stat. Ann. § 358-A:2.

721.     Among other things, the New Hampshire CPA specifically defines the following acts and representations about the subject matter of the consumer transaction as deceptive acts: (1) causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods; (2) causing likelihood of confusion or misunderstanding as to affiliation, connection, or associations with, or certification by, another; (3) that such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; and (4) that such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not. *See* N.H. Rev. Stat. Ann. § 358-A:2.

722.     At all relevant times, Plaintiffs, members of the New Hampshire Subclass, and Defendant were "persons" within the meaning of the New Hampshire CPA. *See* N.H. Rev. Stat. Ann. § 358-A:1, I.

723.     Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with trade or commerce in violation of N.H. Rev. Stat. Ann. § 358-A:2 as described in the allegations above.

724.     As a result, Defendant's conduct violates several provisions of the New Hampshire CPA, including but not limited to:

a. Section 358-A:2, II: Causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods—here, Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food while at the same time asserting that the toxic baby food irrelevant safety standards causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that consumers will believe the toxic baby food does not contain excessive amounts of toxins as approved by the authorities who issue certain safety regulations. This provision does not require proof of actual confusion or misunderstanding;

b. Section 358-A:2, III: Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another—here, Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food while at the same time asserting that the toxic baby food irrelevant safety standards causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that consumers will believe the toxic baby food does not contain excessive amounts of toxins as approved by the authorities who issue certain safety regulations. This provision does not require proof of actual confusion or misunderstanding;

c. Section 358-A:2, V: Representing that the subject of a consumer transaction has sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that it do not have—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which

consumers could use without unduly exposing their babies to the risk of exposure to toxins; and

d.  Section 358-A:2, VII: Representing that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins.

725.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

726.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

727.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the New Hampshire Subclass.

728.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the New Hampshire Subclass has little alternative but to submit and causes consumers substantial injury.

729.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

730.    The New Hampshire Subclass has suffered economic injury as a direct and proximate result of the Defendant's conduct.

731.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiff, individually and on behalf of the Class and/or Classes of persons described herein, prays for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiff as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiff and the Class and against Defendant;

d.  Awarding Plaintiff and Class members their damages or $1,000, whichever is greater; three times the amount of their damages or $1,000, as the case may be; reasonable attorneys' fees; costs; and

e.  Granting such further relief as the Court deems just.

**COUNT 40**
**Violation of the New Jersey Consumer Fraud Act (N.J. Stat. Ann. §§ 56:8-1, *et seq.*), on Behalf of Plaintiffs Kimberly Conway, Brittany Distaso, and the New Jersey Subclass**

732.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

733.    Plaintiffs Kimberly Conway and Brittany Distaso bring this Count individually and on behalf of the New Jersey Subclass.

734.    New Jersey's Consumer Fraud Act ("New Jersey CFA") prohibits any "act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false

pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission

of any material fact with intent that others rely upon such concealment, suppression or omission,

in connection with the sale or advertisement of any merchandise."

735.   At all relevant times, members of the New Jersey Subclass and Defendant were

"persons" within the meaning of the New Jersey CFA. *See* N.J. Stat. Ann. § 56:8-1(d).

736.   Defendant willfully and purposefully engaged in deceptive and unfair acts and

practices, misrepresentation, and the concealment, suppression, and omission of material facts they

intended others to rely upon in connection with the sale of merchandise (as defined by N.J. Stat.

Ann. § 56:8-1(c)) in violation of N.J. Stat. Ann. § 56:8-2 as described in the allegations above.

737.   Defendant's misrepresentations and omissions in the sale of its toxic baby food

detailed above is an act or practice in the conduct of trade or commerce.

738.   Defendant's misrepresentations and omissions in the sale of its toxic baby food

detailed above impacts the public interest.

739.   Defendant's misrepresentations and omissions in the sale of its toxic baby food

detailed above is unfair because it is inequitably enriching Defendant at the expense of the New

Jersey Subclass.

740.   Defendant's misrepresentations and omissions in the sale of its toxic baby food

detailed above is unfair because it offends public policy, and is so oppressive that the New Jersey

Subclass has little alternative but to submit and causes consumers substantial injury.

741.   Defendant's misrepresentations and omissions in the sale of its toxic baby food

detailed above is unfair in that it violates the well-established public policies of protecting children

from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit

for human consumption.

742.    The New Jersey Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

743.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

    a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

    b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

    c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

    d.  Awarding Plaintiffs and Class members their damages; threefold their damages; reasonable attorneys' fees; filing fees; and costs; and

    e.  Granting such further relief as the Court deems just.

### COUNT 41
**Violation of the New Mexico Unfair Practices Act (N.M. Stat. Ann. §§ 57-12-1, *et seq.*), on Behalf of Plaintiffs Ayame Tatiana Galassini and the New Mexico Subclass**

744.    Plaintiff incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

745.    Plaintiff Ayame Tatiana Galassini brings this Count individually and on behalf of the New Mexico Subclass.

746.    New Mexico's Unfair Practices Act ("New Mexico UPA") prohibits any "[u]nfair or deceptive trade practices and unconscionable trade practices in the conduct of any trade or commerce."

747.     At all relevant times, members of the New Mexico Subclass and Defendant were "persons" within the meaning of the New Mexico UPA. *See* N.M. Stat. Ann. § 57-12-1(A).

748.     Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with trade or commerce in violation of N.M. Stat. Ann. § 57-12-3 as described in the allegations above.

749.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce that Defendant intended to induce consumers to buy toxic baby food.

750.     Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer. Plaintiffs and the New Mexico Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the New Mexico Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

751.     If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the New Mexico Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the New Mexico Subclass would not have purchased Defendant's toxic baby food.

752.     Plaintiff and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

753.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

754.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the New Mexico Subclass.

755.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the New Mexico Subclass has little alternative but to submit and causes consumers substantial injury.

756.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

757.    The New Mexico Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

758.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiff, individually and on behalf of the Class and/or Classes of persons described herein, prays for an Order as follows:

    a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

    b.  Designating Plaintiff as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.  Awarding Plaintiffs and Class member treble damages or $300, whichever is greater; attorneys' fees, and costs; and

e.  Granting such further relief as the Court deems just.

**COUNT 42**
**Violation of the New York Deceptive Acts and Practices (N.Y. Gen. Bus. Law §§ 349, *et seq.*), on Behalf of Plaintiffs Melissa Bloomquist-Smith, Shelby Geraci, Robert Partello, Tina Marie Perez, and the New York Subclass**

759.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

760.   Plaintiffs Melissa Bloomquist-Smith, Shelby Geraci, Robert Partello, and Tina Marie Perez bring this Count individually and on behalf of the New York Subclass.

761.   New York's Deceptive Acts and Practices prohibits any "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service."

762.   Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with trade or commerce in violation of N.Y. Gen. Bus. Law § 349 as described in the allegations above.

763.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce that Defendant intended to induce consumers to buy toxic baby food.

764.   Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer. Plaintiffs and the New York Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health.

Plaintiff and the New York Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

765.    If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the New York Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the New York Subclass would not have purchased Defendant's toxic baby food.

766.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

767.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

768.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the New York Subclass.

769.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the New York Subclass has little alternative but to submit and causes consumers substantial injury.

770.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

771.    The New York Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

772.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

    a.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

    b.    Designating Plaintiffs as Class representative and counsel as Class counsel;

    c.    Entering judgment in favor of Plaintiffs and the Class and against Defendant;

    d.    Awarding Plaintiffs and Class members three times their actual damages or $1,000, whichever is greater; reasonable attorneys' fees; and costs; and

    e.    Granting such further relief as the Court deems just.

**COUNT 43**
**Violation of the North Carolina Unfair Trade Practices Act (N.C. Gen. Stat. §§ 75-1.1, *et seq.*), on Behalf of Plaintiffs Krystal Leigh Anderson, Theresa Fintonis, Debbie Hawkins, Cheryl Smith, Beverly Watkins, and the North Carolina Subclass**

773.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

774.    Plaintiffs Krystal Leigh Anderson, Theresa Fintonis, Debbie Hawkins, Cheryl Smith, and Beverly Watkins bring this Count individually and on behalf of the North Carolina Subclass.

775.    North Carolina Unfair Trade Practices Act prohibits any "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce."

776.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to reasonably rely upon in connection with trade or commerce in violation of N.C. Gen. Stat. § 75-1.1(a) as described in the allegations above.

777.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce that Defendant intended to induce consumers to buy toxic baby food.

778.    Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer. Plaintiffs and the North Carolina Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the North Carolina Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

779.    If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the North Carolina Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the North Carolina Subclass would not have purchased Defendant's toxic baby food.

780.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

781.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

782.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the North Carolina Subclass.

783.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the North Carolina Subclass has little alternative but to submit and causes consumers substantial injury.

784.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

785.    The North Carolina Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

786.    As a direct and proximate result of the foregoing acts and practices Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d. Awarding Plaintiffs and Class members treble damages, attorneys' fees, and costs; and

e. Granting such further relief as the Court deems just.

## COUNT 44
### Violation of the North Dakota Unlawful Sales or Advertising Practices Act (N.D. Cent. Code §§ 51-15-01, *et seq.*), on Behalf of Plaintiffs Rachael Kruup, Ashley Swenningson, and the North Dakota Subclass

787.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

788.   Plaintiffs Rachael Kruup and Ashley Swenningson brings this Count individually and on behalf of the North Dakota Subclass.

789.   North Dakota's Unlawful Sales or Advertising Practices Act ("North Dakota USAPA") prohibits any "act, use, or employment by any person of any deceptive act or practice, fraud, false pretense, false promise, or misrepresentation, with the intent that others rely thereon in connection with the sale or advertisement of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby."

790.   At all relevant times, members of the North Dakota Subclass and Defendant were "persons" within the meaning of the North Dakota USAPA. *See* N.D. Cent. Code § 51-15-01(4).

791.   Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection with the sale or advertisement of "merchandise" (as defined by N.D. Cent. Code § 51-15-01(3)) in violation of N.D. Cent. Code § 51-15-02 as described in the allegations above.

792.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce that Defendant intended to induce consumers to buy toxic baby food.

793.    Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer. Plaintiffs and the North Dakota Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the North Dakota Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

794.    If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the North Dakota Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the North Dakota Subclass would not have purchased Defendant's toxic baby food.

795.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

796.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

797.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the North Dakota Subclass.

798.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the North Dakota Subclass has little alternative but to submit and causes consumers substantial injury.

799.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

800.    The North Dakota Subclass has suffered economic injury as a direct and proximate result of the Defendant's conduct.

801.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

   a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

   b. Designating Plaintiffs as Class representative and counsel as Class counsel;

   c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

   d. Awarding Plaintiffs and Class members three times the actual damages, costs, disbursements, and actual reasonable attorneys' fees; and

   e. Granting such further relief as the Court deems just.

## COUNT 45
**Violation of the Ohio Consumer Sales Protection Act (Ohio Rev. Code Ann. §§ 1345, *et seq.*), on Behalf of Plaintiffs Lillian Hinkle, Shaylan Isaacs, Olivia Johnson, Rebecca Keeton, Kali McGlinch, and the Ohio Subclass**

802.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

803.    Plaintiffs Lillian Hinkle, Shaylan Isaacs, Olivia Johnson, Rebecca Keeton, and Kali McGlinch bring this Count individually and on behalf of the Ohio Subclass.

804.    Ohio's Consumer Sales Protection Act ("Ohio CSPA") prohibits any "unfair or deceptive act or practice in connection with a consumer transaction."

805.    At all relevant times, members of the Ohio Subclass and Defendant were "persons" within the meaning of the Ohio CSPA. *See* Ohio Rev. Code Ann. § 1345.01(B).

806.    Specifically, the Ohio CSPA forbids: (1) representing that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have; (2) representing hat the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not; and (3) knowingly providing a disclosure that includes a material misrepresentation. *See* Ohio Rev. Code Ann. § 1345.02.

807.    Further, the Ohio CSPA unconscionable acts or practices in connection with a consumer transaction, including but not limited to: (1) knowingly taking advantage of the inability of the consumer reasonably to protect the consumer's interest because of the consumer's ignorance, and (2) knowingly making a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment.

808.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in

connection with a consumer transaction (as defined by Ohio Rev. Code Ann. § 1345.01(A)) in violation of Ohio Rev. Code Ann. § 1345.02(A) as described in the allegations above.

809.   As a result, Defendant's conduct violates several provisions of the Ohio CSPA, including but not limited to:

      a.   Section 1345.02(B)(1): Representing that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have —here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins;

      b.   Section 1345.02(B)(7): Representing hat the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins;

      c.   Section 1345.02(F)(2): Knowingly providing a disclosure that includes a material misrepresentation—as one example, Defendant willfully failed to disclose to consumers the excessive amounts of toxins in toxic baby food and instead disclosing that the toxic baby food met government safety standards, which standards were irrelevant to the toxins that are the subject of this action;

      d.   Section 1345.03(B)(1): Knowingly taking advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's

ignorance—the Defendant had knowledge about the amounts of toxins in its toxic baby food, which information:

    i. Defendant measures and analyzes in the regular operation of its business;

    ii. Is directly related to consumers' interest; and

    iii. Is not within the ability of the consumer to reasonably measure and analyze.

e. Section 1345.03(B)(6): Knowingly making a misleading statement of opinion on which the consumer was likely to rely to the consumer's detriment—Defendant's branding of its toxic baby food, including but not limited to opinions and other descriptive language, carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins, which branding the Defendant knew consumers would rely upon when purchasing baby food.

810. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce that Defendant intended to induce consumers to buy toxic baby food.

811. Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer. Plaintiffs and the Ohio Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Ohio Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

812. If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Ohio Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of

substandard quality, and Plaintiffs and the Ohio Subclass would not have purchased Defendant's toxic baby food.

813. Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

814. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

815. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Ohio Subclass.

816. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Ohio Subclass has little alternative but to submit and causes consumers substantial injury.

817. The Ohio Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

818. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

819. As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

   a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

   b. Designating Plaintiffs as Class representative and counsel as Class counsel;

   c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

   d. Awarding Plaintiffs and Class members three times the amount of their actual damages or $200, whichever is greater, plus $5,000 in noneconomic or recover damages; reasonable attorneys' fees; and costs; and

   e. Granting such further relief as the Court deems just.

### COUNT 46
### Violation of the Oklahoma Consumer Protection Act (Okla. Stat. tit. 15, §§ 751, *et seq.*), on Behalf of Plaintiffs Lindsay Barr, Serenitey Carlin, Adrianne Cooper, Amanda Hobbs-Rogers, and the Oklahoma Subclass

820.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

821.   Plaintiffs Lindsay Barr, Serenitey Carlin, Adrianne Cooper and Amanda Hobbs-Rogers bring this Count individually and on behalf of the Oklahoma Subclass.

822.   At all relevant times, members of the Oklahoma Subclass and Defendant were "persons" within the meaning of the Oklahoma Consumer Protection Act ("Oklahoma CPA"). *See* Okla. Stat. tit. 15, § 752(1).

823.   Oklahoma's CPA" prohibits "any practice which offends established public policy or if the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers" and any "misrepresentation, omission or other practice that has deceived or could

reasonably be expected to deceive or mislead a person to the detriment of that person." *See* Okla. Stat. tit. 15, § 752(14).

824.    Specifically, the Oklahoma CPA forbids: (1) making a false or misleading representation, knowingly or with reason to know, as to the source, sponsorship, approval, or certification of the subject of a consumer transaction; (2) making a false representation, knowingly or with reason to know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject of a consumer transaction or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith; (3) representing, knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another; and (4) committing an unfair or deceptive trade practice as defined in Okla. Stat. tit. 15, § 752.

825.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material reasonably expected to deceive or mislead consumers in violation of Okla. Stat. tit. 15, § 753(20) as described in the allegations above.

826.    As a result, Defendant's conduct violates several provisions of the Oklahoma CPA, including but not limited to:

> a. Section 15-753(2): Making a false or misleading representation, knowingly or with reason to know, as to the source, sponsorship, approval, or certification of the subject of a consumer transaction—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins;

b. Section 15-753(5): Making a false representation, knowingly or with reason to know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject of a consumer transaction or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith—as above, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins;

c. Section 15-753(7): Representing, knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another— as one example, Defendant willfully failed to disclose to consumers the excessive amounts of toxins in toxic baby food and instead disclosing that the toxic baby food met government safety standards, which standards were irrelevant to the toxins that are the subject of this action; and

d. Section 15-753(20): Committing an unfair or deceptive trade practice as defined in Okla. Stat. tit. 15, § 752—Defendant's induced consumers to buy toxic baby food by, among other acts, making calculated references to irrelevant government safety standards to deceive consumers that they should trust Defendant and not have concerns about the amounts of heavy metals and other toxins in the baby food, which trade practices are deceptive, unfair, immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

827. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce that Defendant intended to induce consumers to buy toxic baby food.

828.     Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer. Plaintiffs and the Oklahoma Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Oklahoma Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

829.     If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Oklahoma Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Oklahoma Subclass would not have purchased Defendant's toxic baby food.

830.     Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

831.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

832.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Oklahoma Subclass.

833.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Oklahoma Subclass has little alternative but to submit and causes consumers substantial injury.

834.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children

from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

835.    The Oklahoma Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

836.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

     a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

     b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

     c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

     d.  Awarding Plaintiffs and Class members damages and $10,000 each for their reasonable attorneys' fees and costs; and

     e.  Granting such further relief as the Court deems just.

### COUNT 47
### Violation of the Oregon Unlawful Trade Practices Act (Ore. Rev. Stat. §§ 646.605, *et seq.*), on Behalf of Plaintiffs Miriah Barbero, Angela Cox, Stephanie Norgaard, and the Oregon Subclass

837.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

838.    Plaintiffs Miriah Barbero, Angela Cox, and Stephanie Norgaard bring this Count individually and on behalf of the Oregon Subclass.

839.   At all relevant times, Plaintiffs, the Oregon Subclass, and Defendant were "persons" within the meaning of Ore. Rev. Stat. § 646.605(4).

840.   The Oregon Unlawful Trade Practices Act ("Oregon UTPA") prohibits unconscionable tactics in connection with selling goods and further prohibits misleading representations in connection with selling goods, *See* Ore. Rev. Stat. §§ 646.607(1) and 646.608. Such a misleading representation "may be a manifestation of any assertion by words or conduct, including, but not limited to, a failure to disclose a fact." *See* Ore. Rev. Stat. § 646.607(2).

841.   Defendant unlawfully engaged in unconscionable tactics and made misleading representations in connection with the sale of toxic baby food as described in the allegations above.

842.   As a result, Defendant's conduct violates several provisions of the Oregon UTPA, including but not limited to:

  a.  Section 646.607(1): Employing any unconscionable tactic in connection with selling goods—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins;

  b.  Section 646.608(c): Causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods—here, Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that consumers will believe the toxic baby food does not contain excessive amounts of toxins and is

regarded as safe for babies to eat. This provision does not require proof of actual confusion or misunderstanding. Ore. Rev. Stat. § 646.608(3); and

c.  Section 646.608(1)(g): Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins.

843.  Defendant's omissions in violation of the Oregon UTPA were likely to mislead an ordinary consumer. Plaintiffs and the Oregon Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Oregon Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

844.  If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Oregon Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Oregon Subclass would not have purchased Defendant's toxic baby food.

845.  Defendant's omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

846.  Plaintiffs and the Oregon Subclass relied to their detriment on Defendant's omissions in purchasing toxic baby food.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b. Designating Plaintiffs as Class representative and counsel as Class counsel;

c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d. Awarding Plaintiffs and Class members their actual damages or $200, whichever is greater; punitive damages; attorneys' fees; and costs; and

e. Granting such further relief as the Court deems just.

**COUNT 48**
**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 Pa. Cons. Stat. §§ 201-1, *et seq.*), on Behalf of Plaintiffs Alyssa Barb, Julie Blakeley, Rachel Knudson, Rachael Kruup, Melinda Pass, Tina Marie Perez, Lea Santos, and the Pennsylvania Subclass**

847. Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

848. Plaintiffs Alyssa Barb, Julie Blakeley, Rachel Knudson, Rachael Kruup, Melinda Pass, Tina Marie Perez, and Lea Santos bring this Count individually and on behalf of the Pennsylvania Subclass.

849. At all relevant times, members of the Pennsylvania Subclass and Defendant were "persons" within the meaning of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania UTPCPL"). *See* 73 Pa. Cons. Stat. § 201-2(2).

850. Pennsylvania's UTPCPL prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

851.    Among other things, the Pennsylvania UTPCPL specifically defines the following acts and representations about the subject matter of the consumer transaction as deceptive acts: (1) causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods; (2) causing likelihood of confusion or misunderstanding as to affiliation, connection, or associations with, or certification by, another; (3) representing that such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; (4) representing that such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not; and (5) engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

852.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection with trade or commerce in violation of 73 Pa. Cons. Stat. § 201-3 as described in the allegations above.

853.    As a result, Defendant's conduct violates several provisions of the Pennsylvania UTPCPL, including but not limited to:

    a.  Section 201-2(4)(i): Causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods—here, Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food while at the same time asserting that the toxic baby food irrelevant safety standards causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that consumers will

believe the toxic baby food does not contain excessive amounts of toxins as approved by the authorities who issue certain safety regulations. This provision does not require proof of actual confusion or misunderstanding;

b.  Section 201-2(4)(iii): Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another—here, Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food while at the same time asserting that the toxic baby food irrelevant safety standards causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that consumers will believe the toxic baby food does not contain excessive amounts of toxins as approved by the authorities who issue certain safety regulations. This provision does not require proof of actual confusion or misunderstanding;

c.  Section 201-2(4)(v): Representing that the subject of a consumer transaction has sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that it do not have—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins;

d.  Section 201-2(4)(vii): Representing that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product

which consumers could use without unduly exposing their babies to health risks from exposure to toxins; and

   e.  Section 201-2(4)(xxi): Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding-- Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food while at the same time asserting that the toxic baby food irrelevant safety standards causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that consumers will believe the toxic baby food does not contain excessive amounts of toxins as approved by the authorities who issue certain safety regulations.

854.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce that Defendant intended to induce consumers to buy toxic baby food.

855.   Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer. Plaintiffs and the Pennsylvania Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Pennsylvania Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

856.   If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Pennsylvania Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Pennsylvania Subclass would not have purchased Defendant's toxic baby food.

857.   Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

858.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

859.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Pennsylvania Subclass.

860.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Pennsylvania Subclass has little alternative but to submit and causes consumers substantial injury.

861.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

862.   The Pennsylvania Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

863.   As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

    a.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

    b.   Designating Plaintiffs as Class representative and counsel as Class counsel;

    c.   Entering judgment in favor of Plaintiffs and the Class and against Defendant;

    d.   Awarding Plaintiffs and Class members three times their actual damages but not less than $100; reasonable attorneys' fees; and costs; and

    e.   Granting such further relief as the Court deems just.

### COUNT 49
**Violation of the Rhode Island Deceptive Trade Practices Act (R.I. Gen. Laws §§ 6-13.1, *et seq.*), on Behalf of Plaintiffs Jo-Ellen Paterno and the Rhode Island Subclass**

864.    Plaintiff incorporates by reference and reallege each and every allegation contained above, as though fully set forth herein.

865.    Plaintiff Jo-Ellen Paterno brings this Count individually and on behalf of the Rhode Island Subclass.

866.    At all relevant times, Plaintiff, the Rhode Island Subclass, and Defendant were "persons" within the meaning of R.I. Gen. Laws § 6-13.1-1(3).

867.    The Rhode Island Deceptive Trade Practices Act prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. R.I. Gen. Laws § 6-13.1-2.

868.    Defendant willfully engaged in unfair, deceptive, and/or unlawful practices as described in the allegations above.

869.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce that Defendant intended to induce consumers to buy toxic baby food.

870.    Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer. Plaintiffs and the Rhode Island Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Rhode Island Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

871.    If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Rhode Island Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Rhode Island Subclass would not have purchased Defendant's toxic baby food.

872.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

873.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

874.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Rhode Island Subclass.

875.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Rhode Island Subclass has little alternative but to submit and causes consumers substantial injury.

876.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children

from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

877.    The Rhode Island Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

878.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

879.    Plaintiff and the Rhode Island Subclass suffered loss of money as a direct and proximate result of Defendant's unfair, deceptive practices.

WHEREFORE, Plaintiff, individually and on behalf of the Class and/or Classes of persons described herein, prays for an Order as follows:

   a.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

   b.   Designating Plaintiff as Class representative and counsel as Class counsel;

   c.   Entering judgment in favor of Plaintiff and the Class and against Defendant;

   d.   Awarding Plaintiff and Class members their damages or $200, whichever is greater; punitive damages; reasonable attorneys' fees; and costs; and

   e.   Granting such further relief as the Court deems just.

**COUNT 50**
**Violation of the South Carolina Unfair Trade Practices Act (S.C. Code Ann. §§ 39-5-10, *et seq.*), on Behalf of Plaintiffs Gabrielle Harrison, Tabitha Mullinax, and the South Carolina Subclass**

880.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

881.    Plaintiffs Gabrielle Harrison and Tabitha Mullinax bring this Count individually and on behalf of the South Carolina Subclass.

882.    At all relevant times, Plaintiffs, the South Carolina Subclass, and Defendant were "persons" within the meaning of S.C. Code Ann. § 39-5-10(a).

883.    The South Carolina Unfair Trade Practices Act prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. *See* S.C. Code Ann. § 39-5-20.

884.    Defendant willfully engaged in unfair, deceptive, and/or unlawful practices as described in the allegations above.

885.    Defendant's misrepresentations, omissions, and suppression of material information in the sale of its toxic baby food are acts or practices in the conduct or trade or commerce.

886.    Plaintiffs and the South Carolina Subclass suffered loss of money as a direct and proximate result of Defendant's unfair, deceptive practices.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.    Designating Plaintiffs as Class representative and counsel as Class counsel;

c.    Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.    Awarding Plaintiffs and Class members three times their damages; reasonable attorneys' fees; and costs; and

e.   Granting such further relief as the Court deems just.

## COUNT 51
### Violation of the South Dakota Deceptive Trade Practices and Consumer Protection Act (S.D. Codified Laws §§ 37-24-1, *et seq.*), on Behalf of Plaintiffs Rachael Kruup, Christine Steele, and the South Dakota Subclass

887.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

888.   Plaintiffs Rachael Kruup and Christine Steele bring this Count individually and on behalf of the South Dakota Subclass.

889.   It is a deceptive act or practice under South Dakota's Deceptive Trade Practices and Consumer Protection Act for any person to "knowingly act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale or advertisement of any merchandise, regardless of whether any person has in fact been misled, deceived, or damaged thereby." *See* S.D. Codified Laws § 37-24-6(1).

890.   At all relevant times, members of the South Dakota Subclass and Defendant were "persons" within the meaning of the Deceptive Trade Practices and Consumer Protection Act. *See* S.D. Codified Laws § 37-24-1(8).

891.   Defendant willfully and knowingly engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection with the sale or advertisement of merchandise (as defined by S.D. Codified Laws § 37-24-1(7)) in violation of S.D. Codified Laws § 37-24-6(1) as described in the allegations above.

892.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

893.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

894.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching the Defendant at the expense of the South Dakota Subclass.

895.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the South Dakota Subclass has little alternative but to submit and causes consumers substantial injury.

896.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

897.    The South Dakota Subclass has suffered economic injury as a direct and proximate result of the Defendant's conduct.

898.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

    a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

    b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c.   Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.   Awarding Plaintiffs and Class members damages; and

e.   Granting such further relief as the Court deems just.

## COUNT 52
### Violation of the Tennessee Consumer Protection Act (Tenn. Code Ann. §§ 47-18-102 *et seq.*), on Behalf of Plaintiffs Megan Ashley, Kelsey Blankenship, Melinda Pass, Christina Salyers, Kinder Smith, and the Tennessee Subclass

899.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

900.   Plaintiffs Megan Ashley, Kelsey Blankenship, Melinda Pass, Christina Salyers, and Kinder Smith bring this Count individually and on behalf of the Tennessee Subclass.

901.   At all relevant times, Plaintiffs, the Tennessee Subclass, and Defendant were "persons" within the meaning of Tenn. Code Ann. § 47-18-103(14).

902.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits unfair or deceptive actions or practices affecting the conduct of any trade or commerce.

903.   Defendants willfully engaged in unfair or deceptive actions or practices affecting the conduct of trade or commerce as described in the allegations above.

904.   As a result, Defendant's conduct violates several provisions of the Tennessee CPA, including but not limited to:

a.   Section 47-18-104(b)(2): causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval or certification of goods or services—here, Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that

consumers will believe the toxic baby food does not contain excessive amounts of toxins and is regarded as safe for babies to eat;

b. Section 47-18-104(b)(5):  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have—Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; and

c. Section 47-18-104(b)(7): Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins.

905.    Defendant's omissions in violation of the Tennessee CPA were likely to mislead an ordinary consumer. Plaintiffs and the Tennessee Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiffs and the Tennessee Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

906.    If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Tennessee Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Tennessee Subclass would not have purchased Defendant's toxic baby food.

907.    Defendant's omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

908.    Plaintiffs and the Tennessee Subclass relied to their detriment on Defendant's omissions in purchasing toxic baby food.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.    Designating Plaintiffs as Class representative and counsel as Class counsel;

c.    Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.    Awarding Plaintiffs and Class members three times their damages; reasonable attorneys' fees; costs; and

e.    Granting such further relief as the Court deems just.

**COUNT 53**
**Violation of the Texas Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. & Com. Code Ann. §§ 17.41, *et seq.*), on Behalf of Plaintiffs Maria Calderon, Adrianne Cooper, Jessica Durrett, Amanda Hobbs-Rogers, Rachel Knudson, Lakrisha Spikes, Megan Troyer, and the Texas Subclass**

909.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

910.    Plaintiffs Maria Calderon, Adrianne Cooper, Jessica Durrett, Amanda Hobbs-Rogers, Rachel Knudson, Lakrisha Spikes, and Megan Troyer bring this Count individually and on behalf of the Texas Subclass.

911.    At all relevant times, members of the Texas Subclass and Defendant were "persons" within the meaning of the Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPCPA"). *See* Tex. Bus. & Com. Code Ann. § 17.45(3).

912.    Texas' DTPCPA prohibits any "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce" or any "act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."

913.    Among other things, the Texas DTPCPA prohibits: (1) causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods; (2) causing likelihood of confusion or misunderstanding as to affiliation, connection, or associations with, or certification by, another; (3) representing such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; and (4) representing that such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not.

914.    Defendant willfully and purposefully engaged in deceptive, unconscionable, and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection with trade or commerce in violation of Tex. Bus. & Com. Code Ann. §§ 17.50(a)(1)(B) and (3) as described in the allegations above.

915.    As a result, Defendant's conduct violates several provisions of the Texas UDTPA, including but not limited to:

    a.   Section 17.46(b)(2): Causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods—here, Defendant's willful

failure to disclose to consumers the excessive amounts of toxins in toxic baby food while at the same time asserting that the toxic baby food irrelevant safety standards causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that consumers will believe the toxic baby food does not contain excessive amounts of toxins as approved by the authorities who issue certain safety regulations. This provision does not require proof of actual confusion or misunderstanding;

b.  Section 17.46(b)(3): Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another—here, Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food while at the same time asserting that the toxic baby food irrelevant safety standards causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that consumers will believe the toxic baby food does not contain excessive amounts of toxins as approved by the authorities who issue certain safety regulations. This provision does not require proof of actual confusion or misunderstanding;

c.  Section 17.46(b)(5): Representing that the subject of a consumer transaction has sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that it do not have—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; and

d.  Section 17.46(b)(7): Representing that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins.

916.  Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce that Defendant intended to induce consumers to buy toxic baby food.

917.  Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer. Plaintiffs and the Texas Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Texas Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

918.  If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Texas Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Texas Subclass would not have purchased Defendant's toxic baby food.

919.  Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

920.  Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

921.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriching Defendant at the expense of the Texas Subclass.

922.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Texas Subclass has little alternative but to submit and causes consumers substantial injury.

923.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

924.    The Texas Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

925.    Plaintiffs have complied with the statute's pre-suit notice requirement.  Plaintiffs provided Defendant pre-suit notice pursuant to Tex. Bus. & Com. Code Ann. § 17.505 by sending a certified letter containing the basis of Plaintiffs' claims on March 12, 2021.  Said notice was received by Defendant on March 24, 2021.

926.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b. Designating Plaintiffs as Class representative and counsel as Class counsel;

c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d. Awarding Plaintiffs and Class members three times their damages; reasonable and necessary attorneys' fees; costs; and

e. Granting such further relief as the Court deems just.

## COUNT 54
### Violation of the Utah Consumer Sales Practices Act (Utah Code Ann. §§ 13-11-1, *et seq.*), on Behalf of Plaintiffs Shaylan Isaacs, Kali McGlinch, Andrea Mozo, Sheetal Pattni, and the Utah Subclass

927.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

928.    Plaintiffs Shaylan Isaacs, Kali McGlinch, Andrea Mozo, and Sheetal Pattni bring this Count individually and on behalf of the Utah Subclass.

929.    At all relevant times, members of the Utah Subclass and Defendant were "persons" within the meaning of Utah Code Ann. § 13-11-1(5).

930.    At all relevant times, Defendant were "suppliers" within the meaning of Utah Code Ann. § 13-11-1(6).

931.    Utah's Consumer Sales Practices Act ("Utah CSPA") prohibits any "deceptive act or practice by a supplier in connection with a consumer transaction" or any "unconscionable act or practice by a supplier in connection with a consumer transaction."

932.    Among other things, the Utah CSPA prohibits: (1) representing such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses,

or benefits it does not have which the supplier knows or should reasonably know it does not have; and (2) representing that such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not.

933.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection consumer transactions (as defined in Utah Code Ann. § 13-11-1(2)) in violation Utah Code Ann. §§ 13-11-4(1) and 13-11-5(1) as described in the allegations above.

934.    As a result, Defendant's conduct violates several provisions of the Utah CSPA, including but not limited to:

      a.  Section 13-11-4(2)(a): Representing that the subject of a consumer transaction has sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that it do not have—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; and

      b.  13-11-4(2)(b): Representing that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins.

935.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce that Defendant intended to induce consumers to buy toxic baby food.

936.     Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer. Plaintiffs and the Utah Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Utah Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

937.     If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Utah Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Utah Subclass would not have purchased Defendant's toxic baby food.

938.     Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

939.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

940.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriches Defendant at the expense of the Utah Subclass.

941.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Utah Subclass has little alternative but to submit and causes consumers substantial injury.

942.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

943.    The Utah Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct

944.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.  Awarding Plaintiffs and Class members their damages or $2,000, whichever is greater; reasonable attorneys' fees; costs; and

e.  Granting such further relief as the Court deems just.

## COUNT 55
### Violation of the Utah Truth in Advertising Act (Utah Code Ann. §§ 13-11a-1, *et seq.*), on Behalf of Plaintiffs Shaylan Isaacs, Kali McGlinch, Andrea Mozo, Sheetal Pattni, and the Utah Subclass

945.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

946.    Plaintiffs Shaylan Isaacs, Kali McGlinch, Andrea Mozo, and Sheetal Pattni bring this Count individually and on behalf of the Utah Subclass.

947.    At all relevant times, members of the Utah Subclass and Defendant were "persons" within the meaning of Utah Code Ann. § 13-11a-2(7).

948.    Utah's Truth in Advertising Act ("Utah TIAA") prohibits any "deceptive, misleading, and false advertising practices and forms in Utah." *See* Utah Code Ann. § 13-11a-1.

949.    Among other things, Utah TIAA forbids: (1) causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods; (2) causing likelihood of confusion or misunderstanding as to affiliation, connection, or associations with, or certification by, another; (3) representing such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have; and (4) representing that such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not.

950.    Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts as alleged above when advertising their toxic baby food in Utah.

951.    As a result, Defendant's conduct violates several provisions of the Utah TIAA, including but not limited to:

a. Section 13-11a-3(b): Causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods—here, Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food while at the same time asserting that the toxic baby food irrelevant safety standards causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that consumers will believe the toxic baby food does not contain excessive amounts of toxins as approved by the authorities who issue certain safety regulations. This provision does not require proof of actual confusion or misunderstanding, Utah Code Ann. § 13-11a-3(6);

b. Section 13-11a-3(c): Causing likelihood of confusion or of misunderstanding as to affiliation, connection, or association with, or certification by, another—here, Defendant's willful failure to disclose to consumers the excessive amounts of toxins in toxic baby food while at the same time asserting that the toxic baby food irrelevant safety standards causes the likelihood of confusion or misunderstanding about the sources and certifications of its ingredients in that it causes a likelihood that consumers will believe the toxic baby food does not contain excessive amounts of toxins as approved by the authorities who issue certain safety regulations. This provision does not require proof of actual confusion or misunderstanding, Utah Code Ann. § 13-11a-3(6);

c. Section 13-11a-3(e): Representing that the subject of a consumer transaction has sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that it do not have—here, Defendant's branding of its toxic baby food carried with it

the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins; and

d. Section 13-11a-3(g): Representing that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins.

952.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above are deceptive, misleading, and false advertising practices and forms in Utah that Defendant intended to induce consumers to buy toxic baby food.

953.    Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer. Plaintiffs and the Utah Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Utah Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

954.    If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Utah Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Utah Subclass would not have purchased Defendant's toxic baby food.

955.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

956.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

957.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriches Defendant at the expense of the Utah Subclass.

958.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Utah Subclass has little alternative but to submit and causes consumers substantial injury.

959.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

960.    The Utah Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct

961.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b. Designating Plaintiffs as Class representative and counsel as Class counsel;

c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d. Awarding Plaintiffs and Class members their damages or $2,000, whichever is greater; reasonable attorneys' fees; costs; and

e. Granting such further relief as the Court deems just.

## COUNT 56
### Violation of the Vermont Consumer Protection Act (Vt. Stat. Ann. tit. 9, §§ 2451, *et seq.*), on Behalf of Plaintiffs Traci Marie Lussier, Rachel Stratton, and the Vermont Subclass

962.　Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

963.　Plaintiffs Traci Marie Lussier and Rachel Stratton bring this Count individually and on behalf of the Vermont Subclass.

964.　Vermont's Consumer Protection Act prohibits any "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce."

965.　Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with trade or commerce leading to damages and/or injury in violation of Vt. Stat. Ann. tit. 9, § 2453(a) as described in the allegations above.

966.　Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce that Defendant intended to induce consumers to buy toxic baby food.

967.    Defendant's misrepresentations and omissions were likely to mislead an ordinary consumer. Plaintiffs and the Vermont Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Vermont Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

968.    If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Vermont Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Vermont Subclass would not have purchased Defendant's toxic baby food.

969.    Plaintiffs and Class members were deceived by Defendant's deceptive and unfair acts and practices in that had they known the truth they would not have purchased Defendant's products or would have paid less for those products.

970.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

971.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it inequitably enriches Defendant at the expense of the Vermont Subclass.

972.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Vermont Subclass has little alternative but to submit and causes consumers substantial injury.

973.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children

from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

974.     The Vermont Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

975.     As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b. Designating Plaintiffs as Class representative and counsel as Class counsel;

c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d. Awarding Plaintiffs and Class members their damages; exemplary damages of three times their damages; reasonable attorneys' fees; and costs; and

e. Granting such further relief as the Court deems just.

### COUNT 57
**Violation of the Virginia Consumer Protection Act (Va. Code Ann. §§ 59.1-196, *et seq.*), on Behalf of Plaintiffs Alyssa Barb, Ashley Baxter, Katrina Thomas, and the Virginia Subclass**

976.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

977.     Plaintiffs Alyssa Barb, Ashley Baxter, and Katrina Thomas bring this Count individually and on behalf of the Virginia Subclass.

978. At all relevant times, Plaintiffs, the Virginia Subclass, and Defendant were "persons" within the meaning of Va. Code Ann. § 59.1-198.

979. The Virginia Consumer Protection Act ("Virginia CPA") prohibits fraudulent acts or practices committed by a supplier in connection with a consumer transaction.

980. Among other things, the Virginia CPA prohibits: (1) misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits; (2) misrepresenting that good or services are of a particular standard, quality, grade, style, or model; and (3) using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction. *See* Va. Code Ann. § 59.1-200.

981. Defendant willfully engaged in fraudulent acts or practices in connection with consumer transactions as described by the allegations above.

982. As a result, Defendant's conduct violates several provisions of the Virginia CPA, including but not limited to:

    a. Section 59.1-200(A)(5): Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits—here, Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins;

    b. Section 59.1-200(A)(6):: Misrepresenting that good or services are of a particular standard, quality, grade, style, or model—as above, Defendant's toxic baby food carried with it the impression that it was a safe, legally compliant product which consumers could use without unduly exposing their babies to health risks from exposure to toxins; and

c. Section 59.1-200(A)(14): Using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction— Defendant's induced consumers to buy toxic baby food by, among other acts, making calculated references to irrelevant government safety standards to deceive consumers that they should trust Defendant and not have concerns about the amounts of heavy metals and other toxins in the baby food, which trade practices are deceptive, unfair, immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

983.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce that Defendant intended to induce consumers to buy toxic baby food.

984.    Defendant's omissions in violation of the Virginia CPA were likely to mislead an ordinary consumer. Plaintiffs and the Virginia Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Virginia Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

985.    If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Virginia Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Virginia Subclass would not have purchased Defendant's toxic baby food.

986.    Defendant's omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

987.    Plaintiffs and the Virginia Subclass relied to their detriment on Defendant's omissions in purchasing toxic baby food.

988.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.    Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.    Designating Plaintiffs as Class representative and counsel as Class counsel;

c.    Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.    Awarding Plaintiffs and Class members three times their damages or $1,000, whichever is greater; reasonable attorneys' fees; and costs; and

e.    Granting such further relief as the Court deems just.

**COUNT 58**
**Violation of the Washington Consumer Protection Act (Wash. Rev. Code §§ 19.86.010, *et seq.*), on Behalf of Plaintiffs Chelzy Desvigne, Sheetal Pattni, Amanda Hobbs-Rogers, Sonja Renee Twiggs, Jennifer Watts, and the Washington Subclass**

989.    Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

990.     Plaintiffs Chelzy Desvigne, Sheetal Pattni, Amanda Hobbs-Rogers, Sonja Renee Twiggs, and Jennifer Watts bring this Count individually and on behalf of the Washington Subclass.

991.     Washington's Consumer Protection Act ("Washington CPA") prohibits any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

992.     At all relevant times, members of the Washington Subclass and Defendant were "persons" within the meaning of the Washington CPA. *See* Wash. Rev. Code § 19.86.010(1).

993.     Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with trade or commerce in violation of Wash. Rev. Code § 19.86.020 as described in the allegations above.

994.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

995.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest in that Defendant's acts: (1) violated the specific legislative declaration of public interest impact described by Wash. Rev. Code § 19.86.920; (2) injured other persons as alleged above; (3) had the capacity to injure other persons; and (4) continues to have the capacity to injure other persons.

996.     Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriches Defendant at the expense of the Washington Subclass.

997.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Washington Subclass has little alternative but to submit and causes consumers substantial injury.

998.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

999.    The Washington Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

1000.   As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

d.  Awarding Plaintiffs and Class members three times their damages; reasonable attorneys' fees; and costs; and

e.  Granting such further relief as the Court deems just.

**COUNT 59**
**Violation of the West Virginia Consumer Protection Act, (W. Va. Code §§ 46A-6-101,** *et seq.***), on Behalf of Plaintiffs Alyssa Barb, Julie Blakeley, Olivia Johnson, and the West Virginia Subclass**

1001.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

1002.   Plaintiffs Alyssa Barb, Julie Blakeley, and Olivia Johnson bring this Count individually and on behalf of the West Virginia Subclass.

1003.   West Virginia's Consumer Protection Act prohibits any "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

1004.   Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they intended others to rely upon in connection with trade or commerce in violation of W.Va. Code § 46A-6-104 as described in the allegations above.

1005.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

1006.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

1007.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriches Defendant at the expense of the West Virginia Subclass.

1008.   Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the West Virginia Subclass has little alternative but to submit and causes consumers substantial injury.

1009. Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

1010. The West Virginia Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

1011. As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

1012. Plaintiffs provided notice to Defendant pursuant to W.Va. Code § 46-6-106(b) by sending a certified letter containing the basis of Plaintiffs' claims on April 13, 2021. Said notice was received by Defendant on or about April 19, 2021.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

    a. Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

    b. Designating Plaintiffs as Class representative and counsel as Class counsel;

    c. Entering judgment in favor of Plaintiffs and the Class and against Defendant;

    d. Awarding Plaintiffs and Class members their damages or $200, whichever is greater; and

    e. Granting such further relief as the Court deems just.

**COUNT 60**
**Violation of the Wisconsin Deceptive Trade Practices Act (Wis. Stat. §§ 100.18, *et seq.*), on Behalf of Plaintiffs Nicole Brisky, Amanda Hobbs-Rogers, and the Wisconsin Subclass**

1013.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

1014.   Plaintiffs Nicole Brisky and Amanda Hobbs-Rogers bring this Count individually and on behalf of the Wisconsin Subclass.

1015.   At all relevant times, Plaintiffs, the Wisconsin Subclass, and Defendant were "persons" within the meaning of Wisconsin Statutes. *See* Wis. Stat. § 990.01.

1016.   Wis. Stat. § 100.18 prohibits the use of fraudulent representations by a person with the intent to sell, distribute, or increase the consumption of merchandise or anything offered by such person, directly or indirectly, to the public—the prohibition includes but is not limited to any advertisement, statement, representation of any kind to the public relating to the purchase, sale, or use of the merchandise which advertisement, statement, or representation is untrue, deceptive, or misleading.

1017.   Wis. Stat. § 100.183 specifically prohibits untrue, deceptive, or misleading practices with respect to the sale of food:

> No person, firm, corporation or association shall, with intent to sell, or increase the consumption thereof, or create an interest therein, make, publish, disseminate, circulate, or place before the public in this state, or cause, directly or indirectly to be made, published, disseminated, or placed before the public in this state, in a newspaper or other publication, or in the form of a book notice, handbill, poster, bill, circular or pamphlet, or in any other manner, an advertisement of any sort regarding articles of food, which advertisement contains any assertion, representation or statement which is untrue, deceptive or misleading.

1018.   Defendant willfully engaged in fraudulent, untrue, deceptive, and/or misleading acts as described in the allegations above.

1019.   As a result, Defendant's conduct violates Wis. Stat. §§ 100.18 and 100.183—Defendant's branding of its toxic baby food carried with it the impression that the toxic baby food was a safe, legally compliant product which consumers could use without unduly exposing their babies to the risk of exposure to toxins.

1020.   Defendant's omissions in violation of Wis. Stat. §§ 100.18 and 100.183 were likely to mislead an ordinary consumer. Plaintiffs and the Wisconsin Subclass reasonably understood Defendant's omissions to mean that the toxic baby food did not contain toxins at levels that are dangerous to babies' health. Plaintiff and the Wisconsin Subclass also reasonably understood Defendant's omissions to mean that the toxic baby food was not of substandard quality.

1021.   If Defendant had disclosed that its toxic baby food contained toxins at levels that are dangerous to babies' health and was of substandard quality, Plaintiffs and the Wisconsin Subclass would have been aware that the toxic baby food contained excessive amounts of toxins and was of substandard quality, and Plaintiffs and the Wisconsin Subclass would not have purchased Defendant's toxic baby food.

1022.   Defendant's omissions alleged herein were material in that a reasonable person would attach importance to the information and would be induced to act upon the information in making purchase decisions.

1023.   Plaintiffs and the Wisconsin Subclass relied to their detriment on Defendant's omissions in purchasing toxic baby food.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

   a.   Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

   b.   Designating Plaintiffs as Class representative and counsel as Class counsel;

   c.   Entering judgment in favor of Plaintiffs and the Class and against Defendant;

   d.   Awarding Plaintiffs and Class members two times their damages; reasonable attorneys' fees; costs; and

   e.   Granting such further relief as the Court deems just.

**COUNT 61**
**Violation of the Wyoming Consumer Protection Act (Wyo. Stat. Ann. §§ 40-12-101, *et seq.*), on Behalf of Sheetal Pattni, Kassandra Romero, Kyla Talley, and the Wyoming Subclass**

1024.   Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

1025.   Plaintiffs Sheetal Pattni, Kassandra Romero, and Kyla Talley bring this Count individually and on behalf of the Wyoming Subclass.

1026.   At all relevant times, members of the Wyoming Subclass and Defendant were "persons" within the meaning of Wyoming's Consumer Protection Act ("Wyoming CPA"). *See* Wyo. Stat. Ann. § 40-12-102(a)(i).

1027.   Wyoming's CPA prohibits any "unfair or deceptive acts or practices."

1028.   Among other things, Wyoming's CPA forbids: (1) representing that merchandise has a source, origin, sponsorship, approval, accessories or uses it does not have; (2) representing that merchandise is of a particular standard, grade, style or model, if it is not; and (3) engaging in unfair or deceptive acts or practices.

1029.   Defendant willfully and purposefully engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts they

intended others to rely upon in connection with the sale or advertisement of merchandise (as defined by Wyo. Stat. Ann. § 40-12-102(a)(vi)) in violation of Wyo. Stat. Ann. § 40-12-105(a)(xv) as described in the allegations above.

1030.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is an act or practice in the conduct of trade or commerce.

1031.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above impacts the public interest.

1032.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it is inequitably enriches Defendant at the expense of the Wyoming Subclass.

1033.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair because it offends public policy, and is so oppressive that the Wyoming Subclass has little alternative but to submit and causes consumers substantial injury.

1034.    Defendant's misrepresentations and omissions in the sale of its toxic baby food detailed above is unfair in that it violates the well-established public policies of protecting children from avoidable dangers and that the manufacturer of food is responsible for ensuring that it is fit for human consumption.

1035.    The Wyoming Subclass has suffered economic injury as a direct and proximate result of Defendant's conduct.

1036.    As a direct and proximate result of the foregoing acts and practices, Defendant has received, or will receive, income, profits, and other benefits which they would not have received if they had not engaged in the violations described in this Complaint.

1037.  Plaintiffs provided notice to Defendant pursuant to Wyo. Stat. Ann. § 40-12-109 by sending a certified letter containing the basis of Plaintiffs' claims on April 13, 2021.  Said notice was received by Defendant on or about April 19, 2021.

WHEREFORE, Plaintiffs, individually and on behalf of the Class and/or Classes of persons described herein, pray for an Order as follows:

    a.  Finding that this action satisfies the prerequisites for maintenance as a class action set forth in Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and certifying the Class and/or Classes defined herein;

    b.  Designating Plaintiffs as Class representative and counsel as Class counsel;

    c.  Entering judgment in favor of Plaintiffs and the Class and against Defendant;

    d.  Awarding Plaintiffs and Class members damages; reasonable attorneys' fees; and costs; and

    e.  Granting such further relief as the Court deems just.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: September 9, 2021                  Respectfully submitted,

By: _____
Joseph Henry (Hank) Bates, III
(ABN 98063)
Carney Bates & Pulliam, PLLC
519 W, 7th Street
Little Rock, AR  72201
Telephone: (501) 312-8500
Facsimile: (501) 312-8505
hbates@cbplaw.com

Aaron M. Zigler\*
ZIGLER LAW GROUP, LLC
308 S. Jefferson Street | Suite 333
Chicago, IL 60661
Tel: 312-673-8427
aaron@ziglerlawgroup.com

Troy E. Walton\*
Steve Telken\*
WALTON TELKEN, LLC
241 N. Main Street
Edwardsville, IL 62025
Tel: (618) 307-9880
twalton@waltontelken.com
stelken@waltonteklen.com

\**Pro Hac Vice* admission to be sought

*Counsel for Plaintiff and the Putative Class*

# EXHIBIT 1



**Baby Foods Are Tainted with Dangerous Levels of Arsenic, Lead, Cadmium, and Mercury**



**Staff Report**

**Subcommittee on Economic and Consumer Policy
Committee on Oversight and Reform
U.S. House of Representatives**

**February 4, 2021**

**oversight.house.gov**

## EXECUTIVE SUMMARY

Inorganic arsenic, lead, cadmium, and mercury are toxic heavy metals. The Food and Drug Administration and the World Health Organization have declared them dangerous to human health, particularly to babies and children, who are most vulnerable to their neurotoxic effects. Even low levels of exposure can cause serious and often irreversible damage to brain development.

On November 6, 2019, following reports alleging high levels of toxic heavy metals in baby foods, the Subcommittee on Economic and Consumer Policy requested internal documents and test results from seven of the largest manufacturers of baby food in the United States, including both makers of organic and conventional products:

- Nurture, Inc. (Nurture), which sells Happy Family Organics, including baby food products under the brand name HappyBABY
- Beech-Nut Nutrition Company (Beech-Nut)
- Hain Celestial Group, Inc. (Hain), which sells baby food products under the brand name Earth's Best Organic
- Gerber
- Campbell Soup Company (Campbell), which sells baby food products under the brand name Plum Organics
- Walmart Inc. (Walmart), which sells baby food products through its private brand Parent's Choice
- Sprout Foods, Inc. (Sprout Organic Foods)

Four of the companies—Nurture, Beech-Nut, Hain, and Gerber—responded to the Subcommittee's requests. They produced their internal testing policies, test results for ingredients and/or finished products, and documentation about what the companies did with ingredients and/or finished products that exceeded their internal testing limits.

Walmart, Campbell, and Sprout Organic Foods refused to cooperate with the Subcommittee's investigation. The Subcommittee is greatly concerned that their lack of cooperation might be obscuring the presence of even higher levels of toxic heavy metals in their baby food products than their competitors' products.

## FINDINGS

1.    According to internal company documents and test results obtained by the Subcommittee, commercial baby foods are tainted with significant levels of toxic heavy metals, including arsenic, lead, cadmium, and mercury. Exposure to toxic heavy metals causes permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior in children. Toxic heavy metals endanger infant neurological development and long-term brain function. Specifically, the Subcommittee reports that:

2

**ARSENIC** was present in baby foods made by all responding companies.

- Nurture (HappyBABY) sold baby foods after tests showed they contained as much as 180 parts per billion (ppb) inorganic arsenic. Over 25% of the products Nurture tested before sale contained over 100 ppb inorganic arsenic. Nurture's testing shows that the typical baby food product it sold contained 60 ppb inorganic arsenic.

- Hain (Earth's Best Organic) sold finished baby food products containing as much as 129 ppb inorganic arsenic. Hain typically only tested its ingredients, not finished products. Documents show that Hain used ingredients testing as high as 309 ppb arsenic.

- Beech-Nut used ingredients after they tested as high as 913.4 ppb arsenic. Beech-Nut routinely used high-arsenic additives that tested over 300 ppb arsenic to address product characteristics such as "crumb softness."

- Gerber used high-arsenic ingredients, using 67 batches of rice flour that had tested over 90 ppb inorganic arsenic.

**LEAD** was present in baby foods made by all responding companies.

- Nurture (HappyBABY) sold finished baby food products that tested as high as 641 ppb lead. Almost 20% of the finished baby food products that Nurture tested contained over 10 ppb lead.

- Beech-Nut used ingredients containing as much as 886.9 ppb lead. It used many ingredients with high lead content, including 483 that contained over 5 ppb lead, 89 that contained over 15 ppb lead, and 57 that contained over 20 ppb lead.

- Hain (Earth's Best Organic) used ingredients containing as much as 352 ppb lead. Hain used many ingredients with high lead content, including 88 that tested over 20 ppb lead and six that tested over 200 ppb lead.

- Gerber used ingredients that tested as high as 48 ppb lead; and used many ingredients containing over 20 ppb lead.

**CADMIUM** was present in baby foods made by all responding companies.

- Beech-Nut used 105 ingredients that tested over 20 ppb cadmium. Some tested much higher, up to 344.55 ppb cadmium.

- Hain (Earth's Best Organic) used 102 ingredients in its baby food that tested over 20 ppb cadmium. Some tested much higher, up to 260 ppb cadmium.

3

- Sixty-five percent of Nurture (HappyBABY) finished baby food products contained more than 5 ppb cadmium.

- Seventy-five percent of Gerber's carrots contained cadmium in excess of 5 ppb, with some containing up to 87 ppb cadmium.

**MERCURY** was detected in baby food of the only responding company that tested for it.

- Nurture (HappyBABY) sold finished baby food products containing as much as 10 ppb mercury.

- Beech-Nut and Hain (Earth's Best Organic) do not even test for mercury in baby food.

- Gerber rarely tests for mercury in its baby foods.

These results are multiples higher than allowed under existing regulations for other products. For example, the Food and Drug Administration has set the maximum allowable levels in bottled water at 10 ppb inorganic arsenic, 5 ppb lead, and 5 ppb cadmium, and the Environmental Protection Agency has capped the allowable level of mercury in drinking water at 2 ppb. The test results of baby foods and their ingredients eclipse those levels: including results up to 91 times the arsenic level, up to 177 times the lead level, up to 69 times the cadmium level, and up to 5 times the mercury level.

2.   Internal company standards permit dangerously high levels of toxic heavy metals, and documents revealed that the manufacturers have often sold foods that exceeded those levels.

- Nurture (HappyBABY) sold all products tested, regardless of how much toxic heavy metal the baby food contained. By company policy, Nurture's toxic heavy metal testing is not intended for consumer safety. The Food and Drug Administration (FDA) has only finalized one standard—100 ppb inorganic arsenic in infant rice cereal—and Nurture set its internal standard for that product 15% higher than the FDA limit, at 115 ppb.

- Beech-Nut set internal arsenic and cadmium standards at 3,000 ppb in additives, such as vitamin mix, and 5,000 ppb lead for certain ingredients like BAN 800. These standards are the highest of any responding manufacturer.

- Hain (Earth's Best Organic) set an internal standard of 200 ppb for arsenic, lead, and cadmium in some of its ingredients. But Hain exceeded its internal policies, using ingredients containing 353 ppb lead and 309 ppb arsenic. Hain justified deviations above its ingredient testing

standards based on "theoretical calculations," even after Hain admitted to FDA that its testing underestimated final product toxic heavy metal levels.

3.  The Subcommittee has grave concerns about baby food products manufactured by Walmart (Parent's Choice), Sprout Organic Foods, and Campbell (Plum Organics). These companies refused to cooperate with the Subcommittee's investigation. The Subcommittee is greatly concerned that their lack of cooperation might obscure the presence of even higher levels of toxic heavy metals in their baby food products, compared to their competitors' products.

- Walmart sells Parent's Choice and Parent's Choice Organic products for babies as young as four months.

- Sprout Organic Foods sells organic products for babies as young as six months. It is owned by North Castle Partners, a Greenwich, Connecticut–based private equity firm.

- Campbell sells Plum Organics products for babies as young as four months.

- Independent testing of Walmart, Sprout Organic Foods, and Campbell products has confirmed that their baby foods contain concerning levels of toxic heavy metals.

4.  The Trump administration ignored a secret industry presentation to federal regulators revealing increased risks of toxic heavy metals in baby foods. On August 1, 2019, FDA received a secret slide presentation from Hain (Earth's Best Organic), which revealed that:

- Corporate policies to test only ingredients, not final products, underrepresent the levels of toxic heavy metals in baby foods. In 100% of the Hain baby foods tested, inorganic arsenic levels were higher in the finished baby food than the company estimated they would be based on individual ingredient testing. Inorganic arsenic was between 28% and 93% higher in the finished products;

- Many of Hain's baby foods were tainted with high levels of inorganic arsenic—half of its brown rice baby foods contained over 100 ppb inorganic arsenic; its average brown rice baby food contained 97.62 ppb inorganic arsenic; and

- Naturally occurring toxic heavy metals may not be the only problem causing the unsafe levels of toxic heavy metals in baby foods; rather, baby food producers like Hain may be adding ingredients that have high levels of toxic heavy metals into their products, such as vitamin/mineral pre-mix.

This presentation made clear that ingredient testing is inadequate, and that only final product testing can measure the true danger posed by baby foods.

The Trump FDA took no new action in response. To this day, baby foods containing toxic heavy metals bear no label or warning to parents. Manufacturers are free to test only ingredients, or, for the vast majority of baby foods, to conduct no testing at all. FDA has only finalized one metal standard for one narrow category of baby food, setting a 100 ppb inorganic arsenic standard for infant rice cereal. But this FDA standard is far too high to protect against the neurological effects on children.

5.    The Subcommittee makes the following recommendations:

- **Mandatory testing**—Baby food manufacturers should be required by FDA to test their finished products for toxic heavy metals, not just their ingredients;

- **Labeling**—Manufacturers should by required by FDA to report levels of toxic heavy metals on food labels;

- **Voluntary phase-out of toxic ingredients**—Manufacturers should voluntarily find substitutes for ingredients that are high in toxic heavy metals, or phase out products that have high amounts of ingredients that frequently test high in toxic heavy metals, such as rice;

- **FDA standards**—FDA should set maximum levels of toxic heavy metals permitted in baby foods. One level for each metal should apply across all baby foods. And the level should be set to protect babies against the neurological effects of toxic heavy metals; and

- **Parental vigilance**—Parents should avoid baby foods that contain ingredients testing high in toxic heavy metals, such as rice products. Instituting recommendations one through four will give parents the information they need to make informed decisions to protect their babies.

6.    Baby food manufacturers hold a special position of public trust. Consumers believe that they would not sell products that are unsafe. Consumers also believe that the federal government would not knowingly permit the sale of unsafe baby food. As this staff report reveals, baby food manufacturers and the Trump administration's federal regulators have broken the faith.

**TABLE OF CONTENTS**

I.  THE DANGER OF TOXIC HEAVY METALS TO CHILDREN'S HEALTH........ 9
    A.  Inorganic Arsenic.............................................................................. 10
    B.  Lead.................................................................................................... 11
    C.  Cadmium ........................................................................................... 12
    D.  Mercury ............................................................................................. 12

II. TOP BABY FOODS ARE TAINTED WITH DANGEROUS LEVELS OF
    INORGANIC ARSENIC, LEAD, CADMIUM, AND MERCURY. ......................... 13
    A.  Inorganic Arsenic.............................................................................. 13
    B.  Lead.................................................................................................... 21
    C.  Cadmium ........................................................................................... 29
    D.  Mercury ............................................................................................. 32

III. INDUSTRY SELF-REGULATION FAILS TO PROTECT CONSUMERS:
     NURTURE, BEECH-NUT, HAIN, AND GERBER SET THEIR OWN
     DANGEROUSLY HIGH INTERNAL STANDARDS FOR TOXIC HEAVY
     METAL LEVELS AND ROUTINELY IGNORED THEM TO SELL PRODUCTS
     WITH HIGHER HEAVY METAL LEVELS.................................................... 33
    A.  Nurture (HappyBABY) sets high internal standards and regularly exceeds
        them.  Nurture admits that its toxic heavy metal testing is not for safety—it
        sells all products tested, regardless of its toxic heavy metal content.  FDA has
        finalized only one standard—100 ppb inorganic arsenic in infant rice
        cereal—Nurture has ignored it, setting its internal standard for that product
        at 115 ppb................................................................................................. 33
    B.  Beech-Nut set internal arsenic and cadmium standards at 3,000 ppb in
        dangerous additives, such as vitamin mix, and 5,000 ppb lead for certain
        ingredients like BAN 800.  These standards are the highest of any responding
        manufacturer.............................................................................................. 37
    C.  Hain (Earth's Best Organic) set an internal standard of 200 ppb for arsenic,
        lead, and cadmium in some of its ingredients.  Hain justified deviations above
        its ingredient testing standards based on "theoretical calculations," even
        after Hain admitted to FDA that its testing underestimated final product
        toxic heavy metal levels. ......................................................................... 39

IV. WALMART, SPROUT ORGANIC FOODS, AND CAMPBELL REFUSED TO
    COOPERATE WITH THE SUBCOMMITTEE'S INVESTIGATION.................... 43

|       | A.   | Walmart (Parent's Choice Brand) ..................................................... 43 |
|-------|------|------------------------------------------------------------------------------------------|
|       | B.   | Campbell (Plum Organics Brand)..................................................... 44 |
|       | C.   | Sprout Organic Foods..................................................................... 46 |

**V.  FDA HAS FAILED TO CONFRONT THE RISKS OF TOXIC HEAVY METALS IN BABY FOOD.  THE TRUMP ADMINISTRATION IGNORED A SECRET INDUSTRY PRESENTATION ABOUT HIGHER AMOUNTS OF TOXIC HEAVY METALS IN FINISHED BABY FOODS. ................................................... 47**

|       | A.   | Mercury and Cadmium................................................................... 48 |
|-------|------|------------------------------------------------------------------------------------------|
|       | B.   | Lead............................................................................................. 49 |
|       | C.   | Arsenic ........................................................................................ 50 |
|       | D.   | The Trump Administration Ignored A Secret Industry Presentation About Higher Risks Of Toxic Heavy Metals In Baby Foods...................................... 53 |
|       | E.   | Corporate Testing Policies Hide the Truth:  In Addition to Hain, Beech-Nut and Gerber Also Fail to Test Finished Product, Risking an Undercount of Toxic Heavy Metals in Their Finished Baby Foods......................................... 56 |

**VI.  RECOMMENDATIONS AND CONSIDERATIONS FOR INDUSTRY, PARENTS, AND REGULATORS:  DO HIGHLY TAINTED INGREDIENTS LIKE RICE BELONG IN BABY FOOD? ......................................................................... 57**

**VII.  CONCLUSION ............................................................................................ 59**

## I.    THE DANGER OF TOXIC HEAVY METALS TO CHILDREN'S HEALTH

Children's exposure to toxic heavy metals causes permanent decreases in IQ, diminished future economic productivity, and increased risk of future criminal and antisocial behavior.[1]

Babies' developing brains are "exceptionally sensitive to injury caused by toxic chemicals, and several developmental processes have been shown to be highly vulnerable to chemical toxicity."[2] The fact that babies are small, have other developing organ systems, and absorb more of the heavy metals than adults, exacerbates their risk from exposure to heavy metals.[3]

Exposure to heavy metals at this developmental stage can lead to "untreatable and frequently permanent" brain damage, which may result in "reduced intelligence, as expressed in terms of lost IQ points, or disruption in behavior."[4] For example, a recent study estimates that exposure to environmental chemicals, including lead, are associated with 40,131,518 total IQ points loss in 25.5 million children (or roughly 1.57 lost IQ points per child)—more than the total IQ losses associated with preterm birth (34,031,025), brain tumors (37,288), and traumatic brain injury (5,827,300) combined.[5] For every one IQ point lost, it is estimated that a child's lifetime earning capacity will be decreased by $18,000.[6]

Well-known vectors of child exposure to toxic heavy metals include lead paint in old housing and water pollution from landfills. Over the decades, a range of federal and state laws and regulations have been passed to protect child health through emissions standards, among other things.

The Food and Drug Administration (FDA) has declared that inorganic arsenic, lead, cadmium, and mercury are dangerous, particularly to infants and children. They have "no established health benefit" and "lead to illness, impairment, and in high doses, death." According to FDA, "even low levels of harmful metals from individual food sources, can

---

[1] Miguel Rodríguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis* (Apr. 9, 2013) (online at www.sciencedirect.com/science/article/abs/pii/S0048969713003409?via%3Dihub).

[2] Philippe Grandjean and Philip J. Landrigan, *Neurobehavioural Effects of Developmental Toxicity* (Mar. 13, 2014) (online at www.ncbi.nlm.nih.gov/pmc/articles/PMC4418502/).

[3] Consumer Reports, *Heavy Metals in Baby Food: What You Need to Know* (Aug. 16, 2018) (online at www.consumerreports.org/food-safety/heavy-metals-in-baby-food/).

[4] Philippe Grandjean and Philip J. Landrigan, *Neurobehavioural Effects of Developmental Toxicity* (Mar. 13, 2014) (online at www.ncbi.nlm.nih.gov/pmc/articles/PMC4418502/).

[5] David C. Bellinger, *A Strategy for Comparing the Contributions of Environmental Chemicals and Other Risk Factors to Neurodevelopment of Children* (Dec. 19, 2011) (online at www.ncbi.nlm.nih.gov/pmc/articles/PMC3339460/).

[6] Martine Bellanger et al., *Economic Benefits of Methylmercury Exposure Control in Europe: Monetary Value of Neurotoxicity Prevention* (Jan. 17, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23289875/).

sometimes add up to a level of concern." FDA cautions that infants and children are at the greatest risk of harm from toxic heavy metal exposure.[7]

The Subcommittee on Economic and Consumer Policy's investigation has found another source of exposure: baby foods. According to documents obtained from baby food manufacturers, toxic heavy metals, such as arsenic, cadmium, lead, and mercury are present at substantial levels in both organic and conventional baby foods. Currently, there is no federal standard on, or warning to parents and caregivers about, these toxins.

A.    **Inorganic Arsenic**

Arsenic is ranked number one among substances present in the environment that pose the most significant potential threat to human health, according to the Department of Health and Human Services' Agency for Toxic Substances and Disease Registry (ATSDR).[8] The known health risks of arsenic exposure include "respiratory, gastrointestinal, haematological, hepatic, renal, skin, **neurological and immunological effects, as well as damaging effects on the central nervous system and cognitive development in children**."[9]

Studies have concluded that arsenic exposure has a "significant negative effect on neurodevelopment in children."[10] This negative effect is most pronounced in Full Scale IQ, and more specifically, in verbal and performance domains as well as memory. For every 50% increase in arsenic levels, there is an approximately "0.4 decrease in the IQ of children."[11]

A study of Maine schoolchildren exposed to arsenic in drinking water found that children exposed to water with an arsenic concentration level greater than 5 parts per billion (ppb) "showed significant reductions in Full Scale IQ, Working Memory, Perceptual Reasoning and Verbal Comprehension scores." The authors pegged 5 ppb as an important threshold.[12]

Likewise, a study of children in Spain found that increasing arsenic exposure led to a decrease in the children's global motor, gross motor, and fine motor function scores. Boys in particular were more susceptible to arsenic's neurotoxicity.[13]

---

[7] Food and Drug Administration, *Metals and Your Food* (online at www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food) (accessed Jan. 26, 2021).

[8] Agency for Toxic Substances and Disease Registry, *ATSDR's Substance Priority List* (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).

[9] Miguel Rodríguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis* (June 1, 2013) (online at https://pubmed.ncbi.nlm.nih.gov/23570911/) (emphasis added).

[10] *Id.*

[11] *Id.*

[12] Gail A. Wasserman et al., *A Cross-Sectional Study of Well Water Arsenic and Child IQ in Maine Schoolchildren* (Apr. 1, 2014) (online at https://ehjournal.biomedcentral.com/articles/10.1186/1476-069X-13-23).

[13] Antonio J. Signes-Pastor et al., *Inorganic Arsenic Exposure and Neuropsychological Development of Children of 4-5 Years of Age Living in Spain* (Apr. 29, 2019) (online at www.ncbi.nlm.nih.gov/pmc/articles/PMC6541502/).

**B.    Lead**

Lead is number two on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[14]  Even small doses of lead exposure are hazardous, particularly to children.[15]  Lead is associated with a range of bad health outcomes, including behavioral problems, decreased cognitive performance, delayed puberty, and reduced postnatal growth.  According to FDA, lead is especially dangerous to "infants" and "young children."  FDA acknowledges that:

> High levels of lead exposure can seriously harm children's health and development, specifically the brain and nervous system.  Neurological effects from high levels of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ.  Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time.[16]

Lead exposure severely affects academic achievement in children.  Even at low levels, early childhood lead exposure has a negative impact on school performance.  Two separate studies of schoolchildren in Detroit and Chicago public schools found a strong inverse relationship between lead exposure and test scores.  In the Detroit study, there was a "significant association" between early childhood lead exposure and decreased standardized test performance, with lead exposure strongly linked to an adverse effect on academic achievement.[17]  The Chicago study found that higher blood lead concentrations were associated with lower reading and math scores in 3rd grade children.  Increased blood lead concentrations correlated with a 32% increase in the risk of failing reading and math.[18]

The cognitive effects of early childhood lead exposure appear to be permanent.  In one study, adults who previously had lead-associated developmental delays continued to show persisting cognitive deficits, demonstrating the long-lasting damage of lead exposure.[19]

---

[14] Agency for Toxic Substances and Disease Registry, *ATSDR's Substance Priority List* (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).

[15] Philippe Grandjean, *Even Low-Dose Lead Exposure Is Hazardous* (Sept. 11, 2010) (online at https://pubmed.ncbi.nlm.nih.gov/20833288/).

[16] Food and Drug Administration, *Lead in Food, Foodwares, and Dietary Supplements* (online at www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements) (accessed Jan. 26, 2021).

[17] Nanhua Zhang et al., *Early Childhood Lead Exposure and Academic Achievement:  Evidence From Detroit Public Schools* (Mar. 2013) (online at http://mediad.publicbroadcasting.net/p/michigan/files/201302/AJPH.2012.pdf).

[18] Anne Evens et al., *The Impact of Low-Level Lead Toxicity on School Performance Among Children in the Chicago Public Schools:  A Population-Based Retrospective Cohort Study* (Apr. 7, 2015) (online at https://ehjournal.biomedcentral.com/articles/10.1186/s12940-015-0008-9).

[19] Maitreyi Mazumdar et al., *Low-Level Environmental Lead Exposure in Childhood and Adult Intellectual Function:  A Follow-Up Study* (Mar. 30, 2011) (online at www.ncbi.nlm.nih.gov/pmc/articles/PMC3072933/).

Studies have also established a significant association between lead exposure and Attention-Deficit/Hyperactivity Disorder (ADHD).[20]

## C.    Cadmium

Cadmium is number seven on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[21] Cadmium is associated with decreases in IQ, as well as the development of ADHD.

A 2018 study found that cadmium exposure negatively affected children's Full Scale IQ, particularly among boys. Boys exhibiting higher amounts of cadmium exposure had seven fewer IQ points than those exhibiting less cadmium exposure.[22] A 2015 study similarly found a significant inverse relationship between early cadmium exposure and IQ.[23]

A 2018 study linked cadmium exposure to ADHD, finding that the disorder was more common among children with the highest levels of cadmium exposure as compared to a control group.[24]

## D.    Mercury

Mercury is number three on ATSDR's list of substances present in the environment that pose the most significant potential threat to human health.[25] Studies of mercury's effect on childhood development have primarily been conducted by considering the mother's exposure to mercury while pregnant. In these instances, "pre-natal mercury exposure has been consistently associated with adverse subsequent neuro-development."[26] And pre-natal mercury exposure is also related to poorer estimated IQ.[27] Beyond prenatal exposure, higher blood mercury levels at

---

[20] Gabriele Donzelli et al., *The Association Between Lead and Attention-Deficit/Hyperactivity Disorder: A Systematic Review* (Jan. 29, 2019) (online at www.mdpi.com/1660-4601/16/3/382/htm).

[21] Agency for Toxic Substances and Disease Registry, *ATSDR's Substance Priority List* (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).

[22] Klara Gustin et al., *Cadmium Exposure and Cognitive Abilities and Behavior at 10 Years Off Age: A Prospective Cohort Study* (Apr. 2018) (online at www.sciencedirect.com/science/article/pii/S0160412017321025).

[23] Alison P. Sanders et al., *Perinatal and Childhood Exposure To Cadmium, Manganese, And Metal Mixtures And Effects On Cognition And Behavior: A Review Of Recent Literature* (July 5, 2015) (online at www.ncbi.nlm.nih.gov/pmc/articles/PMC4531257/).

[24] Min-Jing Lee et al., *Heavy Metals' Effect on Susceptibility to Attention-Deficit/Hyperactivity Disorder: Implication of Lead, Cadmium, and Antimony* (June 10, 2018) (online at www.ncbi.nlm.nih.gov/pmc/articles/PMC6025252/).

[25] Agency for Toxic Substances and Disease Registry, *ATSDR's Substance Priority List* (2019) (online at www.atsdr.cdc.gov/spl/index.html#2019spl).

[26] Margaret R. Karagas et al., *Evidence on the Human Health Effects of Low-Level Methylmercury Exposure* (June 1, 2012) (online at https://ehp.niehs.nih.gov/doi/10.1289/ehp.1104494).

[27] Joseph Jacobson et al., *Relation of Prenatal Methylmercury Exposure from Environmental Sources to Childhood IQ* (Aug. 1, 2015) (online at https://ehp.niehs.nih.gov/doi/10.1289/ehp.1408554).

"2 and 3 years of age were positively associated with autistic behaviors among preschool-age children."[28]

## II.    TOP BABY FOODS ARE TAINTED WITH DANGEROUS LEVELS OF INORGANIC ARSENIC, LEAD, CADMIUM, AND MERCURY.

Internal company test results obtained by the Subcommittee confirm that all responding baby food manufacturers sold baby foods tainted by high levels of toxic heavy metals.

### A.    Inorganic Arsenic

There is no established safe level of inorganic arsenic consumption for babies. Organizations such as Healthy Babies Bright Futures have called for a goal of no measurable amount of inorganic arsenic in baby food.[29]  Consumer Reports suggests setting inorganic arsenic levels as low as 3 parts per billion (ppb).[30]  FDA has already set maximum inorganic arsenic levels at 10 ppb for bottled water.[31]  The Environmental Protection Agency (EPA) has similarly set a 10 ppb inorganic arsenic cap on drinking water, as have the European Union (EU) and the World Health Organization (WHO).[32]

### 1.    Nurture (HappyBABY) sold finished baby foods after testing showed they contained as much as 180 ppb inorganic arsenic; over 25% of the tested baby food sold by Nurture exceeded 100 ppb inorganic arsenic; on average, Nurture baby food on store shelves has nearly 60 ppb inorganic arsenic.

Nurture is the only baby food manufacturer that appears to regularly tests its finished baby food products for inorganic arsenic content (the others only test ingredients).

---

[28] Jia Ryu et al., *Associations of Prenatal and Early Childhood Mercury Exposure with Autistic Behaviors at 5 Years of Age:  The Mothers and Children's Environmental Health (MOCEH) Study* (Dec. 15, 2017) (online at www.sciencedirect.com/science/article/pii/S0048969717316479).

[29] Healthy Babies Bright Futures, *What's in My Baby's Food?  A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) (online at www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

[30] Consumer Reports, *Arsenic in Some Bottled Water Brands at Unsafe Levels, Consumer Reports Says* (June 28, 2019) (online at www.consumerreports.org/water-quality/arsenic-in-some-bottled-water-brands-at-unsafe-levels/); Consumer Reports, *Arsenic and Lead Are in Your Fruit Juice:  What You Need to Know* (Jan. 30, 2019) (online at www.consumerreports.org/food-safety/arsenic-and-lead-are-in-your-fruit-juice-what-you-need-to-know/).

[31] Food and Drug Administration, *Arsenic in Food and Dietary Supplements* (online at www.fda.gov/food/metals-and-your-food/arsenic-food-and-dietary-supplements) (accessed Jan. 26, 2021).

[32] Environmental Protection Agency, *Drinking Water Requirements for States and Public Water Systems* (online at www.epa.gov/dwreginfo/chemical-contaminant-rules) (accessed Jan. 26, 2021); The European Food Information Council, *Arsenic (Q&A)* (online at www.eufic.org/en/food-safety/article/arsenic-qa) (accessed Jan. 26, 2021); World Health Organization, *Arsenic* (Feb. 15, 2018) (online at www.who.int/news-room/fact-sheets/detail/arsenic).

According to internal company documents, Nurture sells products even after testing confirms that they are dangerously high in inorganic arsenic. Nurture sold one such product, Apple and Broccoli Puffs, despite tests results showing it contained 180 ppb inorganic arsenic.[33] An arsenic level of 180 ppb is high by all standards, but it is 80% higher than Nurture's own internal goal threshold of 100 ppb.

*Nurture's Heavy Metal Test Results for Baby Food Products (Excerpted Entries)*[34]

| Product Name | Category | Best Before Date | Parameter | Goal Threshold | Result | | Unit | Date of Test Report | Disposition |
|---|---|---|---|---|---|---|---|---|---|
| Apple & Broccoli Puffs | Baby 7+ Months | 9/7/2018 | Inorganic Arsenic | 100 180 | 180 | ppb | 11/01/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Banana & Pumpkin Puffs | Baby 7+ Months | 10/11/2018 | Inorganic Arsenic | 100 160 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry & Beet Puffs | Baby 7+ Months | 7/24/2018 | Inorganic Arsenic | 100 160 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

Nurture routinely sold products that exceeded its internal standards. Twenty-nine other products that Nurture tested and sold registered over 100 ppb inorganic arsenic. In total, over 25% of the products that Nurture tested for inorganic arsenic, and sold, had inorganic arsenic levels above 100 ppb.[35]

*Nurture's Heavy Metal Test Results for Baby Food Products (Excerpted Entries)*[36]

| Product Name | Goal Threshold | Result | Date of Test Report | Disposition |
|---|---|---|---|---|
| Apple & Broccoli Puffs | 100 | 180 | 11/01/17 | Sell |
| Banana & Pumpkin Puffs | 100 | 160 | 10/31/17 | Sell |
| Strawberry & Beet Puffs | 100 | 160 | 10/31/17 | Sell |
| Kale & Spinach Puffs | 100 | 150 | 10/31/17 | Sell |
| Kale & Spinach Puffs | 100 | 150 | 10/31/17 | Sell |
| Purple Carrot & Blueberry Puffs | 100 | 150 | 11/17/17 | Sell |
| Sweet Potato & Carrot Puffs | 100 | 150 | 10/31/17 | Sell |
| Sweet Potato & Carrot Puffs | 100 | 150 | 10/31/17 | Sell |
| Apple Rice Cakes | 100 | 130 | 02/08/17 | Sell |
| Apple Rice Cakes | 100 | 130 | 02/08/17 | Sell |
| Sweet Potato & Carrot Puffs | 100 | 122 | 09/13/18 | Sell |
| Apple Rice Cakes | 100 | 120 | 02/08/17 | Sell |

---

[33] Nurture, *Heavy Metal Test Results for Baby Food Products* (Dec. 18, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/1.xlsx).

[34] *Id.*

[35] *Id.*

[36] *Id.*

| Blueberry Beet Rice Cakes | 100 | 120 | 02/08/17 | | Sell |
|---|---|---|---|---|---|
| Purple Carrot & Blueberry Puffs | 100 | 120 | 10/31/17 | | Sell |
| Apple & Broccoli Puffs | 100 | 115 | 10/15/18 | | Sell |
| Strawberry & Beet Puffs | 100 | 114 | 03/21/19 | | Sell |
| Purple Carrot & Blueberry Puffs | 100 | 112 | 06/05/18 | | Sell |
| Apple Rice Cakes | 100 | 110 | 07/28/17 | | Sell |
| Blueberry Beet Rice Cakes | 100 | 110 | 02/08/17 | | Sell |
| Blueberry Beet Rice Cakes | 100 | 110 | 02/08/17 | | Sell |
| Strawberry & Beet Puffs | 100 | 108 | 12/10/18 | | Sell |
| Strawberry & Beet Puffs | 100 | 108 | 09/21/18 | | Sell |
| Apple & Broccoli Puffs | 100 | 107 | 05/30/19 | | Sell |
| Strawberry & Beet Puffs | 100 | 107 | 05/22/19 | | Sell |
| Strawberry & Beet Puffs | 100 | 105 | 09/21/18 | | Sell |
| Strawberry & Beet Puffs | 100 | 104 | 08/22/18 | | Sell |
| Banana & Pumpkin Puffs | 100 | 103 | 04/24/19 | | Sell |
| Sweet Potato & Carrot Puffs | 100 | 103 | 04/24/19 | | Sell |
| Banana & Pumpkin Puffs | 100 | 101 | 09/21/18 | | Sell |

The average amount of inorganic arsenic in the baby foods that Nurture tested and sold was 59.54 ppb. That towers over existing and recommended standards, including FDA's and EPA's water limits of 10 ppb.

At least 89 of Nurture's final products—over 78% of those products tested—tested at 9 ppb inorganic arsenic or above.

For results under 9.54 ppb, Nurture did not differentiate—it marked them all as "<9.54." Because of this "less than" reporting format, there is no way to know if any of Nurture's products were free of inorganic arsenic.

***Summary of Nurture's Inorganic Arsenic Results***

| |
|---|
| **180 ppb – Nurture's product with the highest amount of inorganic arsenic:  Apple & Broccoli Puffs.** |
| **>100 ppb – Over 25% of the baby food products that were tested for inorganic arsenic had over 100 ppb inorganic arsenic.** |
| **59.54 ppb – Average amount of inorganic arsenic in all baby food products tested for inorganic arsenic.** |
| **>50 ppb – Over 50% of Nurture's baby food products that were tested for inorganic arsenic contained over 50 ppb inorganic arsenic.** |

2.     **Hain (Earth's Best Organic) produced finished baby foods that contained as much as 129 ppb inorganic arsenic; Hain used ingredients in its baby foods with as much at 309 ppb total arsenic.**

Hain does not regularly test finished baby food products for inorganic arsenic content. It typically only tests ingredients. However, when Hain did test a small sample of finished product, it found 129 ppb inorganic arsenic.[37]

**Hain Celestial, FDA Testing Result Investigation, August 1, 2019 (Excerpted Entries)[38]**

| FDA Data | | | | | Track & Trace Data | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| FDA Sample Number | Best By Date | Lot number | FDA FG Inorganic Arsenic (ppb) | Avg FG Result | Estimate % Avg FG Increase from Avg Raw | Packaging Date | WIP Batch | Rice Flour Lot #s | Type of Arsenic Test | Raw Material Results (ppb) | Avg Raw Result |
| 1024309 | 4/27/19 | BN12216 | 129 | 129.0 | 93% | 11/3/17 | 204146 | B160005305 | Total Arsenic | 69 | 67.0 |
| | | | | | | | | B160005306 | Total Arsenic | 76 | |
| | | | | | | | | B160005512 | Total Arsenic | 62 | |
| | | | | | | | | B160005152 | Total Arsenic | 61 | |

The Subcommittee's review of the ingredient test results reveals that Hain routinely used ingredients with high levels of arsenic. Hain used brown rice flour that had tested at 309 ppb arsenic.[39] Hain likewise used a vitamin pre-mix containing 223 ppb arsenic, and raisin and wheat flour containing 200 ppb arsenic.[40] The testing data shows that Hain used at least 24 ingredients after testing found that they contained more than 100 ppb arsenic, its already-dangerously-high internal standard for most ingredients.[41]

**Hain, Raw Material Pre-Shipment Test Data History (Excerpted Entries)[42]**

| Lab Results Date | Product Description | Status | Arsenic Spec Limit (ppb) | Arsenic Result (ppb) |
|---|---|---|---|---|
| Jun/19/2019 | Org Brown Rice Flour | Deviation Approved | 100 | 309 |
| Nov/26/2019 | Vitamin Pre-Mix | Deviation Approved | 100 | 223 |
| Jul/10/2018 | Org Whole Raisins | Accepted | 100 | 200 |
| Sep/29/2017 | Org Soft White Wheat Flour | Accepted | 200 | 200 |
| Dec/14/2017 | Org Spelt Flour | Accepted | 100 | 190 |
| Jan/8/2018 | Organic Barley Malt Extract | Accepted | 100 | 180 |
| Dec/5/2017 | Org Yellow Split Pea Powder | Accepted | 100 | 160 |
| Jul/13/2017 | Medium Grain Whole Rice | Accepted | 200 | 150 |
| Oct/3/2017 | Org Brown Rice Flour | Accepted | 100 | 140 |
| Sep/4/2019 | Org Brown Rice Flour | Deviation Approved | 100 | 134 |
| Dec/5/2017 | Org Butternut Squash Puree | Accepted | 100 | 130 |
| Oct/31/2017 | Org Brown Rice Flour | Accepted | 100 | 130 |

---

[37] Hain, *PowerPoint Presentation to FDA: FDA Testing Result Investigation* (Aug. 1, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2.pdf).

[38] *Id.*

[39] Hain, *Raw Material Pre-Shipment Test Data History* (Dec. 11, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/3_0.pdf).

[40] *Id.*

[41] *Id.*

[42] *Id.*

| Oct/31/2017 | Org Brown Rice Flour | Accepted | 100 | 130 |
| Oct/31/2017 | Org Brown Rice Flour | Accepted | 100 | 129 |
| Oct/31/2017 | Org Brown Rice Flour | Accepted | 100 | 129 |
| Oct/31/2017 | Org Brown Rice Flour | Accepted | 100 | 129 |
| Oct/31/2017 | Org Brown Rice Flour | Accepted | 100 | 127 |
| Oct/31/2017 | Org Brown Rice Flour | Accepted | 100 | 126 |
| Dec/13/2017 | Org Blueberry Puree | Accepted | 100 | 120 |
| Dec/27/2017 | Org Barley Flour | Accepted | 100 | 120 |
| Oct/31/2017 | Org Brown Rice Flour | Accepted | 100 | 119 |
| Nov/29/2017 | Org Blueberry Puree | Accepted | 100 | 110 |
| Nov/3/2017 | Org Cinnamon Powder | Accepted | 100 | 110 |
| Jul/11/2019 | Org Brown Rice Flour | Accepted | 100 | 101 |

3. **Beech-Nut used ingredients in its baby foods with as much at 913.4 ppb arsenic; Beech-Nut routinely used ingredients that exceeded 300 ppb total arsenic; Beech-Nut unnecessarily uses high-arsenic additives to address issues like "crumb softness."**

Beech-Nut only tested arsenic content in its ingredients, not its final product. The Subcommittee has determined that Beech-Nut used ingredients containing as much as 913.4 ppb arsenic.[43] Test results show that Beech-Nut used at least fourteen other ingredients containing over 300 ppb arsenic.[44] And it used at least 45 ingredients containing over 100 ppb arsenic.

*Beech-Nut, Raw Material Heavy Metal Testing (Excerpted Entries)*[45]

| Date | Commodity | Arsenic Result (ppb) | Spec. | Acceptance (Y/N) |
|---|---|---|---|---|
| 9/19/2018 | Amylase | 913.40 | N/A | Y |
| 4/26/2018 | Amylase | 741.10 | N/A | Y |
| 10/7/2017 | BAN 800 | 710.90 | <3000 | Y |
| 11/29/2017 | Alpha Amylase | 679.00 | N/A | Y |
| 10/12/2017 | Amylase | 645.10 | N/A | Y |
| 8/20/2019 | Sebamyl 100 | 583.60 | N/A | Y |
| 3/6/2018 | Org. Rice Flour | 570.00 | ≤100(inorg) | Y |
| 6/7/2019 | Enzyme | 499.30 | N/A | Y |
| 12/20/2017 | BAN 800 | 465.20 | <3000 | Y |
| 1/14/2019 | Enzyme | 442.30 | N/A | Y |
| 10/23/2017 | BAN 800 | 401.40 | <3000 | Y |

---

[43] Beech-Nut, *Raw Material Heavy Metal Testing* (Dec. 6, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/4.xlsx).

[44] *Id.*

[45] *Id.*

| 2/19/2018 | BAN 800 | 382.00 | <3000 | Y |
|---|---|---|---|---|
| 6/12/2018 | Ban 800 | 353.80 | <3000 | Y |
| 5/21/2018 | Org. Cumin | 322.70 | ≤1000 | Y |
| 4/13/2018 | Org. Rice | 237.40 | ≤100(inorg) | Y |
| 4/12/2018 | Rice Flour | 170.00 | ≤100(inorg) | Y |
| 4/6/2018 | Rice Flour | 170.00 | ≤100(inorg) | Y |
| 7/14/2017 | Org. Cumin | 168.50 | ≤1000 | y |
| 7/31/2018 | rice flour | 162.00 | ≤100(inorg) | Y |
| 2/28/2018 | Rice Flour | 161.00 | ≤100(inorg) | y |
| 3/30/2017 | Cumin | 160.50 | ≤1000 | Y |
| 3/27/2018 | Rice Flour | 160.00 | ≤100(inorg) | Y |
| 5/30/2018 | Rice Flour | 160.00 | ≤100(inorg) | Y |
| 6/12/2018 | Rice Flour | 160.00 | ≤100(inorg) | Y |
| 7/20/2018 | Rice Flour | 160.00 | ≤100(inorg) | Y |
| 10/11/2016 | Oregano | 158.10 | <1000 | Y |
| 1/15/2018 | Rice Flour | 150.00 | ≤100(inorg) | Y |
| 1/15/2018 | Rice Flour | 150.00 | ≤100(inorg) | Y |
| 2/15/2018 | Rice Flour | 150.00 | ≤100(inorg) | Y |
| 5/31/2018 | Rice Flour | 150.00 | ≤100(inorg) | Y |
| 2/22/2018 | Rice Flour | 140.00 | ≤100(inorg) | Y |
| 1/6/2018 | Rice Flour | 140.00 | ≤100(inorg) | Y |
| 4/6/2018 | Rice Flour | 140.00 | ≤100(inorg) | Y |
| 9/4/2019 | Org. rice | 132.30 | ≤200 | Y |
| 11/3/2017 | Org.Cumin | 130.20 | ≤1000 | Y |
| 2/15/2018 | Rice Flour | 130.00 | ≤100(inorg) | Y |
| 2/5/2018 | Rice Flour | 130.00 | ≤100(inorg) | Y |
| 2/8/2018 | Rice Flour | 130.00 | ≤100(inorg) | Y |
| 1/5/2018 | Rice Flour | 122.30 | ≤100(inorg) | Y |
| 1/5/2018 | Rice Flour | 120.80 | ≤100(inorg) | Y |
| 2/8/2018 | Rice Flour | 120.00 | ≤100(inorg) | Y |
| 1/18/2017 | Org.Rice | 110.00 | ≤200 | Y |
| 5/8/2018 | Rice Flour | 110.00 | ≤100(inorg) | Y |
| 5/17/2017 | Rice | 110.00 | ≤200 | Y |
| 2/6/2017 | Vitamin Mix | 106.90 | <3000 | Y |

The six Beech-Nut ingredients with the highest arsenic levels—Amylase, BAN 800, Alpha Amylase, and Sebamyl 100—are all enzymes that Beech-Nut adds to its products. BAN 800 is an enzyme that reportedly "[i]ncreases crumb softness" in baked goods.[46] Amylase is an

---

[46] Novozymes, *Meet Consumer Demands with Enzymes that Support Organic Labeling* (May 2018) (online at www.novozymes.com/-/media/Project/Novozymes/Website/website/document-library/Advance-your-business/Baking/Baking-Product-Range-for-Organic-Production.pdf).

enzyme that is "used in bread-making as an additive to improve the conversion of complex sugars into simple sugars that yeast are then able to feed on and produce alcohol and $CO_2$."[47]

**4.    Gerber used 67 batches of rice flour that had more than 90 ppb inorganic arsenic.**

Gerber did not provide inorganic arsenic results for all of its ingredients.  However, test results for conventional rice flour revealed that Gerber routinely used flour with over 90 ppb inorganic arsenic.[48]  Gerber used five batches of rice flour that had 98 ppb inorganic arsenic, and 67 batches that contained more than 90 ppb.

*Gerber Products Company Test Results (Excerpted Entries)*[49]

| Year | Ingredient | Total Arsenic (ppb) | Inorganic Arsenic (ppb) |
|------|-----------|--------------------|-----------------------|
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 98 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 98 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 98 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 98 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 98 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 107 | 97 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 107 | 97 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 107 | 97 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 107 | 97 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 107 | 97 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |

---

[47] ChefSteps, *Amylase* (online at www.chefsteps.com/ingredients/amylase) (accessed Jan. 26, 2021).

[48] Gerber, *Gerber Products Company Test Results* (Dec. 9, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/5_0.pdf).

[49] *Id.*

| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 105 | 96 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 123 | 95 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 123 | 95 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 95 | 95 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 123 | 95 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 123 | 95 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 124 | 95 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 124 | 95 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 124 | 95 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 124 | 95 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 118 | 94 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 118 | 94 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 94 | 94 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 118 | 94 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 118 | 94 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 111 | 94 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 111 | 94 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 111 | 94 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 111 | 94 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 111 | 94 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 111 | 94 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 111 | 94 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 111 | 94 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 111 | 94 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 111 | 94 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 121 | 93 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 123 | 92 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 123 | 92 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 123 | 92 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 123 | 92 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 108 | 92 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 92 | 92 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 108 | 92 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 108 | 92 |
| 2017 | Flour Rice Long Grain Tote NGM InfG Kshr | 108 | 92 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 120 | 92 |

| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 120 | 92 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 120 | 92 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 120 | 92 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 120 | 92 |
| 2018 | Flour Rice Long Grain Tote NGM InfG Kshr | 120 | 92 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 138 | 91 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 138 | 91 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 138 | 91 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 138 | 91 |
| 2019 | Flour Rice Long Grain Tote NGM InfG Kshr | 138 | 91 |

**B.    Lead**

There is a growing consensus among health experts that lead levels in baby foods should not exceed 1 ppb.  The American Academy for Pediatrics, the Environmental Defense Fund, and Consumer Reports have all, in some form, called for a 1 ppb level in food and drinks that babies and children consume.[50]  Healthy Babies Bright Futures has called for a goal of no measurable amount of lead in baby food.[51]

There is no federal standard for lead in baby food.  However, FDA has set a 5 ppb lead standard for bottled water, WHO has set 10 ppb lead as a provisional guideline for drinking water, and EPA has set an action level of 15 ppb for lead in drinking water.  FDA has also set standards for lead in juice (50 ppb) and candy (100 ppb).  The European Union has set the maximum lead level in infant formula to 20 ppb.[52]

---

[50] American Academy of Pediatrics, *Prevention of Childhood Lead Toxicity* (May 5, 2016) (online at https://pediatrics.aappublications.org/content/pediatrics/early/2016/06/16/peds.2016-1493.full.pdf); Environmental Defense Fund, *Lead in Food:  A Hidden Health Threat* (June 15, 2017) (online at www.edf.org/sites/default/files/edf_lead_food_report_final.pdf); Consumer Reports, *Consumer Reports Letter to FDA on Reducing Heavy Elements Like Arsenic, Lead, and Cadmium in Fruit Juices* (Jan. 30, 2019) (online at https://advocacy.consumerreports.org/research/consumer-reports-letter-to-fda-on-reducing-heavy-elements-like-arsenic-lead-and-cadmium-in-fruit-juices/).

[51] Healthy Babies Bright Futures, *What's in My Baby's Food?  A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) (online at www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

[52] World Health Organization, *Lead in Drinking-Water* (2011) (online at www.who.int/water_sanitation_health/dwq/chemicals/lead.pdf); Environmental Protection Agency, *Drinking Water Requirements for States and Public Water Systems* (online at www.epa.gov/dwreginfo/lead-and-copper-rule) (accessed Jan. 26, 2021); European Union, *Setting Maximum Levels for Certain Contaminants in Foodstuffs* (Dec. 19, 2006) (online at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:02006R1881-20150521).

*Proposed and Existing Lead Standards*

| Group or Agency | Standard |
|---|---|
| Environmental Defense Fund | 1 ppb, especially for baby food |
| Consumer Reports | 1 ppb in fruit juices |
| American Academy of Pediatrics (AAP) | 1 ppb for water fountains in schools |
| FDA | 5 ppb for bottled water |
| World Health Organization | 10 ppb provisional guideline |
| EPA | 15 ppb for drinking water (action level) |
| European Union (EU) | 20 ppb for "infant formulae and follow-on formulae" |
| FDA | 50 ppb for juice |
| | 100 ppb for candy |

The Subcommittee's investigation has found that baby food manufacturers are selling baby food with higher levels of lead than what is allowed by existing standards for water, juice, and candy. Internal testing data from Gerber, Nurture, Beech-Nut, and Hain demonstrate that all four companies sold products or used ingredients with significant amounts of lead. Only Nurture routinely tested its finished product for lead. Hain, Beech-Nut, and Gerber did not test their finished products, only their ingredients. All companies, whether they test their final products or merely their ingredients, sold baby foods even when they or their ingredients contained unsafe levels of lead.

### 1. Nurture (HappyBABY) sold finished baby food products after testing confirmed they contained as much as 641 ppb lead, over six times its already-dangerously-high internal standard.

Nurture sold products that tested as high as 641 ppb lead—over six times higher than its internal limit of 100 ppb lead.[53] Nurture also sold five other products after they tested over 50 ppb lead.[54]

---

[53] Nurture, *Heavy Metal Test Results for Baby Food Products* (Dec. 18, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/1.xlsx).

[54] *Id.*

*Nurture's Heavy Metal Test Results for Baby Food Products (Excerpted Entries)*[55]

| Product Name | Category | Best Before Date | Param eter | Goal Thresh old | Result | Unit | Date of Test Report | Dispos ition |
|---|---|---|---|---|---|---|---|---|
| Blueberry Purple Carrot | Baby 7+ Months | 10/25/2017 | Lead | 100 | 641 | ppb | 01/27/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Multi-Grain Cereal Canister | Baby 6+ Months | 11/16/2018 | Lead | 100 | 500 | ppb | 08/30/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Apple Spinach Kiwi Cre | Baby 7+ Months | 8/4/2018 | Lead | 100 | 86 | ppb | 07/29/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Blueberry Beet Rice Ca | Baby 7+ Months | 5/22/2018 | Lead | 100 | 61 | ppb | 07/29/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Pea Spinach Teether | Baby 7+ Months | 10/24/2019 | Lead | 100 | 55 | ppb | 12/12/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Pea Spinach Teether | Baby 7+ Months | 05/07/2019 | Lead | 100 | 50 | ppb | 12/12/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

Of the 206 finished products that Nurture tested for lead, 16 products registered over 20 ppb lead—exceeding the lenient EU standard. And 39 products, or 18.9%, tested over 10 ppb lead.[56] It is not clear that even one of Nurture's baby food products registered at or below 1 ppb lead, which should be the upper limit for lead content according to the health experts at Consumer Reports, the Environmental Defense Fund, and the American Academy of Pediatrics.

> **2.    Beech-Nut used ingredients containing as much as 886.9 ppb lead; Beech-Nut routinely used ingredients with high lead content, including 483 ingredients that contained over 5 ppb lead, 89 ingredients that contained over 15 ppb lead, and 57 ingredients that contained over 20 ppb lead.**

Beech-Nut used ingredients in its baby foods that contained high lead levels. For instance, Beech-Nut used cinnamon that contained 886.9 ppb lead.[57]

*Beech-Nut's Raw Materials Heavy Metal Testing (Excerpted Entry)*[58]

| Date | Commodity | Preshipmen t Lot | Arsenic result (ppb) | Spec. | Cadmiu m result (ppb) | Spec. | Lead result (ppb) | Spec. | Acceptance (Y/N) |
|---|---|---|---|---|---|---|---|---|---|
| 10/19/2016 | cinnamon | 762 | 18.8 | ≤1000 | 344.5 | ≤1000 | 886.9 | ≤1000 | Y |

Beech-Nut tested and used 57 ingredients that contained over 20 ppb lead, the EU's lax standard for lead in infant formula. Beech-Nut accepted 89 ingredients that tested at or over 15 ppb lead, EPA's action level for drinking water, and 483 ingredients that tested at or over 5 ppb lead, FDA's standard for lead in bottled water.[59]

---

[55] *Id.*

[56] *Id.*

[57] Beech-Nut, *Raw Material Heavy Metal Testing* (Dec. 6, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/4.xlsx).

[58] *Id.*

[59] *Id.*

*Beech-Nut's Raw Materials Heavy Metal Testing (Excerpted Entries)*[60]

| Date | Commodity | Lead result (ppb) | Spec. | Acceptance (Y/N) |
|------|-----------|-------------------|-------|------------------|
| 10/19/2016 | Cinnamon | 886.9 | ≤1000 | Y |
| 5/21/2018 | Org. Cumin | 644.9 | ≤1000 | Y |
| 8/11/2017 | Org. Coriander | 603.5 | <1000 | Y |
| 10/11/2016 | Oregano | 570.4 | <1000 | Y |
| 7/14/2017 | Org. Cumin | 231.2 | ≤1000 | y |
| 5/31/2017 | Cinnamon | 203.9 | ≤1000 | Y |
| 3/30/2017 | Cumin | 177.7 | ≤1000 | Y |
| 11/3/2017 | Org. Cumin | 167.7 | ≤1000 | Y |
| 12/5/2017 | Org. Cinnamon | 126.2 | ≤1000 | Y |
| 11/29/2017 | Alpha Amylase | 114.5 | <300 | Y |
| 9/19/2018 | Amylase | 108.8 | <300 | Y |
| 7/11/2017 | Org. Lemon | 102 | ≤160 | Y |
| 7/8/2019 | Org. Cinnamon | 100 | ≤1000 | Y |
| 7/12/2019 | Org. Cinnamon | 100 | ≤1000 | Y |
| 10/12/2017 | Amylase | 95.8 | <300 | Y |
| 4/26/2018 | Amylase | 91 | <300 | Y |
| 4/12/2017 | Turmeric | 76.3 | ≤1000 | Y |
| 8/27/2018 | Sunflower Lecithin | 71.6 | ≤100 | Y |
| 8/3/2017 | Org. Lemon | 63.7 | ≤160 | Y |

---

[60] *Id.*

| 4/11/2018 | Org. Cinnamon | 59 | ≤1000 | Y |
| 11/2/2018 | S. Potato | 55.3 | ≤15 | Y |
| 4/21/2017 | Sunflower Lecithin | 54.9 | ≤100 | Y |
| 8/15/2018 | Quinoa Flour | 51.6 | <75 | Y |
| 11/2/2018 | S. Potato | 50.1 | ≤15 | Y |
| 10/25/2016 | Lemon | 47.5 | ≤160 | Y |
| 1/14/2019 | Enzyme | 47.3 | <300 | Y |
| 5/31/2018 | Prune Puree | 41.5 | ≤40 | Y - ER |
| 11/6/2018 | S. Potato | 40.3 | ≤15 | Y |
| 9/29/2017 | Org. Turmeric | 39.3 | ≤1000 | Y |
| 9/13/2019 | Org. Cinnamon | 37.8 | ≤1000 | Y |
| 8/11/2017 | Org. Cinnamon | 36.7 | ≤1000 | y |
| 11/6/2018 | S. Potato | 35.2 | ≤15 | Y |
| 11/2/2018 | S. Potato | 34.9 | ≤15 | Y |
| 10/10/2018 | Dehydrated Potato | 32.4 | <75 | Y - ER |
| 8/2/2018 | Mango | 32.3 | ≤20 | Y |
| 11/2/2018 | S. Potato | 31.8 | ≤15 | Y |
| 6/11/2018 | Sunflower Lecithin | 31.7 | ≤100 | Y |
| 8/6/2018 | Prune | 31.1 | ≤40 | |
| 8/20/2019 | Sebamyl 100 | 30.6 | <300 | Y |
| 3/19/2018 | Org. Prune | 30 | ≤40 | Y |
| 9/20/2016 | Apricot | 28 | ≤20 | Y - ER |
| 2/13/2019 | Org. Prune | 27.9 | ≤40 | Y - ER |

| 6/7/2019 | Enzyme | 26.3 | <300 | Y |
| 6/19/2018 | Org. Quinoa Flour | 25.3 | <75 | Y - ER |
| 2/6/2017 | Vitamin Mix | 24.6 | <10 | Y |
| 9/28/2017 | Org. Quinoa Seeds | 24.2 | <75 | Y |
| 9/28/2017 | Org. Quinoa Seeds | 24.2 | <75 | Y |
| 2/1/2019 | Blueberry | 22.7 | <25 | Y |
| 11/6/2018 | S. Potato | 22 | ≤15 | Y |
| 3/18/2019 | Org. Pears | 21.7 | <10 | |
| 6/14/2019 | Sunflower Lecithin | 21 | ≤100 | Y |
| 3/20/2018 | Carrots | 20 | <25 | Y - ER |
| 3/20/2018 | Carrots | 20 | <25 | Y - ER |
| 3/19/2018 | Carrots | 20 | <25 | Y - ER |
| 3/19/2018 | Carrots | 20 | <25 | Y - ER |
| 3/16/2017 | Sunflower Lecithin | 20 | ≤100 | Y |
| 3/1/2019 | Org. Cinnamon | 20 | ≤1000 | Y |

3.   **Hain (Earth's Best Organic) used ingredients containing as much as 352 ppb lead; Hain consistently used baby food ingredients with high lead content, including 88 ingredients that tested over 20 ppb lead and six ingredients that tested over 200 ppb lead.**

Hain used an ingredient called vitamin pre-mix in its baby food that contained as much as 352 ppb lead.[61]

---

[61] Hain, *Raw Material Pre-Shipment Test Data History* (Dec. 11, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/3_0.pdf).

*Hain's Raw Material Pre-Shipment Test Data History (Excerpted Entry)*[62]



| Lab Results Date | Vendor Name | Item Number | Product Description | Status | Comments on Status | Lab | Spec Based On | Arsenic Spec Limit (ppb) | Arsenic Result (ppb) | Lead Spec Limit (ppb) | Lead Result (ppb) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Nov/26/2019 | Wright Enrichment | 5316067 | Vitamin Pre Mix | Deviation Approved | Accepted on deviation 20190236 | Eurofins/Covance | As Purchased | 100 | 223 | 100 | 352 |

Hain used six ingredients that tested above 200 ppb lead. Hain used 88 ingredients with lead levels at or over 20 ppb—the EU's standard for lead in infant formula. Hain accepted 115 ingredients that registered at or over 15 ppb—EPA's action level for drinking water. And at least 27% of Hain ingredients tested at or over 5 ppb lead, FDA's standard for lead in bottled water. None of the test results showed an ingredient below 1 ppb lead, which should be the upper limit for lead content according to the health experts at Consumer Reports, the Environmental Defense Fund, and the American Academy of Pediatrics.

*Hain's Raw Material Pre-Shipment Test Data History (Excepted Entries for Ingredients Above 200 ppb Lead)*[63]

| Lab Results Date | Vendor Name | Item Number | Product Description | Status | Comments on Status | Lab | Spec Based On | Arsenic Spec Limit (ppb) | Arsenic Result (ppb) | Cadmium Spec Limit (ppb) | Cadmium Result (ppb) | Lead Spec Limit (ppb) | Lead Result (ppb) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nov/26/2019 | Wright Enrichment | 5316067 | Vitamin Pre Mix | Deviation Approved | Accepted on deviation 20190236 | Eurofins/Covance | As Purchased | 100 | 223 | 100 | 60.5 | 100 | 352 |
| Jan/19/2018 | Grain Millers | 471138 | Org Whole Wheat Fine Flour | Accepted | Calculated Levels on consumed basis | Deibel | As consumed | 100 | <100 | 100 | 160 | 100 | 250 |
| Dec/28/2017 | Grain Millers | 471011 | Org Quick Oats | Accepted | Calculated Levels on consumed basis | Deibel | As consumed | 100 | <100 | 100 | <100 | 100 | 230 |
| Dec/27/2017 | Grain Millers | 55300 | Org Barley Flour | Accepted | Calculated Levels on consumed basis | Deibel | As consumed | 100 | 120 | 100 | <100 | 100 | 230 |
| Nov/3/2017 | Starwest Botanicals | 40500 | Org Cinnamon Powder | Accepted | Calculated Levels on consumed basis | Deibel | As consumed | 100 | 110 | 100 | 200 | 100 | 230 |
| Jan/22/2018 | Jewel Date | 14300 | Org Date Paste | Accepted | Calculated Levels on consumed basis | Deibel | As consumed | 100 | <100 | 100 | 190 | 100 | 220 |

4.    **Gerber used ingredients that tested as high as 48 ppb lead; and routinely accepted ingredients containing over 20 ppb lead.**

Gerber produced limited lead testing results. The results for its sweet potatoes and juices demonstrated its willingness to use ingredients that contained dangerous lead levels. Gerber used an ingredient, conventional sweet potatoes, with 48 ppb lead. Gerber also used twelve other batches of sweet potato that tested over 20 ppb for lead, the EU's lenient upper standard.[64]

---

[62] *Id.*

[63] *Id.*

[64] Gerber, *Gerber Products Company Test Results* (Dec. 9, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/5_0.pdf).

*Gerber Products Company Test Results (Excerpted Entries)*[65]

| Year | Ingredient | Lead Level (ppb) |
|------|------------|------------------|
| 2017 | Conventional | 48 |
| 2017 | Organic | 35 |
| 2017 | Organic | 34 |
| 2017 | Organic | 34 |
| 2018 | Conventional | 34 |
| 2019 | Conventional | 34 |
| 2019 | Conventional | 34 |
| 2018 | Organic | 25 |
| 2019 | Organic | 25 |
| 2018 | Organic | 22 |
| 2018 | Organic | 22 |
| 2018 | Organic | 21 |
| 2019 | Conventional | 21 |

The average amount of lead in Gerber's tested juice concentrates was 11.2 ppb—more than FDA's limit for lead in bottled water. Over 83% of the juice concentrates tested showed greater than 1 ppb lead, which is Consumer Reports' recommended limit for fruit juices.

*Gerber Products Company Test Results (Excerpted Entries)*[66]

| GERBER Products Company Test Results | | Confidential Business Information 19-Dec-19 | | |
|---|---|---|---|---|
| **Juice Concentrate Ingredients (Lead Results )** | | | | |
| Year | Ingredient | | | Lead (ppb) |
| 2018 | Grape Juice White 68 Bx Asp Tote AR InfG | | Supplier 1 | 29 |
| 2018 | Grape Juice White 68 Bx Asp Tote AR InfG | | Supplier 1 | 26 |
| 2018 | Grape Juice White 68 Bx Asp Tote AR InfG | | Supplier 1 | 25 |

---

[65] *Id.*

[66] *Id.*

## C.    <u>Cadmium</u>

Outside the context of baby food, some regulation has taken action against cadmium. For example, EPA has a limit of 5 ppb in drinking water, and FDA has set a limit of 5 ppb in bottled water.[67] These standards approach WHO's 3 ppb limit for cadmium in drinking water.[68]

Groups like Healthy Babies Bright Futures have set a goal of no measurable amount of cadmium in baby food.[69] Consumer Reports has called for a limit of 1 ppb cadmium in fruit juices.[70] And the EU has set a limit ranging from 5–20 ppb cadmium for infant formula.

The Subcommittee found that baby food manufacturers sold many products with much higher cadmium content.

***Proposed and Existing Cadmium Standards***

| Group or Agency | Standard |
|---|---|
| Consumer Reports | 1 ppb in all fruit juices |
| World Health Organization | 3 ppb for drinking water |
| EPA | 5 ppb for drinking water |
| FDA | 5 ppb for drinking water |
| European Union (EU) | 5-20 ppb for infant formulae |

### 1.    Beech-Nut used ingredients in its baby food containing up to 344.55 ppb cadmium; 105 Beech-Nut ingredients tested over 20 ppb cadmium.

Beech-Nut used twenty ingredients registering over 100 ppb cadmium, including cinnamon containing 344.5 ppb cadmium.[71] That is more than 17 times higher than the EU's lax

---

[67] Environmental Protection Agency, *Ground Water and Drinking Water* (online at www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations) (accessed Jan. 26, 2021); 21 C.F.R. § 165 (2019) (online at www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=165.110).

[68] World Health Organization, *Cadmium in Drinking-Water* (2011) (online at www.who.int/water_sanitation_health/water-quality/guidelines/chemicals/cadmium.pdf?ua=1).

[69] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) (online at www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

[70] Consumer Reports, *Consumer Reports Letter To FDA On Reducing Heavy Elements Like Arsenic, Lead, and Cadmium in Fruit Juices* (Jan. 30, 2019) (online at https://advocacy.consumerreports.org/research/consumer-reports-letter-to-fda-on-reducing-heavy-elements-like-arsenic-lead-and-cadmium-in-fruit-juices/); European Union, *Setting Maximum Levels for Certain Contaminants in Foodstuffs* (Dec. 19, 2006) (online at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:02006R1881-20150521).

[71] Beech-Nut, *Raw Material Heavy Metal Testing* (Dec. 6, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/4.xlsx).

upper limit on cadmium in baby food. At least 105 ingredients that Beech-Nut tested and used in baby foods registered at or over 20 ppb cadmium—the EU's lax infant formula upper limit.[72]

*Beech-Nut's Raw Materials Heavy Metal Testing (Excerpted Entries)*[73]

| Date | Commodity | Cadmium Result (ppb) | Spec. | Acceptance (Y/N) |
|------|-----------|----------------------|-------|------------------|
| 10/19/2016 | Cinnamon | 344.50 | ≤1000 | Y |
| 4/11/2018 | Org. Cinnamon | 225.10 | ≤1000 | Y |
| 5/31/2017 | Cinnamon | 194.30 | ≤1000 | Y |
| 6/8/2018 | Org. Garlic | 186.00 | ≤1000 | Y |
| 8/11/2017 | Org.Cinnamon | 178.20 | ≤1000 | y |
| 10/11/2016 | Oregano | 176.50 | <1000 | Y |
| 12/5/2017 | Org. Cinnamon | 163.40 | ≤1000 | Y |
| 11/29/2017 | Dehydrated Potato | 148.40 | <90 | Y - ER |
| 10/10/2018 | Dehydrated Potato | 146.00 | <90 | Y |
| 10/10/2018 | Dehydrated Potato | 143.50 | <90 | Y - ER |
| 7/10/2019 | Spinach Puree | 143.00 | <180 | Y |
| 7/2/2018 | Fresh Spinach | 142.30 | <180 | Y |
| 7/8/2019 | Org. Cinnamon | 140.00 | ≤1000 | Y |
| 7/12/2019 | Org. Cinnamon | 140.00 | ≤1000 | Y |
| 3/1/2019 | Org. Cinnamon | 120.00 | ≤1000 | Y |
| 11/29/2017 | Dehydrated Potato | 119.60 | <90 | Y - ER |
| 9/13/2019 | Org. Cinnamon | 117.30 | ≤1000 | Y |
| 7/15/2019 | Spinach | 117.00 | <180 | Y |
| 7/15/2019 | Spinach | 101.00 | <180 | Y |
| 7/15/2019 | Spinach | 101.00 | <180 | Y |

2.  **Hain (Earth's Best Organic) used ingredients in its baby food containing up to 260 ppb cadmium; 102 Hain ingredients tested over 20 ppb cadmium.**

Hain used 14 ingredients that contained more than 100 ppb cadmium, including barley flour that registered at 260 ppb cadmium.[74] That is thirteen times the EU's lax upper limit on cadmium in baby food. Hain tested and used 102 ingredients that registered at or above 20 ppb cadmium—the EU's lax upper limit.

---

[72] *Id.*

[73] *Id.*

[74] Hain, *Raw Material Pre-Shipment Test Data History* (Dec. 11, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/3_0.pdf).

*Hain's Raw Material Pre-Shipment Test Data History (Excerpted Entries)*[75]

| Lab Results Date | Products Description | Status | Cadmium Spec. limit (ppb) | Cadmium Result (ppb) |
|---|---|---|---|---|
| Jan/19/2018 | Org Barley Flour | Accepted | 100 | 260 |
| Jan/22/2018 | IQF Org Chopped Broccoli | Accepted | 100 | 250 |
| Jan/23/2018 | Org Date Paste | Accepted | 100 | 220 |
| Nov/3/2017 | Org Cinnamon Powder | Accepted | 100 | 200 |
| Aug/21/2017 | Org Brown Flax Milled | Accepted | 100 | 190 |
| Jan/22/2018 | Org Date Paste | Accepted | 100 | 190 |
| Jan/18/2018 | Org Yellow Papaya Puree | Accepted | 100 | 170 |
| Jan/19/2018 | Org Whole Wheat Fine Flour | Accepted | 100 | 160 |
| Aug/17/2017 | Org Red Lentils | Accepted | 100 | 130 |
| Jan/15/2018 | Org Oat Flakes | Accepted | 100 | 130 |
| Jun/13/2018 | Org Brown Flax Milled | Accepted | 100 | 121 |
| Jan/12/2018 | Org Barley Flour | Accepted | 100 | 110 |
| Jun/25/2018 | Org Oat Flour | Accepted | 100 | 102 |
| Feb/19/2019 | Org Cinnamon Powder | Deviation Approved | 100 | 102 |

3.    **Sixty-five percent of Nurture (HappyBABY) finished baby food products contained more than 5 ppb cadmium, the EPA's limit for drinking water.**

Nurture sold multi-grain cereal with 49 ppb cadmium. Nurture sold another 125 products that tested over 5 ppb, which is the EPA's limit for drinking water.[76]

*Nurture's Heavy Metal Test Results for Baby Food Products (Excerpted Entries)*[77]

| Product Name | Category | Best Before Date | Parameter | Goal Thresh old | Result | Unit | Date of Test Report Disposition |
|---|---|---|---|---|---|---|---|
| Multi-Grain Cereal Canister | Baby 6+ Months | 11/16/2018 | Cadmium | 50 | 49 | ppb | 08/30/17 Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry Raspberry | Baby 7+ Months | 1/18/2019 | Cadmium | 50 | 36 | ppb | 12/05/17 Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Kale & Spinach Puffs | Baby 7+ Months | 12/4/2020 | Cadmium | 50 | 35 | ppb | 10/03/19 Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry Raspberry | Baby 7+ Months | 11/10/2019 | Cadmium | 50 | 31 | ppb | 10/23/18 Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry Raspberry | Baby 7+ Months | 11/10/2019 | Cadmium | 50 | 30 | ppb | 10/31/18 Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

---

[75] *Id.*

[76] Nurture, *Heavy Metal Test Results for Baby Food Products* (Dec. 18, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/1.xlsx).

[77] *Id.*

**4.    Gerber used carrots containing as much as 87 ppb cadmium; 75% of Gerber's carrots contain cadmium in excess of 5 ppb.**

Gerber does not test all its ingredients for cadmium.  Of those it does test, it accepts ingredients with high levels of cadmium.  Gerber used multiple batches of carrots containing as much as 87 ppb cadmium, and 75% of the carrots Gerber used had more than 5 ppb cadmium—the EPA's drinking water standard.[78]

*Gerber Products Company Test Results (Excerpted Entries)*[79]

| Year | Ingredient | Supplier | Arsenic (ppb) | Cadmium (ppb) | Mercury (ppb) | Lead (ppb) |
|------|-----------|----------|---------------|---------------|---------------|------------|
| 2018 | Conventional | Supplier 1 | | 87 | | |
| 2018 | Conventional | Supplier 4 | | 53 | | |
| 2019 | Conventional | Supplier 4 | | 42 | | |
| 2017 | Conventional | Supplier 1 | <2 | 40 | <1 | 4 |

**D.    Mercury**

Outside the context of baby food, some regulation has taken action against mercury.  EPA, for example, has capped mercury in drinking water at 2 ppb.[80]  Consumer advocates urge even stricter standards for baby food.  For example, Health Babies Bright Futures has called for a goal of no measurable amount of mercury in baby food.[81]

**1.    Nurture (HappyBABY) sold finished baby food products containing as much as 10 ppb mercury.**

Nurture sold a finished baby food product that contained 10 ppb mercury, and two others that contained 9.8 and 7.3 ppb.  A level of 10 ppb is five times more than the EPA's 2 ppb standard for drinking water.  In total, Nurture sold 56 products that contained over 2 ppb mercury.[82]

---

[78] Gerber, *Gerber Products Company Test Results* (Dec. 9, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/5_0.pdf).

[79] *Id.*

[80] Environmental Protection Agency, *Ground Water and Drinking Water* (online at www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations) (accessed Jan. 26, 2021).

[81] Healthy Babies Bright Futures, *What's in My Baby's Food?  A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) (online at www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

[82] Nurture, *Heavy Metal Test Results for Baby Food Products* (Dec. 18, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/1.xlsx).

*Nurture's Heavy Metal Test Results for Baby Food Products (Excerpted Entries)* [83]

| Product Name | Category | Best Before Date | Param eter | Goal Thresh old | Result | Unit | Date of Test Report | Dispos ition |
|---|---|---|---|---|---|---|---|---|
| Brown Rice Cereal Canister | Baby 6+ Months | 08/16/2019 | Mercury | 10 | 10 | ppb | 08/20/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Banana Sweet Potato Tea | Baby 7+ Months | 6/3/2019 | Mercury | 10 | 8.8 | ppb | 04/16/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Brown Rice Cereal Canister | Baby 6+ Months | 04/17/2019 | Mercury | 10 | 7.3 | ppb | 12/04/18 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

> **2.     Beech-Nut and Hain (Earth's Best Organic) did not even test for mercury in baby food; Gerber barely tests for it.**

From the documents produced to this Subcommittee, it appears that neither Beech-Nut nor Hain tests their ingredients or their finished products for mercury.

Gerber only tests certain ingredients for mercury. Of the test results they presented to the Subcommittee, they only tested carrots, sweet potatoes, and lemon juice concentrate.

**III.     INDUSTRY SELF-REGULATION FAILS TO PROTECT CONSUMERS: NURTURE, BEECH-NUT, HAIN, AND GERBER SET THEIR OWN DANGEROUSLY HIGH INTERNAL STANDARDS FOR TOXIC HEAVY METAL LEVELS AND ROUTINELY IGNORED THEM TO SELL PRODUCTS WITH HIGHER HEAVY METAL LEVELS.**

Baby food manufacturers are free to set their own internal standards for toxic heavy metal content of their products. They have set those standards at dangerously high levels and have often sold foods that exceed even those levels.

> **A.     Nurture (HappyBABY) sets high internal standards and regularly exceeds them. Nurture admits that its toxic heavy metal testing is not for safety—it sells all products tested, regardless of its toxic heavy metal content. FDA has finalized only one standard—100 ppb inorganic arsenic in infant rice cereal—Nurture has ignored it, setting its internal standard for that product at 115 ppb.**

Nurture created internal standards but did not follow them. Nurture describes these standards as "goal thresholds" that "are not used to make product disposition decisions and are not a pre-condition to product release."[84] Instead, its testing regime is limited to monitoring the supply chain. Nurture's thresholds are not actually used to prevent products that contain high levels of toxic heavy metals from being sold.[85]

---

[83] *Id.*

[84] Letter from Nurture, Inc. to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 18, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/10.pdf).

[85] *Id.*

Nurture does not even claim to be testing for safety—it made clear in its letter response to this Subcommittee that all products will be sold regardless of testing result: **"our heavy metal testing is performed as part of our monitoring program and not as a condition of product release, all of the products that were tested were sold into commerce."**[86]

Nurture sells the products it tests, regardless of their toxic heavy metal content. In total, Nurture tested 113 final products and sold every product tested, regardless of how much inorganic arsenic or lead the product contained, and regardless of whether those metals exceeded its own internal standards.

As a result of this policy of not testing for safety, Nurture released products containing as much as 641 ppb lead and 180 ppb inorganic arsenic.[87]

Nurture sold 29 products that were above its internal arsenic limit of 100 ppb, including Apple & Broccoli Puffs that contained 180 ppb inorganic arsenic. Nurture's standards "are not used to make product disposition decisions and are not a pre-condition to product release." Instead, their testing regime is limited to monitoring the supply chain.[88]

*Nurture's Heavy Metal Test Results for Baby Food Products (Excerpted Entries)*[89]

| Product Name | Category | Best Before Date | Parameter | Goal Thresh old | Result | Unit | Date of Test Report | Disposition |
|---|---|---|---|---|---|---|---|---|
| Apple & Broccoli Puffs | Baby 7+ Months | 9/7/2018 | Inorganic Arsenic | 100 | 180 | ppb | 11/01/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Banana & Pumpkin Puffs | Baby 7+ Months | 10/11/2018 | Inorganic Arsenic | 100 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Strawberry & Beet Puffs | Baby 7+ Months | 7/24/2018 | Inorganic Arsenic | 100 | 160 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Kale & Spinach Puffs | Baby 7+ Months | 3/16/2019 | Inorganic Arsenic | 100 | 150 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Kale & Spinach Puffs | Baby 7+ Months | 11/18/2018 | Inorganic Arsenic | 100 | 150 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Purple Carrot & Blueberry Puffs | Baby 7+ Months | 2/15/2019 | Inorganic Arsenic | 100 | 150 | ppb | 11/17/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |
| Sweet Potato & Carrot Puffs | Baby 7+ Months | 1/19/2019 | Inorganic Arsenic | 100 | 150 | ppb | 10/31/17 | Sell - Testing For Monitoring & Supply Chain Improvement Purposes Only |

---

[86] *Id.*

[87] Nurture, *Heavy Metal Test Results for Baby Food Products* (Dec. 18, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/1.xlsx).

[88] Letter from Nurture, Inc. to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 18, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/10.pdf).

[89] Nurture, *Heavy Metal Test Results for Baby Food Products* (Dec. 18, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/1.xlsx).

Further, Nurture appears to have misled the Subcommittee about its testing standards. As seen from Nurture's goal thresholds pictured below, Nurture conveyed to the Subcommittee that after January of 2019, it had a goal threshold of 50 ppb for lead in all of its baby food products—infant formula, cereals, and wet foods.[90]  However, in the test results that Nurture provided to this Subcommittee, it was still using 100 ppb as an internal guideline after January 2019.

This image is from Nurture's December 18, 2019, response to the Subcommittee, stating that after January of 2019, its lead threshold was 50 ppb in all baby food products:[91]

All of our specific goal thresholds for the referenced contaminants[8] are set forth in the chart below.

| Product Type | Contaminant | Analytical Matrix | Goal Threshold | Unit |
|---|---|---|---|---|
| Infant Formula | Cadmium | As Sold | 10 | ppb |
| Infant Formula | Inorganic Arsenic | As Sold | 75 | ppb |
| Infant Formula | Lead | As Sold | 50 | ppb |
| Cereals | Cadmium | As Consumed | 50 | ppb |
| Cereals with <75% Rice | Inorganic Arsenic | As Sold | 100 | ppb |
| Cereals with >75% Rice | Inorganic Arsenic | As Sold | 115 | ppb |
| Cereals | Lead | As Consumed | 50* | ppb |
| Cereals | Mercury | As Consumed | 10 | ppb |
| Wet Foods | Cadmium | As Consumed | 50 | ppb |
| Wet Foods | Inorganic Arsenic | As Sold | 100 | ppb |
| Wet Foods | Lead | As Consumed | 50* | ppb |
| Wet Foods | Mercury | As Consumed | 10 | ppb |

*Threshold lowered from 100ppb to 50ppb in January, 2019.

However, the chart below appears to show that after the date Nurture claims to have moved to a 50 ppb lead standard—January 2019—Nurture was still using a "Goal Threshold" of 100 ppb for 53 baby food products.  The fact that Nurture appears to have continued using a higher standard up to nine months after it claimed to the Subcommittee to have lowered the threshold casts serious doubt on Nurture's candor in this matter.

***Nurture's Heavy Metal Test Results for Baby Food Products (Excerpted Entries)***[92]

---

[90] Letter from Nurture, Inc. to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 18, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/10.pdf).

[91] *Id.*

[92] Nurture, *Heavy Metal Test Results for Baby Food Products* (Dec. 18, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/1.xlsx).

| Product Name | Parameter | Goal Threshold | Result | Unit | Date of Test Report |
|---|---|---|---|---|---|
| Blueberry Beet Rice Cakes | Lead | 100 | <4.0 | ppb | 10/14/19 |
| Stage 3 Root Vegetable and Turkey | Lead | 100 | <4.0 | ppb | 10/11/19 |
| Apple & Broccoli Puffs | Lead | 100 | 5.8 | ppb | 10/10/19 |
| Apple Cinnamon Oat Jar | Lead | 100 | <4.0 | ppb | 10/09/19 |
| Apple Spinach Jar | Lead | 100 | <4.0 | ppb | 10/09/19 |
| Kale & Spinach Puffs | Lead | 100 | 9.7 | ppb | 10/09/19 |
| Apple Mango Beet | Lead | 100 | <4.0 | ppb | 08/22/19 |
| Pear Prune Jar | Lead | 100 | <4.0 | ppb | 08/22/19 |
| Apple Spinach Pea & Kiwi | Lead | 100 | 43 | ppb | 08/22/19 |
| Pea Spinach Teether | Lead | 100 | 18 | ppb | 08/16/19 |
| Strawberry Yogis | Lead | 100 | <4.0 | ppb | 08/13/19 |
| Sweet Potato & Carrot Puffs | Lead | 100 | 7.7 | ppb | 07/25/19 |
| Banana & Pumpkin Puffs | Lead | 100 | 6.2 | ppb | 07/25/19 |
| Apples Blueberries & Oats | Lead | 100 | <4.0 | ppb | 07/24/19 |
| CC Oats & Quinoa Cereal | Lead | 100 | <4.0 | ppb | 07/24/19 |
| Green Beans Jar | Lead | 100 | <4.0 | ppb | 07/24/19 |
| Pears Mangoes & Spinach | Lead | 100 | <4.0 | ppb | 07/24/19 |
| Carrots | Lead | 100 | <4.0 | ppb | 07/20/19 |
| Pea Spinach Teether | Lead | 100 | 23 | ppb | 07/11/19 |
| Apple & Broccoli Puffs | Lead | 100 | 11 | ppb | 07/11/19 |
| Kale & Spinach Puffs | Lead | 100 | 11 | ppb | 07/11/19 |
| Mangoes | Lead | 100 | <4.0 | ppb | 07/03/19 |
| Sweet Potatoes Jar | Lead | 100 | <4.0 | ppb | 07/03/19 |
| CC Oats & Quinoa Cereal | Lead | 100 | <4.0 | ppb | 07/02/19 |
| Harvest Vegetables & Chicken | Lead | 100 | <4.0 | ppb | 07/02/19 |
| Apple Rice Cakes | Lead | 100 | 7.2 | ppb | 07/02/19 |
| Blueberry Purple Carrot Greek Yogis | Lead | 100 | 4.3 | ppb | 07/02/19 |
| Apple & Broccoli Puffs | Lead | 100 | 9.9 | ppb | 05/30/19 |
| Strawberry & Beet Puffs | Lead | 100 | 10 | ppb | 05/22/19 |
| Apples & Spinach | Lead | 100 | <4.0 | ppb | 05/15/19 |
| Clearly Crafted Apple Guava Beet | Lead | 100 | <4.0 | ppb | 05/10/19 |
| Sweet Potato Jar | Lead | 100 | <4.0 | ppb | 05/10/19 |
| Banana & Pumpkin Puffs | Lead | 100 | 13 | ppb | 04/24/19 |
| Sweet Potato & Carrot Puffs | Lead | 100 | 7.7 | ppb | 04/24/19 |
| Apple Pumpkin Carrots | Lead | 100 | <4.0 | ppb | 04/12/19 |
| Pea Spinach Teether | Lead | 100 | 23 | ppb | 04/12/19 |
| Multi-Grain Cereal Canister | Lead | 100 | 5.2 | ppb | 04/12/19 |
| Carrots | Lead | 100 | <4.0 | ppb | 04/11/19 |
| Sweet Potato Jar | Lead | 100 | <4.0 | ppb | 04/11/19 |
| Apple Spinach Pea & Kiwi | Lead | 100 | 34 | ppb | 03/29/19 |
| Strawberry & Beet Puffs | Lead | 100 | 7.8 | ppb | 03/21/19 |

| Banana & Pumpkin Puffs | Lead | 100 | 5.5 | ppb | 03/21/19 |
|---|---|---|---|---|---|
| CC Oatmeal Cereal | Lead | 100 | <4.0 | ppb | 03/18/19 |
| Carrots & Peas | Lead | 100 | <4.0 | ppb | 03/13/19 |
| CC Prunes | Lead | 100 | <4.0 | ppb | 03/13/19 |
| Pears & Kale Jar | Lead | 100 | <4.0 | ppb | 03/13/19 |
| Vegetable & Beef Medley | Lead | 100 | <4.0 | ppb | 03/07/19 |
| Banana Sweet Potato Teether | Lead | 100 | 12 | ppb | 02/19/19 |
| Banana & Pumpkin Puffs | Lead | 100 | 11 | ppb | 02/19/19 |
| Blueberry Purple Carrot Teether | Lead | 100 | 10 | ppb | 02/19/19 |
| Mangoes | Lead | 100 | <4.0 | ppb | 02/13/19 |
| Apple Mango Beet | Lead | 100 | <4.0 | ppb | 02/12/19 |
| Strawberry Banana Greek Yogis | Lead | 100 | <4.0 | ppb | 02/12/19 |

Nurture has also ignored the only final standard that FDA has set. FDA set a 100 ppb inorganic arsenic limit for infant rice cereal. Rather than comply with that limit, Nurture set its internal standards 15% higher, at 115 ppb inorganic arsenic.[93]

**Excerpt of December 18, 2019, Letter from Nurture, Inc. to Chairman Raja Krishnamoorthi[94]**

| Product Type | Contaminant | Analytical Matrix | Goal Threshold | Unit |
|---|---|---|---|---|
| Infant Formula | Cadmium | As Sold | 10 | ppb |
| Infant Formula | Inorganic Arsenic | As Sold | 75 | ppb |
| Infant Formula | Lead | As Sold | 50 | ppb |
| Cereals | Cadmium | As Consumed | 50 | ppb |
| Cereals with <75% Rice | Inorganic Arsenic | As Sold | 100 | ppb |
| Cereals with >75% Rice | Inorganic Arsenic | As Sold | 115 | ppb |

**B.    Beech-Nut set internal arsenic and cadmium standards at 3,000 ppb in dangerous additives, such as vitamin mix, and 5,000 ppb lead for certain ingredients like BAN 800. These standards are the highest of any responding manufacturer.**

Beech-Nut has set an internal specification limit (listed in the chart below as "spec.") of 3,000 ppb inorganic arsenic for certain ingredients, including vitamin mix.[95] As a result of

---

[93] Letter from Nurture, Inc. to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 18, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/10.pdf).

[94] *Id.*

[95] Beech-Nut, *Raw Material Heavy Metal Testing* (Dec. 6, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/4.xlsx).

adopting this high internal standard, Beech-Nut has used ingredients containing 710.9, 465.2, and 401.4 ppb arsenic.[96]  Beech-Nut also set internal guidelines of 3,000 ppb for cadmium and 5,000 ppb for lead for certain ingredients.[97]  These far surpass any existing regulatory standard in existence and toxic heavy metal levels for any other baby food manufacturer that responded to the Subcommittee's inquiry.

*Beech-Nut's Raw Materials Heavy Metal Testing (Excerpted Entries)*[98]

| Date | Commodity | Preshipment | Arsenic result (ppb) | Spec. | Cadmium result (ppb) | Spec. | Lead result (ppb) | Spec. | Acceptance (Y/N) |
|---|---|---|---|---|---|---|---|---|---|
| 12/20/2017 | BAN 800 | 786 | 465.20 | <3000 | 6.30 | <500 | <58 | <5000 | Y |
| 1/23/2019 | ascorbic acid | 80 | <5 | <3000 | <1 | <3000 | <5 | <3000 | Y |
| 10/7/2017 | BAN 800 | 673 | 710.90 | <3000 | 8.30 | <500 | <5 | <5000 | Y |
| 10/23/2017 | BAN 800 | 712 | 401.40 | <3000 | 6.10 | <500 | <5 | <5000 | Y |
| 2/19/2018 | BAN 800 | 120 | 382.00 | <3000 | <5 | <500 | <5 | <5000 | Y |
| 6/12/2018 | Ban 800 | 292 | 353.80 | <3000 | <5 | <500 | <5 | <5000 | Y |
| 3/12/2018 | BAN 800 | 164 | 29.70 | <3000 | <5 | <500 | <5 | <5000 | Y |
| 2/6/2017 | Vitamin Mix | 76 | 106.90 | <3000 | 60.30 | <3000 | 24.6 | <10 | Y |
| 1/31/2017 | Vitamin Mix | 72 | 89.40 | <3000 | 48.20 | <3000 | 18 | ≤20 | Y |
| 10/10/2019 | BAN 800 | 680 | 91.10 | <3000 | 28.40 | <500 | 7.5 | <5000 | Y |
| 12/5/2018 | ascorbic acid | 1084 | <5 | <3000 | <5 | <3000 | 6 | <3000 | Y |
| 9/4/2019 | BAN 800 | 442 | 59.70 | <3000 | 11.00 | <500 | 5.8 | <5000 | Y |

Beech-Nut sold eleven products that surpassed its own internal cadmium limits.  By doing so, Beech-Nut accepted dehydrated potato containing 119.6, 143.5, and 148.4 ppb cadmium, far surpassing its own internal limit of 90 ppb for that ingredient.[99]

---

[96] *Id.*

[97] *Id.*

[98] *Id.*

[99] *Id.*

*Beech-Nut's Raw Materials Heavy Metal Testing (Excerpted Entries)*[100]

| Date | Commodity | Preshipment | Arsenic result (ppb) | Spec. | Cadmium result (ppb) | Spec. | Lead result (ppb) | Spec. | Acceptance (Y/N) |
|---|---|---|---|---|---|---|---|---|---|
| 1/11/2018 | Oat Flour | 38 | 47.00 | ≤40 | 21.80 | ≤20 | <5 | ≤20 | Y |
| 1/16/2018 | Coarse Oat Flour | 45 | 45.60 | ≤40 | 20.70 | ≤20 | <5 | ≤20 | Y |
| 6/22/2018 | Org. Oat Flour | 299 | 24.00 | ≤40 | 20.80 | ≤20 | <5 | ≤20 | Y |
| 7/5/2018 | oat flour | 299 | 24.00 | ≤40 | 20.80 | ≤20 | <5 | ≤20 | |
| 3/13/2018 | Coarse Oat Flour | 168 | 23.40 | ≤40 | 20.70 | ≤20 | <5 | ≤20 | Y |
| 10/1/2019 | Oat Flour | 645 | 20.90 | ≤40 | 20.90 | ≤20 | <5 | ≤20 | Y |
| 9/13/2019 | Oat Flour | 554 | 18.20 | ≤40 | 22.30 | ≤20 | <5 | ≤20 | Y |
| 10/10/2018 | Dehydrated Potato | 816 | 11.30 | <75 | 143.50 | <90 | 32.4 | <75 | Y - ER |
| 11/29/2017 | Dehydrated Potato | 760 | 9.30 | <75 | 148.40 | <90 | 10.1 | <75 | Y - ER |
| 1/30/2018 | Org. Oat Flour | 73 | 8.50 | ≤40 | 21.70 | ≤20 | <5 | ≤20 | Y - ER |
| 11/29/2017 | Dehydrated Potato | 749 | 7.60 | <75 | 119.60 | <90 | <5 | <75 | Y - ER |

Beech-Nut's explanation of why it accepted products over its own internal limits was that it did so "rarely" and the ingredients were "generally restricted to a 20% variance of BNN's allowable limits…."[101] However, as the cadmium examples show, Beech-Nut accepted certain ingredients in spite of their own testing results which showed that they contained over 20% more cadmium than their already-high internal limit. Beech-Nut's internal limit for cadmium in dehydrated potato appears to be 90 ppb. A 20% variance would permit Beech-Nut to accept dehydrated potato containing up to 108 ppb cadmium. Nevertheless, Beech-Nut accepted three shipments of dehydrated potato containing cadmium in excess of its 20% variance allowance.[102] Beech-Nut did not offer any explanation.

C. **Hain (Earth's Best Organic) set an internal standard of 200 ppb for arsenic, lead, and cadmium in some of its ingredients. Hain justified deviations above its ingredient testing standards based on "theoretical calculations," even after Hain admitted to FDA that its testing underestimated final product toxic heavy metal levels.**

Hain set an internal standard of 200 ppb arsenic for 12 ingredients, most of which were different kinds of flours. By setting this high internal standard, Hain justified accepting wheat flour and rice that contained 200 and 150 ppb arsenic.[103]

---

[100] *Id.*

[101] Letter from the President and Chief Executive Officer of Beech-Nut Nutrition Company to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 6, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/6_0.pdf).

[102] Beech-Nut, *Raw Material Heavy Metal Testing* (Dec. 6, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/4.xlsx).

[103] Hain, *Raw Material Pre-Shipment Test Data History* (Dec. 11, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/3_0.pdf).

*Hain's Raw Material Pre-Shipment Test Data History (Excerpted Entries)*[104]

| Lab Results Date | Product Description | Status | Arsenic Spec Limit (ppb) | Arsenic Result (ppb) |
|---|---|---|---|---|
| Aug/3/2017 | Org Kamut Flour | Accepted | 200 | <100 |
| Aug/3/2017 | Org Spelt Flour | Accepted | 200 | <100 |
| Jul/6/2017 | Org Yellow Split Pea Powder | Accepted | 200 | <100 |
| Jul/5/2017 | Org Quinoa Flour | Accepted | 200 | <100 |
| May/26/2017 | Org Soft White Wheat Flour | Accepted | 200 | <100 |
| Aug/1/2017 | Org Fiber Oat | Accepted | 200 | <100 |
| Sep/25/2017 | Org Quinoa Flour | Accepted | 200 | <100 |
| Sep/12/2017 | Org Spelt Flour | Accepted | 200 | <100 |
| Aug/4/2017 | Org Spelt Flour | Accepted | 200 | <100 |
| Jul/19/2017 | Org Green Lentil Flour | Accepted | 200 | <100 |
| Sep/29/2017 | Org Soft White Wheat Flour | Accepted | 200 | 200 |
| Jul/13/2017 | Medium Grain Whole Rice | Accepted | 200 | 150 |

Similarly, Hain set an internal limit of 200 ppb for lead in five ingredients—forty times higher than FDA's guidance for bottled water. By doing so, Hain justified accepting lentil flour with 110 ppb lead and quinoa flour with 120 ppb lead. These surpass every existing regulatory standard for lead.[105]

*Hain's Raw Material Pre-Shipment Test Data History (Excerpted Entries)*[106]



| Lab Results Date | Vendor Name | Item Number | Product Description | Status | Comments on Status | Lab | Spec Based On | Lead Spec Limit (ppb) | Lead Result (ppb) |
|---|---|---|---|---|---|---|---|---|---|
| Aug/3/2017 | Montana Flour & Grains | 5303053 | Org Kamut Flour | Accepted | | Deibel | As consumed | 200 | <100 |
| Jul/19/2017 | Firebird Artisan Mills | 57200 | Org Green Lentil Flour | Accepted | Calculated Levels on consumed basis | Deibel | As consumed | 200 | 110 |
| Aug/21/2017 | Grain Millers | 5308029 | Org Brown Flax Milled | Accepted | Calculated Levels on consumed basis | Deibel | As consumed | 200 | <100 |
| Jul/5/2017 | Firebird Artisan Mills | 5303042 | Org Quinoa Flour | Accepted | | Deibel | As consumed | 200 | <100 |
| Sep/25/2017 | Firebird Artisan Mills | 5303042 | Org Quinoa Flour | Accepted | spec for lead was 200ppb | Deibel | As consumed | 200 | 120 |

[104] *Id.*

[105] *Id.*

[106] *Id.*

Hain used four products that surpassed its internal toxic heavy metal limits. For example, it accepted cinnamon that contained 102 ppb cadmium, vitamin pre-mix that had 223 ppb arsenic and 353 ppb lead, and two rice flours that had 134 and 309 ppb arsenic.[107]

***Hain's Raw Material Pre-Shipment Test Data History (Excerpted Entries)***[108]

| Lab Results Date | Vendor Name | Item Number | Product Description | Status | Comments on Status | Lab | Spec Based On | Arsenic Spec Limit (ppb) | Arsenic Result (ppb) | Cadmium Spec Limit (ppb) | Cadmium Result (ppb) | Lead Spec Limit (ppb) | Lead Result (ppb) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Feb/8x/2019 | Red Ape Cinnamon | 40500 | Org Cinnamon Powder | Deviation Approved | Accepted on deviation 20190045 | Dubal | As Purchased | 100 | 20 | 100 | 102 | 100 | 40 |
| Nov/26/2019 | Wright Enrichment | 5316067 | Vitamin Pre Mix | Deviation Approved | Accepted on deviation 20190236 | Eurofins/C ovance | As Purchased | 100 | 223 | 100 | 60.5 | 100 | 352 |
| Jun/19/2019 | Firebird Artisan Mills | 57600 | Org Brown Rice Flour | Deviation Approved | Accepted on deviation 20190127 | Eurofins/C ovance | As Purchased | 100 | 309 | 100 | 23 | 100 | <10 |
| Sep/4/2019 | Firebird Artisan Mills | 57600 | Org Brown Rice Flour | Deviation Approved | Accepted on deviation 2019030 and 20190234 | Eurofins/C ovance | As Purchased | 100 | 134 | 100 | 12.8 | 100 | 5 |

Hain justified these variations by claiming that the "theoretical" final goods will not surpass its internal limits. For example, Hain became aware that the vitamin pre-mix contained 223 ppb arsenic and 352 ppb lead.[109]

***Hain Deviation Report, Vitamin Premix (Nov. 26, 2019)***[110]

| | |
|---|---|
| **Ingredient Exp. Date** | |
| **Lot Code** | 19090122P |
| **Specification** | Arsenic: 100 ppb  Lead: 100 ppb |
| **Highest Percentage in Finished Good(s)** | 2.08% |

Arsenic: 223 ppb
Lead: 352 ppb

Despite having dangerously high levels of toxic heavy metals, Hain approved the use of this vitamin pre-mix based on a "theoretical" calculation of toxic heavy metals in the final good.[111]

---

[107] *Id.*

[108] *Id.*

[109] Hain, *Deviation Report, Vitamin Premix* (Nov. 26, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/11_Redacted.pdf).

[110] *Id.*

[111] *Id.*

*Hain Deviation Report, Vitamin Premix (Nov. 26, 2019)*[112]



| | QUALITY & FOOD SAFETY REVIEW | |
|---|---|---|
| Reviewed Date | 11/26/2019 | Select one: |
| | | ● Approved |
| Reviewed By | ███████ | ○ Rejected |
| | | ○ Revisions Requested |
| Comments | Vitamin premix is used at 2.08% in the rice cereal finished good C90001. Upon theoretical calculations including the 10% variation, the arsenic and lead levels in the finished product are below 100 ppb. Attached calculations. | |

To calculate the estimated quantity of lead and arsenic in the finished good, Hain considered the percentage of rice flour and vitamin pre-mix in the finished goods, and their projected amounts of arsenic and lead. Ultimately, Hain predicted that the finished good would have roughly 85 ppb arsenic and 25 ppb lead.[113]

*Hain Deviation Report, Vitamin Premix (Nov. 26, 2019)*[114]



| Item | Lot Code | Heavy Metal | Test Value (ppb) | % in formula | Hypothetical Level in finished product (ppb) | |
|---|---|---|---|---|---|---|
| Rice Flour | B160007680 | Inorganic Arsenic | 81.9 | 97.8 | 80.0982 | |
| | | Lead | 17.6 | 97.8 | 17.2128 | |
| | | Cadmium | 18.6 | 97.8 | 18.1908 | |
| Vitamin Premix | 19090122P | Inorganic Arsenic | 223 | 2.08 | 4.6384 | |
| | | Lead | 352 | 2.08 | 7.3216 | |
| | | Cadmium | 60.5 | 2.08 | 1.2584 | |
| | | Theoretical Arsenic | | | 84.7366 | 93.21026 |
| | | Theoretical Lead | | | 24.5344 | 26.98784 |
| | | Theoretical Cadmium | | | 19.4492 | 21.36412 |

However, it is not clear that Hain ever tested the finished good. Hain appears to have used this vitamin pre-mix with dangerously high levels of toxic heavy metals without ever confirming the finished good was actually safe to consume.

Hain made this decision four months ***after*** it had made a secret presentation to FDA admitting that heavily tainted vitamin premix caused dangerous levels of arsenic in its finished

---

[112] *Id.*

[113] *Id.*

[114] *Id.*

products, which initially went undetected because Hain did not test its finished products.[115] Hain made no effort to correct the problem. *Note: Full discussion of Hain's secret presentation to FDA appears in Section V., Parts D. and E., below.*

## IV.   WALMART, SPROUT ORGANIC FOODS, AND CAMPBELL REFUSED TO COOPERATE WITH THE SUBCOMMITTEE'S INVESTIGATION

Nurture, Beech-Nut, Hain, and Gerber cooperated with the Subcommittee's investigation, despite the fact that doing so exposed their reckless disregard for the health of babies. With that in mind, the Subcommittee questions why Walmart (Parent's Choice), Sprout Organic Foods, and Campbell (Plum Organics) would refuse to comply with the investigation. None of them produced testing results or specific testing standards and Sprout never even responded to the Subcommittee's repeated inquiries. The Subcommittee is greatly concerned that these companies might be obscuring the presence of even higher levels of toxic heavy metals in their baby food products than their competitors' products.

### A.   Walmart (Parent's Choice Brand)

Walmart refused to produce any documents showing its internal testing policies, its testing results, or how Walmart treats ingredients and/or products that surpass any internal standards.

Walmart's evasion is concerning, as even limited independent testing has revealed the presence of toxic heavy metals in its baby food.

*Data from Healthy Babies Bright Futures Report:  What's in My Baby's Food?*[116]

| Brand | Food | Food type | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) | Metro area where purchased | Retailer |
|---|---|---|---|---|---|---|---|---|---|
| Parent's Choice (Walmart) | Little Hearts Strawberry Yogurt Cereal Snack - Stage 3, 9+ months | Snack - other | 56.1 | – | 5.2 | 26.1 | 0.941 | Charlottesville, VA | Walmart |
| Parent's Choice (Walmart) | Organic Strawberry Rice Rusks - Stage 2, 6+ months | Snack - teething biscuits & rice rusk/cakes | 100 | 66 | 26.9 | 2.4 | 2.05 | Charlottesville, VA | Walmart |

---

[115] Hain, PowerPoint Presentation to Food and Drug Administration: *FDA Testing Result Investigation* (Aug. 1, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2.pdf).

[116] Healthy Babies Bright Futures, *What's in My Baby's Food?  A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) (online at www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

*Walmart (Parent's Choice) Baby Food that Tested High in Toxic Heavy Metals*[117]



## B.    Campbell (Plum Organics Brand)

Campbell refused to produce its testing standards and specific testing results to the Subcommittee. Campbell has hidden its policies and the actual level of toxic heavy metals in its products.

Instead of producing any substantive information, Campbell provided a spreadsheet self-declaring that every one of its products "meets criteria."[118] Campbell declined to state what those criteria are.

*Campbell's Product Heavy Metal Test Results (Excerpted Entries)*[119]

| Product Name | Testing Date | Arsenic | Cadmium | Lead | Mercury |
|---|---|---|---|---|---|
| Plum Organics® Stage 2 Apple & Carrot, 4oz | 11/1/2017 | Meets Criteria | Meets Criteria | Meets Criteria | Meets Criteria |
| Plum Organics® Stage 2 Banana & Pumpkin, 4oz | 11/1/2017 | Meets Criteria | Meets Criteria | Meets Criteria | Meets Criteria |
| Plum Organics® Mighty 4® Blends Strawberry Banana, Greek Yogurt, Kale, Oat & Amaranth, 4oz | 11/1/2017 | Meets Criteria | Meets Criteria | Meets Criteria | Meets Criteria |
| Plum Organics® Mighty Snack Bars® Strawberry, 4 0zoz (Pack of 6) | 10/29/2017 | Meets Criteria | Meets Criteria | Meets Criteria | Meets Criteria |
| Plum Organics® Mighty Nut Butter Bar™ Almond Butter (Pack of 5) | 8/29/2018 | Meets Criteria | Meets Criteria | Meets Criteria | Meets Criteria |

---

[117] Walmart, *Parent's Choice Organic Strawberry Rice Rusks* (online at www.walmart.com/ip/Parent-s-Choice-Organic-Baby-Rusks-Strawberry-Flavored/171533478) (accessed on Jan. 26, 2021).

[118] Campbell, *Product Heavy Metal Test Results* (Dec. 11, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/12.pdf).

[119] *Id.*

Campbell's testing summary hides more than it reveals, since it does not show the levels of heavy metals that the testing found or the levels of heavy metals that would "meet criteria."

The Subcommittee was disturbed that, for mercury, which is a powerful neurotoxin, Campbell notes with asterisks that it has no criterion whatsoever, stating: "No specific threshold established because no high-risk ingredients are used."[120]  However, despite Campbell having no mercury threshold, Campbell still marked every food as "meets criteria" for mercury.[121]  This misleading framing—of meeting criteria that do not exist—raises questions about what Campbell's other thresholds actually are, and whether they exist.

Campbell's evasion is concerning, as even limited independent testing has revealed the presence of toxic heavy metals in its baby food.

### *Data from Healthy Babies Bright Futures Report:  What's in My Baby's Food?*[122]

| Brand | Food | Food type | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) | Metro area where purchased | Retailer |
|---|---|---|---|---|---|---|---|---|---|
| Plum Organics | Mighty Morning Bar - Blueberry Lemon - Tots: 15 months & up | Snack - other | 40 * | 39 | 3.4 | 24.3 | <0.137 | Cincinnati, OH | Kroger |
| Plum Organics | Little Teethers Organic Multigrain Teething Wafers - Banana with Pumpkin - Baby Crawler | Snack - teething biscuits & rice rusks:cakes | 49.9 | – | 1.4 * | 6.3 | 0.726 | Columbia, SC | Publix |

---

[120] *Id.*

[121] *Id.*

[122] Healthy Babies Bright Futures, *What's in My Baby's Food?  A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) (online at www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

*Plum Organics' Foods That Tested High in Toxic Heavy Metals*[123]




### C.    Sprout Organic Foods

Sprout Organic Foods did not respond to the Subcommittee at all. Despite numerous emails to executives and its general information email address, as well as numerous attempts to reach the Sprout central office by telephone, Sprout never responded or made contact with the Subcommittee.

Sprout Organic Foods was acquired by North Castle Partners, a Greenwich, Connecticut private equity firm, in 2015. North Castle Partners also owns such well-known brands as Curves International/Jenny Craig, Palladio Beauty Group, Mineral Fusion, Red Door Spas, Performance Bicycles, Octane Fitness, Ibex Outdoor Clothing, and Doctor's Best.[124]

Whether due to evasion or negligence, Sprout's failure to respond raises serious concerns about the presence of toxic heavy metals in its baby foods, as even limited independent testing has revealed the presence of toxic heavy metals in its products.

---

[123] Plum Organics, *Little Teethers, Banana with Pumpkin* (online at www.plumorganics.com/products/banana-with-pumpkin-wafers/) (accessed Jan. 26, 2021); Plum Organics, *Mighty Morning Bar, Blueberry Lemon* (online at www.plumorganics.com/products/blueberry-lemon-bar/) (accessed Jan. 26, 2021).

[124] North Castle Partners, *Press Release: North Castle Partners Invests in Sprout Organic Foods, Inc.* (June 29, 2015) (online at www.northcastlepartners.com/wp-content/uploads/2016/01/North-Castle_Sprout-Press-Release.pdf).

*Data from Healthy Babies Bright Futures Report:  What's in My Baby's Food?*[125]

| Brand | Food | Food type | Arsenic (total, ppb) | Arsenic (inorganic, ppb) | Lead (ppb) | Cadmium (ppb) | Mercury (total, ppb) | Metro area where purchased | Retailer |
|---|---|---|---|---|---|---|---|---|---|
| Sprout | Organic Quinoa Puffs Baby Cereal Snack - Apple Kale | Snack - puffs, contains rice | 107 | 47 | 39.3 | 41.5 | 1.31 | Washington, DC | amazon.com |

*Sprout Organic Food That Tested High in Toxic Heavy Metals*[126]



## V.    FDA HAS FAILED TO CONFRONT THE RISKS OF TOXIC HEAVY METALS IN BABY FOOD.  THE TRUMP ADMINISTRATION IGNORED A SECRET INDUSTRY PRESENTATION ABOUT HIGHER AMOUNTS OF TOXIC HEAVY METALS IN FINISHED BABY FOODS.

Despite the well-known risks of harm to babies from toxic heavy metals, FDA has not taken adequate steps to decrease their presence in baby foods.  FDA has not issued thresholds for the vast majority of toxic heavy metals in baby foods and does not require warning labels on any baby food products.  In the summer of 2019, FDA received a secret presentation from a baby

---

[125] Healthy Babies Bright Futures, *What's in My Baby's Food?  A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) (online at www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

[126] Sprout Organic Foods, *Quinoa Puffs, Apple Kale* (online at www.sproutorganicfoods.com/babies/6-months-and-up/plant-power-puffs/apple-kale-plant-power-puffs) (accessed Jan. 26, 2021).

food manufacturer that revealed that the commercial process of preparing finished baby foods increases their levels of toxic heavy metals. For that manufacturer, Hain (HappyBABY), the process increased inorganic arsenic levels between 28% and 93%. Yet, FDA took no apparent action.

In May 2017, FDA established the Toxic Elements Working Group with the goal of reducing exposure to toxic elements in food, cosmetics, and dietary supplements. FDA claims that the Toxic Elements Working Group is focusing on metals "because high levels of exposure to those metals are likely to have the most significant impact on public health," and "can be especially harmful to children because of concerns about effects on their neurological development." [127] But the working group has not resulted in new or stronger regulations to protect babies from toxic heavy metals in their food.

A.    **Mercury and Cadmium**

FDA has acknowledged the dangers of mercury. Mercury has "no established health benefit" and has been "shown to lead to illness, impairment, and in high doses, death."[128] FDA has acknowledged the added risk to babies and children, noting that it is: "paying special attention to children because their smaller body sizes and metabolism may make them more susceptible to the harmful effects of these metals," including mercury.[129]

Despite these statements, FDA has taken no action to limit mercury in baby food. Instead, FDA has only set mercury standards for wheat, and fish, shellfish, and crustaceans, and they are high—1,000 ppb.[130] There are no FDA protections for mercury in baby food.

The lack of FDA action on mercury standards stands in contrast to other regulators. The EPA, for example, set a limit of 2 ppb mercury in drinking water, even after taking into account the cost of attainment for industry.[131]

---

[127] Food and Drug Administration, *Metals and Your Food* (online at www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food) (accessed Jan. 26, 2021); Food and Drug Administration, *What FDA Is Doing to Protect Consumers from Toxic Metals in Foods* (Apr. 20, 2018) (online at www.fda.gov/food/conversations-experts-food-topics/what-fda-doing-protect-consumers-toxic-metals-foods).

[128] Food and Drug Administration, *Metals and Your Food* (online at www.fda.gov/food/chemicals-metals-pesticides-food/metals-and-your-food) (accessed Jan. 26, 2021).

[129] *Id.*

[130] Food and Drug Administration, *Guidance for Industry: Action Levels for Poisonous or Deleterious Substances in Human Food and Animal Feed* (Aug. 2000) (online at www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-action-levels-poisonous-or-deleterious-substances-human-food-and-animal-feed).

[131] Environmental Protection Agency, *Ground Water and Drinking Water* (online at www.epa.gov/ground-water-and-drinking-water/national-primary-drinking-water-regulations) (accessed Jan. 26, 2021).

Similarly, FDA has taken no action on cadmium in baby food. FDA has issued only one guideline for cadmium, and that is a limit of 5 ppb for bottled water.[132] The EU has instituted a limit of 10-15 ppb for infant formula.[133]

**B.    Lead**

FDA acknowledges that there is "no identified safe blood lead level" and that lead is especially dangerous to children:

> Lead is especially harmful to vulnerable populations, including infants, young children, pregnant women and their fetuses, and others with chronic health conditions. High levels of lead exposure can seriously harm children's health and development, specifically the brain and nervous system. Neurological effects from high levels of lead exposure during early childhood include learning disabilities, behavior difficulties, and lowered IQ. Because lead can accumulate in the body, even low-level chronic exposure can be hazardous over time.[134]

FDA has taken action on bottled water, limiting lead to 5 ppb.[135] FDA has also taken steps toward regulating lead content in products for older children. FDA has released guidance recommending a maximum lead level of 100 ppb in candy likely to be consumed by children, and 50 ppb in some juices.[136] It is not sound logic to say that water is unsafe to drink if it contains over 5 ppb lead, but candy and fruit juice can be ten and twenty times higher than that limit.

Unfortunately, it appears that FDA designed these limits to be protective of industry. In its "Supporting Document for Recommended Maximum Level for Lead in Candy," FDA repeatedly emphasizes achievability by industry, as opposed to safety for children:

- "FDA believes that sugar-based candy products *can be made* with lead levels below" [100 ppb]."
- "We believe *that if milk chocolate manufacturers source their raw materials appropriately, lead levels in their finished products will not exceed* [100 ppb] lead."
- "We believe that, *if dark chocolate manufacturers source their raw materials appropriately, lead levels in their finished products will not exceed* [100 ppb]."

---

[132] 21 C.F.R. § 165 (2019) (online at www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfcfr/cfrsearch.cfm?fr=165.110).

[133] European Union, *Setting Maximum Levels for Certain Contaminants in Foodstuffs* (Dec. 19, 2006) (online at https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX:02006R1881-20150521).

[134] Food and Drug Administration, *Lead in Food, Foodwares, and Dietary Supplements* (online at www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements) (accessed Jan. 26, 2021).

[135] *Id.*

[136] *Id.*

- "[E]ven for high-chili-content candy and powdered snack mix products, *we believe that candy with appropriately sourced ingredients will not exceed* [100 ppb] lead."
- "We believe that *if manufacturers source salt to minimize lead levels, finished, high-salt- content powdered snack mix products will not exceed* [100 ppb] lead."[137]

But FDA has failed to regulate lead levels in baby foods. Manufacturers are free to set their own limits. Hain, for example, used internal soft limits of 100 and 200 ppb lead for the majority of its ingredients.

FDA *has* created what it calls an Interim Reference Level (IRL) for lead, but this standard does not apply to manufacturers and is unhelpful for parents purchasing baby food. An Interim Reference Level is what FDA calls a calculation of "the maximum daily intake for lead from food."[138] Above this limit, a person or baby's blood level would reach a "point of concern." FDA's current IRL is 3 µg per day for children. This standard, though perhaps helpful to FDA in researching and evaluating how lead affects our nation's children, is unworkable for parents. For this standard to be useful to a parent, they would need to know:

- what a µg is (it stands for a microgram);
- how much lead is in each product they are serving their baby;
- how much lead their child is exposed to through tap water; and
- how much lead is in their local environment, such as through lead-based paints.

Obtaining this information is currently impossible for parents because baby food manufacturers do not publicly provide information on the amount of lead in their products. Given the information gaps parents face, it would be most appropriate for FDA to promulgate clear rules for baby food manufacturers that limit the amount of lead in baby food.

## C.    Arsenic

In the context of arsenic in baby food, there are only two FDA regulations for specific products—an unenforceable draft guidance issued in July 2013, but never finalized, recommending an action level of 10 ppb for inorganic arsenic in single-strength (ready to drink) apple juice, and an August 2020 final guidance, setting an action level for inorganic arsenic in infant rice cereals at 100 ppb.[139]

---

[137] Food and Drug Administration, *Supporting Document for Recommended Maximum Level for Lead in Candy Likely to Be Consumed Frequently by Small Children* (Nov. 2006) (online at www.fda.gov/food/metals-and-your-food/supporting-document-recommended-maximum-level-lead-candy-likely-be-consumed-frequently-small) (emphasis added).

[138] Food and Drug Administration, *Lead in Food, Foodwares, and Dietary Supplements* (online at www.fda.gov/food/metals-and-your-food/lead-food-foodwares-and-dietary-supplements) (accessed Jan. 26, 2021).

[139] Food and Drug Administration, *Draft Guidance for Industry: Action Level for Arsenic in Apple Juice* (July 2013) (online at www.fda.gov/regulatory-information/search-fda-guidance-documents/draft-guidance-industry-action-level-arsenic-apple-juice); Food and Drug Administration, *Guidance for Industry: Action Level for*

The first problem with these standards is that they cover only a small sliver of the foods babies eat.

The second problem is that they are far too lax to be protective of babies. There is no established safe level of inorganic arsenic consumption for babies. Arsenic exposure has a "significant negative effect on neurodevelopment."[140] FDA acknowledged that "Low-to-moderate levels of inorganic arsenic appear to be associated with adverse health effects during childhood."[141] Children exposed to water with an arsenic concentration of just 5 ppb "showed significant reductions in Full Scale, Working Memory, Perceptual Reasoning and Verbal Comprehension scores."[142] This suggests that 5 ppb may be an important threshold, or that the threshold of safety may fall far below that.

Healthy Babies Bright Futures has called for a goal of no measurable amount of inorganic arsenic in baby food.[143] Consumer Reports suggests that the level of inorganic arsenic should be set as low as 3 ppb for water and fruit juices.[144]

FDA has already set inorganic arsenic levels at 10 ppb for bottled water.[145] EPA has similarly set a 10 ppb inorganic arsenic cap on water, as have the European Union and the World Health Organization.[146]

---

*Inorganic Arsenic in Rice Cereals for Infants* (Aug. 2020) (online at www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-action-level-inorganic-arsenic-rice-cereals-infants).

[140] Miguel Rodríguez-Barranco et al., *Association of Arsenic, Cadmium and Manganese Exposure with Neurodevelopment and Behavioural Disorders in Children: A Systematic Review and Meta-Analysis* (Apr. 9, 2013) (online at www.sciencedirect.com/science/article/abs/pii/S0048969713003409?via%3Dihub).

[141] Food and Drug Administration, *Arsenic in Rice and Rice Products Risk Assessment Report* (Mar. 2016) (online at www.fda.gov/files/food/published/Arsenic-in-Rice-and-Rice-Products-Risk-Assessment-Report-PDF.pdf).

[142] Gail A. Wasserman et al., *A Cross-Sectional Study of Well Water Arsenic and Child IQ in Maine Schoolchildren* (Apr. 1, 2014) (online at https://ehjournal.biomedcentral.com/articles/10.1186/1476-069X-13-23).

[143] Healthy Babies Bright Futures, *What's in My Baby's Food? A National Investigation Finds 95 Percent of Baby Foods Tested Contain Toxic Chemicals That Lower Babies' IQ, Including Arsenic and Lead* (Oct. 2019) (online at www.healthybabyfood.org/sites/healthybabyfoods.org/files/2019-10/BabyFoodReport_FULLREPORT_ENGLISH_R5b.pdf).

[144] Consumer Reports, *Arsenic in Some Bottled Water Brands at Unsafe Levels, Consumer Reports Says* (June 28, 2019) (online at www.consumerreports.org/water-quality/arsenic-in-some-bottled-water-brands-at-unsafe-levels/); Consumer Reports, *Arsenic and Lead Are in Your Fruit Juice: What You Need to Know* (Jan. 30, 2019) (online at www.consumerreports.org/food-safety/arsenic-and-lead-are-in-your-fruit-juice-what-you-need-to-know/).

[145] Food and Drug Administration, *Arsenic in Food and Dietary Supplements* (online at www.fda.gov/food/metals-and-your-food/arsenic-food-and-dietary-supplements) (accessed Jan. 26, 2021).

[146] Environmental Protection Agency, *Drinking Water Requirements for States and Public Water Systems* (online at www.epa.gov/dwreginfo/chemical-contaminant-rules) (accessed Jan. 26, 2021); The European Food Information Council, *Arsenic (Q&A)* (online at www.eufic.org/en/food-safety/article/arsenic-qa) (accessed Jan. 26, 2021); World Health Organization, *Arsenic* (Feb. 15, 2018) (online at www.who.int/news-room/fact-sheets/detail/arsenic).

FDA is fully aware of the dangers that inorganic arsenic presents to young children, stating that:

> There is growing evidence … that exposure to inorganic arsenic during…infancy…may increase the risk of adverse health effects, including impaired development during…childhood and neurodevelopmental toxicity in infants and young children, and that these adverse effects may persist later in life …. [C]hildren may likewise be particularly susceptible to neurotoxic effects of inorganic arsenic, e.g., as manifested in intelligence test results in children …. Also, children three years and younger have the highest exposure to inorganic arsenic because they have 2-3-fold higher intakes of food on a per body mass basis as compared to adults. Therefore, a child's daily exposure to contaminants in food, such as inorganic arsenic in rice, could potentially be much higher than that of adults.[147]

Yet, in the one category of baby food for which FDA has finalized a standard—infant rice cereal—it set the maximum inorganic arsenic content at the dangerous level of 100 ppb.

Why did FDA set its level so high? Because in developing the limit, FDA was focused on the level of inorganic arsenic that would cause cancer. FDA disregarded the risk of neurological damage, which happens at a much lower level. In its 2016 Risk Assessment Report, FDA was able to quantify the risk of lung and bladder cancer that inorganic arsenic presents. It was not able to quantify the risks of neurological development for infants.[148] As a result, the 100 ppb limit is too high to adequately protect infants and children from the effects of inorganic arsenic.

The third problem is that FDA's piecemeal approach of setting different inorganic arsenic standards for different products is logically unsound. There can be only one safe level for inorganic arsenic in the foods that babies consume. All finished baby food products should accord with this safe level.

Aside from these guidance documents for infant rice cereal and apple juice, FDA does not regulate toxic heavy metals in other baby food products.

One example of how this approach is failing is with FDA's decision to release draft guidance for apple juice, but not any other fruits juices. Based on the testing results the Subcommittee reviewed, baby food companies routinely exceed this draft limit of 10 ppb in other types of commonly consumed juices. Gerber, for example, used grape juice concentrate registering at 39 ppb inorganic arsenic. But because it was grape juice, as opposed to apple

---

[147] Food and Drug Administration, *Supporting Document For Action Level For Inorganic Arsenic In Rice Cereals For Infants* (Aug. 2020) (online at www.fda.gov/food/chemical-metals-natural-toxins-pesticides-guidance-documents-regulations/supporting-document-action-level-inorganic-arsenic-rice-cereals-infants#introduction).

[148] Food and Drug Administration, *Arsenic in Rice and Rice Products Risk Assessment Report* (Mar. 2016) (online at www.fda.gov/files/food/published/Arsenic-in-Rice-and-Rice-Products-Risk-Assessment-Report-PDF.pdf).

juice—which, from a safety perspective, is a distinction without a difference—Gerber incorporated in its products juice concentrate with high arsenic levels.

The fourth problem with FDA's piecemeal approach is that it appears designed to be protective of baby food manufacturers. In developing the infant rice cereal limit of 100 ppb, FDA considered an "achievability assessment." The achievability assessment considered "manufacturers' ability to achieve hypothetical maximum limits for inorganic arsenic in infant rice cereals...."[149] FDA considered samples taken from three time periods: 2011-2013, 2014, and 2018. As shown below, over time, the number of samples that tested under 100 ppb inorganic arsenic increased from 36% to 76% of the total number of samples. FDA noted that this increase meant "alternate sources of rice are available to enable infant rice cereal manufacturers to supply the market and meet the" 100 ppb level.[150] In short, FDA's standard reflects manufacturers' ease of compliance, rather than babies' safety.

If it is not possible, or it is exceedingly costly, to source ingredients like rice that achieve a safe level, then baby food manufacturers should find substitutes for those ingredients. Our nation's children should not bear lifelong health burdens because of a manufacturer's preference for tainted ingredients.

### D.    The Trump Administration Ignored A Secret Industry Presentation About Higher Risks Of Toxic Heavy Metals In Baby Foods.

On August 1, 2019, the Trump administration received a secret industry presentation that disclosed higher risks of toxic heavy metals in finished baby food products. Hain (Earth's Best Organic) revealed the finding in a presentation to FDA entitled "FDA Testing Result Investigation."[151]

---

[149] Food and Drug Administration, *Supporting Document for Action Level for Inorganic Arsenic in Rice Cereals for Infants* (Aug. 2020) (online at www.fda.gov/food/chemical-metals-natural-toxins-pesticides-guidance-documents-regulations/supporting-document-action-level-inorganic-arsenic-rice-cereals-infants#introduction).

[150] *Id.*

[151] Hain, *PowerPoint Presentation to Food and Drug Administration: FDA Testing Result Investigation* (Aug. 1, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2.pdf).



FDA Testing Result Investigation
August 1, 2019



Confidential Business Information – Not Subject to Freedom of Information Act
Confidential Business Information                                    Hain-000154

Hain revealed that half (10 of 21) of the finished rice products that Hain tested contained 100 ppb or more of inorganic arsenic—exceeding FDA's standard for infant rice cereal. One product contained almost 30% more, registering at 129 ppb inorganic arsenic.

| FDA Data | | | | Estimate % Avg FG | | | Track & Trace Data | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| FDA Sample Number | Best By Date | Lot number | FDA FG Inorganic Arsenic (ppb) | Increase from Avg Raw | Packaging Date | WIP Batch | Rice Flour Lot #s | Type of Arsenic Test | Raw Material Results (ppb) | Avg Raw Result |
| 1024309 | 4/27/19 | BN I 2216 | 129 | 93% | 11/3/17 | 204146 | B160005305 | Total Arsenic | 69 | 67.0 |
| | | | | | | | B160005306 | Total Arsenic | 76 | |
| | | | | | | | B160005512 | Total Arsenic | 62 | |
| | | | | | | | B160005152 | Total Arsenic | 61 | |

Hain's average level of inorganic arsenic in its finished rice foods was 97.62 ppb, which nearly matches FDA's dangerously high 100 ppb level for inorganic arsenic for infant rice cereal.

Hain claims that it "revised its internal policies and testing standards to conform to FDA's non-binding recommendations."[152] In 2016, FDA instituted draft guidance (which is now final) for inorganic arsenic in infant rice cereal at the dangerously high level of 100 ppb. However, Hain has not consistently abided by those limits.

FDA also learned that Hain's policy to test ingredients underrepresented the levels of toxic heavy metals in its finished baby foods. Hain's finished products contained between 28% and 93% more inorganic arsenic than Hain estimated they would based on Hain's ingredient

---

[152] Letter from Kelly B. Kramer, Counsel for The Hain Celestial Group, Inc. to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 11, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/9_Redacted.pdf).

testing method.[153]  Hain found higher levels of arsenic in **all** finished foods tested for this FDA presentation than were reflected in tests of individual raw ingredients.  This revelation means that every single finished good containing brown rice had more arsenic than the company's estimates, which were based on testing the raw ingredients.

After seeing these results, FDA was put on notice that finished baby foods pose an even higher risk to babies than reflected in company tests of the raw ingredients that go into those finished products.

***Final Product Data Compared to Raw Ingredient Data, From Hain's Presentation to FDA***[154]

| FDA Sample Number | Best By Date | Lot number | FDA FG Inorganic Arsenic (ppb) | Avg FG Result | Estimate % Avg FG Increase from Avg Raw | Packaging Date | WIP Batch | Rice Flour Lot #s | Type of Arsenic Test | Raw Material Results (ppb) | Avg Raw Result |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1017814 | | BN A 0636 | 94 | | | | | B160004661 | Total Arsenic | 54 | |
| | | | | | | | 199987 | B160004870 | Total Arsenic | 58 | 56.3 |
| 1088929 | 3/2/19 | BN C 1139 | 83 | 80.3 | 43% | 9/8/17 | | B160004759 | Total Arsenic | 57 | |
| | | | | | | | | B160004659 | Total Arsenic | 54 | |
| 1036633 | | BN F 1648 | 64 | | | | 197594 | B160004870 | Total Arsenic | 58 | |
| | | | | | | | | B160004759 | Total Arsenic | 57 | |
| 1039750 | 3/8/19 | BN E | 74 | 74.0 | 29% | 9/14/17 | 200408 | B160004871 | Total Arsenic | 60 | |
| | | | | | | | | B160004870 | Total Arsenic | 58 | 57.3 |
| | | | | | | | | B160004661 | Total Arsenic | 54 | |
| 1041752 | 3/20/19 | BN G | 92 | | | 9/26/17 | | B160005149 | Total Arsenic | 65 | |
| 1037983 | | BN E 1536 | 67 | 96.0 | 57% | | 200651 | | | | |
| 1041751 | 3/21/19 | BN B 0832 | 108 | | | | | B160004873 | Total Arsenic | 58 | 61.3 |
| 1038677 | | BN B 0932 | 116 | | | 9/27/17 | | B160005157 | Total Arsenic | 62 | |
| 1026932 | | BN D 1248 | 97 | | | | | B160004871 | Total Arsenic | 60 | |
| 1044380 | 4/11/19 | BH C | 100 | 100.0 | 69% | 10/18/17 | 201873 | B160005148 | Total Arsenic | 61 | |
| | | | | | | | | B160004872 | Total Arsenic | 55 | 59.0 |
| | | | | | | | | B160005152 | Total Arsenic | 61 | |
| 1024309 | 4/27/19 | BN I 2216 | 129 | 129.0 | 51% | 11/3/17 | 204166 | B160005305 | Total Arsenic | 69 | |
| | | | | | | | | B160005306 | Total Arsenic | 76 | 67.0 |
| | | | | | | | | B100005312 | Total Arsenic | 62 | |
| | | | | | | | | B160005152 | Total Arsenic | 61 | |
| 1024210 | 6/6/19 | BN I 2241 | 94 | | | 12/13/17 | | B160005515 | Total Arsenic | 63 | |
| 547103 | | BN I 2339 | 115 | | | | | | | | |
| 1013927 | 6/7/19 | BN E 1540 | 92 | 101.0 | 61% | 12/14/17 | 206697 | B160005513 | Total Arsenic | 60 | 62.7 |
| 1026516 | | BN H 2128 | 104 | | | | | | | | |
| 1074288 | 6/8/19 | BNE 1406 | 106 | | | 12/15/17 | | | | | |
| 1035738 | 6/13/19 | BN I 0000 | 96 | | | 12/20/17 | | B160005150 | Total Arsenic | 65 | |
| 1047511 | 6/27/19 | BN C 1142 | 100 | 100.0 | 56% | 1/3/18 | 208226 | B160006180 | Inorganic Arsenic | 73 | 64.0 |
| | | | | | | | | B160005581 | Total Arsenic | 55 | |
| 1063061 | 7/19/19 | BN I | 115 | 115.0 | 43% | 1/25/18 | 208594 | B160006189 | Inorganic Arsenic | 81 | 80.5 |
| | | | | | | | | B160006191 | Inorganic Arsenic | 80 | |
| 1027437 | 8/18/19 | BN A 0703 | 97 | 97.0 | 28% | 2/24/18 | 210374 | B160006265 | Inorganic Arsenic | 77 | |
| | | | | | | | | B160006263 | Inorganic Arsenic | 74 | 75.7 |
| | | | | | | | | B160006260 | Inorganic Arsenic | 76 | |
| 784399 | 11/23/19 | BN K 0305 | 108 | 108.0 | 31% | 6/1/18 | 215305 | B160007235 | Inorganic Arsenic | 66 | 82.5 |
| | | | | | | | | B160006755 | Inorganic Arsenic | 99 | |

Hain admitted to FDA in its presentation that "Brown Rice Flour testing results do not appear to be correlated to finished good results data."[155]  They are not correlated because the finished goods can contain as much as double the amount of arsenic as the raw ingredients.

---

[153] Hain, *PowerPoint Presentation to Food and Drug Administration:  FDA Testing Result Investigation* (Aug. 1, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2.pdf).

[154] *Id.*

[155] *Id.*

What can account for this increase in inorganic arsenic from the time the ingredients are tested to the time the products are finished? Hain conveyed to FDA that the cause of the increase was Hain's use of a dangerous additive, stating: "Preliminary investigation indicates Vitamin/Mineral Pre-Mix may be a major contributing factor." Although this additive may only make up roughly 2% of the final good, Hain suggested it was still responsible for the spike in the levels of inorganic arsenic in the finished baby food.[156]

Hain's finding accords with the Subcommittee's own. In the test results we reviewed, Hain used vitamin pre-mix that contained 223 ppb arsenic.[157] This ingredient also contained 352 ppb lead, a matter not even addressed in the FDA presentation.

### Hain's Raw Material Pre-Shipment Test Data History (Excerpted Entry)[158]



| Lab Results Date | Vendor Name | Item Number | Product Description | Status | Comments on Status | Lab | Spec Based On | Arsenic Spec Limit (ppb) | Arsenic Result (ppb) | Lead Spec Limit (ppb) | Lead Result (ppb) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Nov/26/2019 | Wright Enrichment | 5316067 | Vitamin Pre Mix | Deviation Approved | Accepted on deviation 20190236 | Eurofins/Covance | As Purchased | 100 | 223 | 100 | 352 |

Therefore, naturally occurring toxic heavy metals may not be the only problem causing dangerous levels of toxic heavy metals in baby foods; rather, baby food producers like Hain are adding ingredients that have high levels of toxic heavy metals into their products, such as vitamin/mineral pre-mix.

FDA did not appear to take any unplanned actions on behalf of babies' safety after it received Hain's presentation. FDA did finalize a previously planned guidance, setting a limit of 100 ppb inorganic arsenic in infant rice cereal. But it did not initiate regulation of additives like Hain's vitamin/mineral pre-mix. Moreover, it has not mandated that baby food manufacturers test finished goods.

### E.    Corporate Testing Policies Hide the Truth: In Addition to Hain, Beech-Nut and Gerber Also Fail to Test Finished Product, Risking an Undercount of Toxic Heavy Metals in Their Finished Baby Foods.

Hain (Earth's Best Organic) revealed to FDA that its policy to test only its ingredients, and not its final product, is underrepresenting the levels of toxic heavy metals in its baby foods. Unfortunately, Hain is not alone. The majority of baby food manufacturers, including Beech-Nut and Gerber, employ the same policy of testing only ingredients.[159] That policy recklessly

---

[156] *Id.*

[157] Hain, Raw Material Pre-Shipment Test Data History (Dec. 11, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/3_0.pdf).

[158] *Id.*

[159] Letter from the President and CEO of Beech-Nut Nutrition Company to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 6, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/6_0.pdf) ("we do not test finished goods"); Letter from the Chief Executive Officer of Gerber Products Company to Chairman Raja Krishnamoorthi, Subcommittee on Economic and Consumer Policy, Committee on Oversight and Reform (Dec. 19,

endangers babies and children and prevents the companies from even knowing the full extent of the danger presented by their products.

As the Hain presentation lays bare, ingredient testing does not work. Hain's finished baby foods had more arsenic than their ingredients 100% of the time—28-93% more inorganic arsenic.[160] That means that only testing ingredients gives the false appearance of lower-than-actual toxic heavy metal levels.

## VI.    RECOMMENDATIONS AND CONSIDERATIONS FOR INDUSTRY, PARENTS, AND REGULATORS:  DO HIGHLY TAINTED INGREDIENTS LIKE RICE BELONG IN BABY FOOD?

Baby food manufacturers hold a special position of public trust. Consumers believe that they would not sell unsafe products. Consumers also believe that the federal government would not knowingly permit the sale of unsafe baby food. As this staff report reveals, baby food manufacturers and federal regulators have broken the faith.

Step one to restoring that trust is for manufacturers to voluntarily and immediately reduce the levels of toxic heavy metals in their baby foods to as close to zero as possible. If that is impossible for foods containing certain ingredients, then those ingredients should not be included in baby foods.

One example of an ingredient that might not be suitable for baby foods is rice. Throughout this report, rice appeared at or near the top of every list of dangerous baby foods.

- For Hain (Earth's Best Organic), organic brown rice was the ingredient that tested highest in inorganic arsenic—309 ppb. Indeed, the majority of Hain ingredients that exceeded 100 ppb inorganic arsenic in testing (13 of 24) were organic brown rice flour.[161]
- For Beech-Nut, the majority of its ingredients that tested over 100 ppb inorganic arsenic (27 of 45) were rice-based (either rice, rice flour, or organic rice).[162]

---

2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/7_Redacted.pdf) (Gerber's policy is to "regularly test our ingredients, and periodically test... finished goods"); Hain, *Testing And Release Procedure For Baby Food Ingredients* (Dec. 11, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/8_Redacted.pdf) (Hain only tests raw ingredients; their testing policy applies only to ingredients and the vast majority of the testing information they provided to the Subcommittee was raw ingredient testing.).

[160] Hain, *PowerPoint Presentation to Food and Drug Administration:  FDA Testing Result Investigation* (Aug. 1, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2.pdf).

[161] *Id.*

[162] Beech-Nut, Raw Material Heavy Metal Testing (Dec. 6, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/4.xlsx).

- A significant number of the Nurture products that exceeded 100 ppb inorganic arsenic were rice products.[163]
- Gerber used 67 batches of rice flour with over 90 ppb inorganic arsenic. [164]

Further, rice and rice flour constitute a large proportion by volume of the baby foods that contain them. Therefore, increased toxic heavy metal levels in rice and rice flour could have a significant impact on the safety of the finished product.

If certain ingredients, like rice, are highly tainted, the answer is not to simply lower toxic heavy metal levels as much as possible for those ingredients, the answer is to stop including them in baby foods. The Subcommittee urges manufacturers to make this change voluntarily.

Similar considerations must be made for other ingredients that consistently contain higher levels of toxic heavy metals—ingredients like cinnamon, amylase, BAN 800, and vitamin premix. Manufacturers suggest that these additives, though high in toxic heavy metals, are not a concern because they make up a low percentage of the final food product. However, those manufacturers do not test their final food products, which is the only way to determine safety. Manufacturers should voluntarily commit to testing all of their finished baby food products, as opposed to just the ingredients. If they refuse, FDA should require them to do so.

The Subcommittee recommends the following:

- **Mandatory Testing**: Only one of the companies reviewed by the Subcommittee routinely tests its finished baby foods, even though the industry is aware that toxic heavy metals levels are higher after food processing. Baby food manufacturers should be required by FDA to test their finished products for toxic heavy metals, not just their ingredients.
- **Labeling**: Manufacturers should by required by FDA to report levels of toxic heavy metals on food labels.
- **Voluntary Phase-Out of Toxic Ingredients**: Manufacturers should voluntarily find substitutes for ingredients that are high in toxic heavy metals, or phase out products that have high amounts of ingredients that frequently test high in toxic heavy metals, such as rice.
- **FDA Standards**: FDA should set maximum levels of inorganic arsenic, lead, cadmium, and mercury permitted in baby foods. One level for each metal should apply across all baby foods. The level should be set to protect babies against the neurological effects of toxic heavy metals.
- **Parental Vigilance**: Parents should avoid baby food products that contain ingredients testing high in heavy metals, such as rice products. The implementation of recommendations one through four will give parents the information they need to make informed decisions to protect their babies.

---

[163] Nurture, *Heavy Metal Test Results For Baby Food Products* (Dec. 18, 2019) (online at http://oversight.house.gov/sites/democrats.oversight.house.gov/files/1.xlsx).

[164] Gerber, *Raw Material Heavy Metal Testing* (Dec. 9, 2019) (online at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/5_0.pdf).

## VII.    CONCLUSION

The Subcommittee's investigation proves that commercial baby foods contain dangerous levels of arsenic, lead, mercury, and cadmium.  These toxic heavy metals pose serious health risks to babies and toddlers.  Manufacturers knowingly sell these products to unsuspecting parents, in spite of internal company standards and test results, and without any warning labeling whatsoever.

Last year, the Trump administration ignored new information contained in a secret industry presentation to federal regulators about toxic heavy metals in baby foods.  On August 1, 2019, FDA received a secret slide presentation from Hain, the maker of Earth's Best Organic baby food, which revealed that finished baby food products contain even higher levels of toxic heavy metals than estimates based on individual ingredient test results.  One heavy metal in particular, inorganic arsenic, was repeatedly found to be present at 28-93% higher levels than estimated.

The time is now for FDA to determine whether there is any safe exposure level for babies to inorganic arsenic, lead, cadmium, and mercury, to require manufacturers to meet those levels, and to inform consumers through labels.